Theresa STIEBERGER, individually and on behalf of other persons similarly situated; and the City of New York, Plaintiffs,

v.

Margaret M. HECKLER, Secretary, United States Department of Health and Human Services; Martha McSteen, Commissioner of the Social Security Administration; Louis B. Hays, Acting Director, Office of Programs and Policy, Social Security Administration; Frank V. Smith III, Associate Commissioner of Hearings and Appeals, Social Security Administration; and Paul Rosenthal, Chief Administrative Law Judge, Office of Hearings and Appeals, Social Security Administration, Defendants.

No. 84 CIV 1302 (LBS).

United States District Court, S.D. New York.

Aug. 19, 1985.

M.F.Y. Legal Services, Inc., New York City (Carolyn A. Kubitschek, Ralph Bird, New York City, of counsel), American Civil Liberties Union Foundation, New York City (Burt Neuborne, Carl Loewenson, Jr.,

New York City, of counsel), for individual plaintiffs and class representatives.

Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, New York City (Mary McCorry, Asst. Corp. Counsel, New York City, of counsel), for City of New York.

Richard K. Willard, Acting Asst. Atty. Gen., Civ. Div., Dept. of Justice, Washington, D.C. (Brook Hedge, Lewis K. Wise, Brian G. Kennedy, Robert S. Lavet, Washington, D.C., of counsel), Terry Coleman Acting Gen. Counsel, Dept. of Health and Human Services, Washington, D.C. (Donald Gonya, Washington, D.C., of counsel), Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City (Frederick M. Lawrence, Asst. U.S. Atty., Mark S. Sochaczewsky, Sp. Asst. U.S. Atty., New York City, of counsel), for defendants.

TABLE OF CONTENTS

I. INTRODUCTION 1321

II. FACTS 1323

III. MOTIONS CONCERNING INDIVIDUAL NAMED PLAINTIFFS 1325

 A. Defendants' Motion to Remand (Stieberger) 1325
 B. Motions to Intervene (Happy, Vega) 1326
 C. Motions to Consolidate (Sullivan, Johnson) 1326

IV. CLASS CERTIFICATION 1327

V. JURISDICTIONAL ISSUES 1328

 A. Social Security Act Jurisdiction: Section 405(g) 1328
 1. Presentment 1329
 2. Exhaustion 1329
 3. Sixty Day Limitation 1330
 B. Mandamus Jurisdiction: Section 1361 1334
 C. Standing of City of New York 1337

VI. PRELIMINARY INJUNCTION 1340

 A. The Standard 1340
 B. Irreparable Harm 1341
 C. Likelihood of Success on the Merits 1342
 1. Non-Acquiescence 1342
 a. Non-Acquiescence in Second Circuit Precedent 1343
 b. Congressional Ratification of Defendants' Treating Physician Rule 1349
 c. The Legality of Non-Acquiescence 1350
 (i) The Original Non-Acquiescence Policy 1351
 (ii) Interim Circular No. 185 1367
 d. Propriety of Injunctive Relief 1375
 2. Bellmon Review 1376
 a. Introduction 1376
 b. Legal Issues 1379
 (i) Standing 1380
 (ii) Mootness 1381
 (iii) Waiver 1381
 (iv) The Legality of Bellmon Review 1386
 (a) The Bellmon Amendment 1388
 (b) Justification for Agency Focus on Allowance Decisions 1390
 (c) Evidence of Bellmon Review's Impact on ALJ Impartiality 1393
 3. Conclusion 1398

VII. RELIEF 1399

APPENDIX
 A. Order
 B. Papers Filed by Parties in Connection with Motions
 C. Interim Circular No. 185

## OPINION

SAND, District Judge.

### I. INTRODUCTION

Plaintiffs, Theresa Stieberger and the City of New York, have instituted this action to challenge two policies of the United States Department of Health and Human Services ("HHS") and the Social Security Administration ("SSA"), as implemented by the abovenamed defendants.[1] Plaintiffs challenge: (1) the "non-acquiescence" policy, under which Administrative Law Judges ("ALJs") have been instructed to disregard the decisions of federal courts within the circuit in which they sit when those decisions conflict with the Secretary's own policies; and (2) the "Bellmon Review" policy, under which, *inter alia*, the decisions of ALJs with a high percentage of pro-claimant determinations in disability benefit cases were subject to agency-initiated review by the agency's Appeals Council.

Plaintiffs contend that the non-acquiescence policy has deprived them of access to impartial and decisionally independent ALJs and has unlawfully discriminated between those claimants who are able to secure judicial review and those who do not have access to judicial review in violation of the Administrative Procedure Act ("APA"), the Social Security Act, the Due Process Clause of the Fifth Amendment to the United States Constitution, and the principle of separation of powers. Plaintiffs contend that the Bellmon Review policy has deprived them of access to impartial and decisionally independent ALJs in violation of the APA, the Social Security Act, and the Due Process Clause of the Fifth Amendment to the United States Constitution and has unlawfully discriminated against disability benefits claimants in violation of the Due Process Clause of the Fifth Amendment[2] by subjecting ALJ decisions to Bellmon Review because such decisions are unfavorable to the government. Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

Six motions are presently pending before this Court. Plaintiffs' four motions were filed on October 23, 1984. First, Patricia Happy and Angel Vega have moved pursuant to F.R.Civ.P. 24 to intervene. Second, Milagros Sullivan and Harold Johnson have moved pursuant to F.R.Civ.P. 42 to have their cases consolidated with the above-captioned action. Third, plaintiffs[3] have moved pursuant to F.R.Civ.P. 23 to certify this action as a class action. Fourth, plaintiffs have moved pursuant to F.R.Civ.P. 65 for a preliminary injunction (1) enjoining defendants from continuing their Bellmon Review and non-acquiescence policies, (2) notifying agency employees and their agents who adjudicate disability claims in New York that they are to decide cases in accordance with the precedents of the United States Court of Appeals for the Second

---

**1.** Jurisdiction is alleged to be proper under 42 U.S.C. §§ 405(g) (Title II of the Social Security Act) and 1383(c)(3) (Title XVI of the Social Security Act), and 28 U.S.C. §§ 1331 and 1361.

**2.** The Due Process Clause of the Fifth Amendment, which applies to the federal government, has been construed as including an equal protection component similar to that which is made applicable to the states under the Fourteenth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**3.** Plaintiffs Stieberger and the City of New York, proposed plaintiff-intervenors Happy and Vega,

and plaintiffs Sullivan and Johnson will be collectively referred to for simplicity as "plaintiffs." The abovecaptioned defendants will be collectively referred to for simplicity as "defendants" or "the Secretary."

 Defendant Frank V. Smith III has been added as a defendant pursuant to F.R.Civ.P. 25(d) in substitution for Louis B. Hays in his capacity as Associate Commissioner of Hearings and Appeals. Defendant Paul Rosenthal has been substituted for Philip T. Brown pursuant to F.R. Civ.P. 25(d). *See* Mason Aff. n. 1.

Circuit, (3) an order granting the individual named plaintiffs interim benefits pending final judgment;[4] and (4) ordering defendants to (a) identify class members, (b) notify them that their denial or termination of benefits may have been wrongful,[5] and (c) develop a procedure for claimants to renew their claims.[6]

On October 4, 1984, defendants moved pursuant to 42 U.S.C. § 405(g) to remand plaintiff Stieberger's case to the Secretary. Defendants subsequently moved on February 4, 1985 to dismiss pursuant to F.R. Civ.P. 12(b)(1) and (6) or alternatively for summary judgment pursuant to F.R.Civ.P. 56. Defendants' motion to dismiss or for summary judgment seeks to dismiss the Bellmon Review claim in its entirety based on lack of standing, mootness, waiver, and on the merits, and seeks to dismiss the non-acquiescence claim on mootness grounds based on alleged congressional ratification of the Secretary's policy for evaluating the opinion of a claimant's treating physician. *See* Defendants' Memorandum of Law (i) In Support of Motion to Dismiss, etc., at 2, 12–24.[7]

On February 4, 1985, oral argument was held on the aforementioned motions. At that time, the Court directed counsel for defendants to secure a review of the SSA's non-acquiescence policy by officials at the highest levels of HHS and to submit a supplemental memorandum concerning the legal issues raised by the policy. *See* Transcript of Oral Argument ("Tr. I") 52, 58, 64. After a review of the policy by the Undersecretary of HHS, the Acting Commissioner of Social Security and the Acting General Counsel of HHS, defendants filed their Memorandum Concerning Instruction to Administrative Law Judges on March 4, 1985. The Court also requested plaintiffs to address the issue of the scope of the proposed class and to give consideration to whether the proposed class definition could be narrowed so as to exclude claimants whose claims were denied for reasons unrelated to the issues in this case. Tr. I 22–23.

By order dated March 8, 1985, plaintiffs' class certification and preliminary injunction motions were referred to Magistrate Naomi Reice Buchwald for report and recommendation. After conducting an oral argument on April 1, 1985, *see* Transcript of Oral Argument ("Tr. II"), the Magistrate issued her report and recommendation on May 8, 1985. The Magistrate recommended that plaintiffs' motion for class certification be granted and that plaintiffs' motion for preliminary injunctive relief enjoining defendants from continued implementation of the Bellmon Review and non-acquiescence policies be granted as well. The Magistrate also recommended that defendants be ordered to identify with reasonable promptness all members of the class.

On June 3, 1985, defendants filed objections to virtually all of the Magistrate's Report.[8] Plaintiffs filed responsive papers on June 21, 1985, in which they essentially objected to that portion of the Magistrate's Report concerning defendants' alleged non-

---

4. This request was granted by Order of this Court dated February 11, 1985.

5. Plaintiffs have orally acknowledged that notification to claimants is unnecessary (with one exception discussed at page 1341 *infra*) at the preliminary injunction stage. *See* Transcript of Oral Argument Before Magistrate Buchwald ("Tr. II") 8–9.

6. These motions were originally made returnable on November 8, 1984. Despite the urgency of these proceedings and plaintiffs' desire for immediate injunctive relief, the return date for these motions was adjourned to February 7, 1985 upon the consent of the parties and with the approval of the Court in order to give the parties the opportunity to fully consider the wisdom of their respective positions. For similar reasons, both parties were also granted ad-

ditional time in which to respond to the Magistrate's Report.

7. These issues are dealt with in conjunction with our discussion of plaintiffs' motion for preliminary injunctive relief.

8. Defendants do not object to the procedural background (pages 1–4); the description of each named plaintiff's claim (pages 4–8); the description of the administrative review process (pages 8–10), or the Report's discussion of the question whether the Secretary was non-acquiescing with respect to Second Circuit cases on the evaluation of pain (pages 29–33). *See* Defendants' Objections to Magistrate's Report and Recommendation, at 1 n. 1.

acquiescence in Second Circuit predecent concerning the evaluation of a claimant's complaints of pain. Defendants filed a supplemental memorandum on July 15, 1985 concerning recent developments in two cases which are relevant to this action and a reply memorandum on July 16, 1985 in response to plaintiffs' responsive papers. Pursuant to 28 U.S.C. § 636, we have reviewed *de novo* those portions of the Report to which objection has been made.[9]

For the reasons set forth below, (1) Patricia Happy's motion to intervene is granted and Angel Vega's motion to intervene is dismissed as moot; (2) the motion to consolidate the cases of Milagros Sullivan and Harold Johnson with this action is granted; (3) the motion to certify this action as a class action is granted as set forth in the Order issued in conjunction with this Opinion (Appendix A); (4) the motion to enjoin the defendants' current non-acquiescence policy is granted under the terms set forth in this Court's Order; and (5) the motion to enjoin the defendants' current Bellmon Review program is denied. Defendants' motion to dismiss, or in the alternative for summary judgment, is denied, and defendants' motion to remand plaintiff Stieberger is denied.

## II. FACTS

In light of the Magistrate's thorough and helpful description of the facts and administrative review process and the absence of objections thereto, we hereby adopt and set forth this portion of the Magistrate's Report:

### "FACTUAL BACKGROUND

*The Individual Plaintiffs*

"This action was originally commenced by plaintiff Theresa Stieberger *pro se* on February 23, 1984. On August 3, 1984, before defendants had answered the Complaint, an Amended Complaint was filed as of right by plaintiff Stieberger, individually, and on behalf of all similarly situated persons who had been denied disability benefits, and by the City of New York. Two other individual plaintiffs, Patricia Happy and Angel Vega, moved to intervene in this action on behalf of themselves and all others similarly situated. In addition, individual plaintiffs Milagros Sullivan and Harold Johnson seek to have their cases consolidated with this pending action.[4] ([4] Plaintiffs assert that Judge Sand's order granting interim benefits constitutes a de facto denial of defendants' motion for remand filed on October 4, 1984 and a grant of the motions for intervention and consolidation. Tr. II 97–98.) A brief description of the individual plaintiffs and their claims follow.

"Theresa Stieberger is 54 years old, and was first given SSI benefits because of mental problems in 1974. In 1978, she missed an appointment with a consulting physician because her son was ill, and her benefits were cut off. Not allowed to reapply immediately, she reapplied on April 7, 1983 for SSI and SSDI benefits. Her applications were rejected on June 21, 1983 and after two reconsiderations, she appeared *pro se* before an ALJ for a hearing [held in July 1983]. In August, 1983, the ALJ rendered a decision against Mrs. Stieberger. He rejected the determination of her treating physician that she was totally disabled by degenerative joint disease in the lower thoracic and lumbar spine, calcific peritendonitis of the right shoulder that prevented her from lifting her right arm, depression, and asthma. Amended Complaint, Ex. II, ALJ Decision at 3. The Appeals Council also rejected her claim. Mrs. Stieberger alleges that she is in constant pain and cannot work. Her 15 year old son does the shopping and heavy housework. They live on $237 in welfare payments and $135 in food stamps per month. *See* Stieberger Aff.Ex. C.[5] ([5] Each of the affidavits of the individual plaintiffs is annexed to the affidavit of Mary McCorry, sworn to on October 22, 1984, submitted in support of plaintiffs' notice of motions.)

---

**9.** The parties have made numerous filings in connection with these motions, as set forth in

Appendix B to this Opinion.

"Patricia Happy suffers from severe back pain and muscle spasms caused by degenerative joint disease and a leg injury received in a motorcycle accident. Ms. Happy alleges that she is unable to cook, clean, wash, iron, or do other basic household chores. The New York City Department of Social Services found her disabled and provided a housekeeper to perform those chores for her. Ms. Happy must lie in bed for most of the day. She applied for disability benefits on August 19, 1983. After her application and request for reconsideration were rejected, she requested a hearing before an ALJ. Ms. Happy did not attend the hearing [held in May 1984] and was not represented by counsel. Plaintiffs assert that in a decision contrary to the detailed reports of Ms. Happy's treating physicians, the ALJ relied on the government physician's examination report to reject her claim on June 14, 1984. Ms. Happy's appeal to the Appeals Council was denied on January 23, 1985. *See* Happy Aff.Ex. D.

"Angel Vega is an eleven-year old retarded boy with severe asthma and emotional problems. His mother applied for SSI on his behalf on October 28, 1982. In February, 1983 the SSA rejected the application and rejected his request for reconsideration in November, 1983. Denying his request after a hearing on July 2, 1984, an ALJ apparently rejected the uncontradicted reports of Angel's treating physicians. On December 10, 1984 the Appeals Council granted Angel benefits. He has received no payments, however, and his public assistance and Medicaid were terminated as of the date of notification. Angel, his mother, father, and his three siblings live on $78 for rent and $156 for the rest of their expenses every 15 days, plus $193 in food stamps every month. *See* Vega Aff.Ex. E.[6] ([6] Because Angel has not received any payment on his award, his counsel has requested that his claim not be found moot. Kubitschek Aff., sworn to on January 31, 1985.)

"Plaintiff Milagros Sullivan suffers from constant pain in the lower right back and right leg caused by a spinal tap administered during childbirth in 1972. Her treating physician testified that she lives in acute pain, is unable to move and is confined to bed. She applied for SSI on October 6, 1982. After her application and request for reconsideration were rejected, she had a hearing before an ALJ on January 17, 1984. According to plaintiffs, in a decision contrary to the findings of Ms. Sullivan's treating physician and two consulting physicians, the ALJ relied on the findings of a third consulting physician in denying her claim. The Appeals Council also rejected her claim. She and her 12 year old daughter live on $399 in public assistance and $98 in food stamps each month. *See* Sullivan Aff.Ex. F.

"Harold Johnson has polymyositis, a rare disease that causes extreme fatigue, muscle weakness and shortness of breath. Mr. Johnson applied for SSI on December 2, 1982. His application and request for reconsideration were rejected by SSA. After a hearing, on March 30, 1984, plaintiffs assert that the ALJ rejected his claim without directly confronting the treating physician's findings that he was disabled. The Appeals Council denied his request on September 11, 1984. Mr. Johnson lives on welfare payments of $268 monthly, $60 food stamps monthly, and on money borrowed from his church. *See* Johnson, Aff.Ex. G.

*The Administrative Review Process*

"To place this case in context, we will briefly describe the administrative process for reviewing applications for disability benefits, which is essentially the same whether the request is for Social Security Disability Insurance ("SSDI") under Title II of the Act or for Supplemental Security Income ("SSI") under Title XVI of the Act. The administrative process for determining social security claims as established by the statute and implementing regulations consists of four levels of administrative consideration, followed by three levels of judicial review.

"First, the claim is reviewed by a state agency. 42 U.S.C. § 421(a). The Secretary may on her own motion review the state agency's initial determination of disability

or lack of disability, either before or after any action is taken to implement that initial determination. 42 U.S.C. § 421(c).

"Next, the claimant may ask the state agency to reconsider the claim *de novo*, with the decision upon reconsideration again reviewable by the Social Security Administration. 20 C.F.R. § 404.907 (1982).[7] ([7] If the initial determination is that the disability has ceased due to medical reasons, and the claimant has a right to a hearing on the same issue in connection with a claim for SSI, the claimant need not request reconsideration, but may request a hearing right after the initial determination. 20 C.F.R. § 404.907 (1982).)

"If the claimant is dissatisfied with the reconsideration outcome, he may request a *de novo* hearing before an ALJ. At the hearing, the claimant may appear in person, submit new evidence, examine the evidence used in making the determination or decision under review, and present and question witnesses. The hearing is not adversarial, and the ALJ who conducts it may ask the claimant questions. At the hearing, the SSA is not represented by counsel. The claimant may be represented by counsel or other representative such as a paralegal. *Mathews v. Eldridge*, 424 U.S. 319, 339, 96 S.Ct. 893, 904–05, 47 L.Ed.2d 18 (1976); 20 C.F.R. § 404.950. Whether or not the claimant is represented by counsel or other representative, the ALJ has an affirmative duty to inquire into all the matters at issue, so as to fully develop the record. 20 C.F.R. § 416.1444; *Mimms v. Heckler*, 750 F.2d 180 (2d Cir.1984) (duty where claimant is *pro se*); *Decker v. Harris*, 647 F.2d 291, 299 (2d Cir.1981) (duty remains where counsel present). The ALJ's decision is to be based on the hearing record. 20 C.F.R. § 404.929.

"The fourth level of administrative consideration is review of the ALJ's decision by the Appeals Council in the Office of Hearings and Appeals, either at the claimant's request or *sua sponte*. The latter form of review is known as "own motion" review. 20 C.F.R. §§ 404.967, 404.969, 416.1467, 416.1468. The Appeals Council may deny or dismiss the request for review, or it may grant the request and ei-

ther issue a decision or remand the case to an ALJ. 20 C.F.R. § 416.1467. The Appeals Council may consider evidence beyond that which was before the ALJ. 20 C.F.R. § 404.976(b). If the Appeals Council decides that the case raises an important issue of law or policy or that oral argument would be helpful, it may grant a claimant leave to present oral argument. 20 C.F.R. 404.976(c). The Appeals Council's decision, or the ALJ's decision if the request for review is denied, is the final administrative decision. 20 C.F.R. § 404.981. The claimant may appeal this decision in federal district court, 42 U.S.C. § 405(g). The district court's decision is subject to further review in the same manner as other civil actions."

## III. MOTIONS CONCERNING INDIVIDUAL NAMED PLAINTIFFS

### A. *Defendants' Motion to Remand (Stieberger)*

■ Prior to plaintiffs' motions for class certification and preliminary injunctive relief, defendants moved to remand plaintiff Stieberger's case to the Secretary pursuant to 42 U.S.C. § 405(g). This section provides in pertinent part that the "Court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary...." Defendants note that Stieberger is a member of the class in *Dixon v. Heckler*, 589 F.Supp. 1494 (S.D.N.Y.1984), in which the Court invalidated a number of the Secretary's regulatory provisions relating to the assessment of the severity of impairments. Defendants argue that this Court should remand plaintiff Stieberger's case pursuant to the relief accorded members of the *Dixon* class.

This motion is denied. First, a remand to the Secretary is not the only form of relief available to members of the *Dixon* class. The order certifying the class in *Dixon* expressly provides that persons such as Stieberger may continue individual court actions such as this one. *See Dixon v. Heckler*, No. 83–7001 (MEL), Order, at 11–12, ¶ 19 (S.D.N.Y. July 25, 1984) ("Nothing

in this order shall be construed as precluding members of the plaintiff class from obtaining greater relief on alternative grounds... Nothing in this order shall be construed as precluding class members who choose to proceed with their individual court cases from seeking preliminary relief in those cases.") (annexed to Plaintiffs' Memo in Opposition to Remand). While Stieberger could also have chosen to have her case remanded, *see id.* at 8, ¶ 10, this is an option which she has chosen not to exercise.

Second, were the only action taken by this Court with respect to Stieberger a remand, she would continue to be subject to the very policies of which she complains in this action—nonacquiescence and Bellmon Review. Such a remand might well be an exercise in futility.

This Court will be in a better position to determine the appropriate relief, if any, to grant plaintiffs at the completion of these proceedings on the merits. In addition to the above-quoted portion of § 405(g), this subsection also provides in pertinent part that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a hearing." Defendant's suggestion that this Court remand this case to the Secretary prior to review of the administrative record and over the objection of plaintiff is clearly premature. Indeed, although defendants suggest that a remand is appropriate when the Secretary has applied an erroneous legal standard, *see, e.g., Marcus v. Califano,* 615 F.2d 23 (2d Cir.1979), plaintiff contends that the evidence of her disability is so persuasive that outright reversal of the Secretary's unfavorable determination is warranted. *See, e.g., Parker v. Harris,* 626 F.2d 225 (2d Cir.1980).[10] The proper remedy which may eventually be awarded to plaintiff Stieberger, as well as to other members of the certified class, is best formulated at the completion of these proceedings.

Accordingly, defendants' motion to remand is denied.

**B. *Motions to Intervene (Happy, Vega)***

 Patricia Happy and Angel Vega have moved to intervene in this action. Defendants initially objected to Happy's motion based on her failure to exhaust administrative review procedures. At that time, Happy's request for reconsideration was pending before the Appeals Council. On January 23, 1985, her request was denied. According to plaintiffs, defendants no longer oppose Happy's motion to intervene. *See* Plaintiffs' Reply Memo, at 31. Defendants have not indicated a position to the contrary. Happy's claims are the same in relevant respects to those of other plaintiffs and intervention will not delay or prejudice the adjudication of the rights of the original parties. Accordingly, Happy's motion to intervene is granted.

 Defendants contend that Vega's receipt of a favorable determination by the Appeals Council on December 10, 1984 renders his challenge moot. In response to this contention, Vega's attorney submitted an affidavit stating that, as of January 31, 1985, Vega had not yet received any disability benefit payments from HHS, although his other government benefits were terminated as soon as he received a favorable disability determination. Kubitschek Aff. ¶ 5. Subsequently, this Court ordered the Secretary to pay SSI benefits to Vega in accordance with her administrative determination of eligibility. *See* Order dated February 11, 1985. Accordingly, Vega's motion to intervene is dismissed as moot without prejudice to Vega's right, if any, to recover any amounts to which he is entitled for the period during which he received neither SSI benefits nor state public assistance.

**C. *Motions to Consolidate (Sullivan, Johnson)***

Plaintiff Milagros Sullivan has moved to consolidate her pending individual action,

---

**10.** It is unclear whether plaintiff Stieberger continues to assert an entitlement to an outright reversal and award of benefits in light of her position as class representative. Even if such relief is no longer sought, a remand order is inappropriate for the reasons noted in text.

84 Civ. 5804 (GLG), with this action. Plaintiff Harold Johnson has also moved to consolidate his pending individual action, 84 Civ. 7613 (LBS), with this action. Defendants do not oppose these motions. *See* Defendants' Memo in Support of Motion to Dismiss, at 3. Both plaintiffs challenge the Bellmon Review and non-acquiescence policies of defendants. Both allege that the ALJ who reviewed his or her disability claim gave insufficient weight to the opinion of his or her treating physician. *See* Kubitschek Aff. ¶¶ 16–21; Sullivan Aff. ¶¶ 8–9; Johnson Aff. ¶¶ 6–7. Plaintiffs' motions to consolidate are granted.

### IV. CLASS CERTIFICATION

Plaintiffs have moved pursuant to F.R. Civ.P. 23(a) and (b)(2) for certification of this action as a class action. Plaintiffs originally proposed that the class consist of

All New York residents whose claims for benefits or continuation of benefits have been or will be denied or terminated pursuant to hearings before administrative law judges since October 1, 1981, and whose benefits have not been granted or restored through subsequent appeals.

*See* Kubitschek Aff. ¶ 22.[11] In response to questions raised by the Court concerning the scope of the class, plaintiffs also proposed a narrower definition of the class, namely,

All New York residents whose claims for benefits or continuation of benefits have been or will be denied or terminated pursuant to hearings before administrative law judges since October 1, 1981, based on a determination that they do not have a disability that prevents them from engaging in substantial gainful activity; and whose benefits have not been granted or restored through subsequent appeals.

*Id.* at 11. According to plaintiffs, this narrower class definition would exclude

All persons denied benefits based on a determination that they were engaged in substantial gainful activity, despite their impairment.

All persons denied benefits based on a determination of financial ineligibility (e.g., under SSI), expiration of entitlement period (e.g., under SSDI), or any other ineligibility requirement unrelated to their medical impairment or residual functional capacity to work.

*Id.* at 12. According to plaintiffs, the latter two groups of cases "are the kinds of cases that are less likely to have resulted in wrongful denials." *Id.*

Two overarching determinations must be made by the Court at this stage of the litigation: first, whether this action is properly maintainable as a class action; and second, which claimants are properly includable as members of the class.

■ Rule 23 governs our analysis of the first issue. Plaintiffs assert, Magistrate Buchwald found, and defendants do not contest, that this action meets the requirements of F.R.Civ.P. 23 and is thus properly maintainable as a class action. Plaintiffs allege that thousands of claimants have been affected by the challenged policies, *see* McCorry Aff. ¶ 7, Kubitschek Aff. ¶ 23, thus satisfying the numerosity requirement. The commonality requirement is satisfied since the class members all allege that their disability claims were decided by ALJs whose allowance decisions were subject to a discriminatory review system and who were instructed by the SSA to disregard circuit court precedents when in conflict with the Secretary's own policy, in violation of their constitutional and statutory rights. Common questions also predominate since plaintiffs seek only to invalidate the challenged policies and obtain administrative redeterminations of their dis-

---

**11.** October 1, 1981 is the date on or about which defendants commenced their Bellmon Review program. *See* page 1377 *infra.* Since the Secretary's previous non-acquiescence policy was contained in the Office of Hearings and Appeals handbook since 1976, and the Secretary's Accelerated Continuing Disability Investigation program pursuant to which the Secretary reviewed and terminated thousands of current beneficiaries began in March 1981, the October 1, 1981 date is also appropriate insofar as the class certification relates to the non-acquiescence policy.

ability claims rather than an individualized consideration of the underlying merits of their disability claims by this Court. The typicality requirement is met since the named plaintiffs all allege that their disability claims were rejected by ALJs while the Bellmon Review program was in effect and on the basis of SSA rules which conflicted with precedents of the Second Circuit. The adequacy requirement is met since the interests of the named plaintiffs are not antagonistic to those of the class and the relief sought for class representatives (with the possible exception of plaintiff Stieberger; *see* note 10 *supra*) and unnamed members is identical. In addition, the qualifications of the plaintiffs' attorneys are undisputed. The action is properly maintainable as a 23(b)(2) class action since defendants have acted "on grounds generally applicable to the class" through implementation of the Bellmon Review program and the nonacquiescence policy and injunctive relief is requested with respect to the class as a whole. The requirements of F.R.Civ.P. 23(a) and (b)(2) have thus been satisfied, and plaintiffs' motion for class certification is granted as set forth in the Order issued in conjunction with this Opinion. *See* Appendix A to this Opinion. This class certification is granted subject to alteration or amendment by the Court at a future stage of these proceedings, if appropriate. F.R.Civ.P. 23(c)(1); *see Holden v. Heckler*, 584 F.Supp. 463, 489 (N.D.Ohio 1984); *Schisler v. Heckler*, 107 F.R.D. 609, 614–15 (W.D.N.Y.1984) (annexed to Plaintiffs' Class Certification Memo), *appeal argued*, No. 85–6092, 6096 (2d Cir. Aug. 14, 1985).

## V. JURISDICTIONAL ISSUES

The jurisdictional issues raised by defendants relate primarily to the proper

scope of the class. Defendants contend that the class should be limited to those claimants who satisfy the requirements of 42 U.S.C. § 405(g), and that mandamus jurisdiction under 28 U.S.C. § 1361 is unavailable. We consider each of these contentions in turn.[12]

### A. *Social Security Act Jurisdiction: Section 405(g)*

■ Section 405(g) provides in pertinent part that:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such determination by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow... The Court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing....

The "final decision" requirement consists of two elements—a jurisdictional, non-waivable requirement that a claim for benefits has been *presented* to the Secretary, and a waivable requirement that the administrative remedies prescribed by the Secretary have been *exhausted*. *See Mathews v. Eldridge*, 424 U.S. 319, 328–30, 96 S.Ct. 893, 899–900, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 764–65, 95 S.Ct. 2457, 2466–67, 45 L.Ed.2d 522 (1975); *City of New York v. Heckler*, 742 F.2d 729, 734 (2d Cir.1984), *petition for rehearing denied*, 755 F.2d 31, *partial stay pending cert. granted*, —— U.S. ——, 105 S.Ct. 3552, 87 L.Ed.2d 671 (1985).[13] Defendants con-

---

**12.** Defendants also have moved to dismiss or for summary judgment with respect to plaintiffs' challenge to Bellmon Review based on lack of standing, mootness, and waiver. These issues are discussed at pages 1380–86 *infra*.

**13.** Defendants have indicated that the Secretary disagrees with the Second Circuit's decision in *City of New York v. Heckler*, that the decision is

allegedly in conflict with decisions of other circuit courts, and that they have sought Supreme Court review of the decision. *See* Defendants' Objections to Report, at 46. On July 1, 1985, the Supreme Court granted an application by the Secretary for a partial stay of the district court judgment pending the Supreme Court's disposition of the Secretary's petition for a writ of certiorari. *Heckler v. New York*, —— U.S. ——,

tend that the class should not include claimants who have failed to (1) present their claims to the Secretary, (2) exhaust their administrative remedies, or (3) seek judicial review of the Secretary's decision within the sixty day period delineated in the statute.

### 1. Presentment

■ The presentment requirement is satisfied when an application for benefits is made to the Secretary or, in the case of a claimant whose benefits have been terminated, notification is given to the agency that the claimant is still disabled. *Mental Health Association of Minnesota v. Heckler*, 720 F.2d 965, 969 (8th Cir.1983). According to the definition of the class, class members include those claimants whose applications for benefits or the continuation of benefits have been or will be denied or terminated pursuant to hearings before ALJs and unsuccessful appeals to the Appeals Council. This is clearly sufficient to satisfy the presentment requirement of § 405(g). *See Mathews v. Eldridge, supra*, 424 U.S. at 329, 96 S.Ct. at 900 (presentment element satisfied when claimant asserts to administrative agency that "benefits should not be terminated because [claimant is] still disabled"); *City of New York v. Heckler, supra*, 742 F.2d at 735; *Jones v. Califano*, 576 F.2d 12, 18 (2d Cir.1978) ("It is undisputed that [plaintiffs], by filing claims with the SSA, have satisfied the non-waivable requirement."); *Dixon v. Heckler*, 589 F.Supp. 1494, 1500 (S.D. N.Y.1984); *cf. Heckler v. Lopez*, 463 U.S. 1328, 1335, 104 S.Ct. 10, 14, 77 L.Ed.2d 1431 (1983) (Rehnquist, J., as Circuit Justice) (questioning whether presentment requirement satisfied by "individuals who have never questioned the initial determination that they cease to be disabled"); *Wheeler v. Heckler*, 719 F.2d 595 (2d Cir. 1983) (terminated recipient who fails to initiate even informal communications with SSA does not satisfy presentment requirement). Future class members, *i.e.*, those who will have their benefits denied or ter-

minated by ALJs and not granted or restored by the Appeals Council, will also satisfy the presentment requirement upon the occurrence of these events and thus are properly included within the class. *See State of New York v. Heckler*, 105 F.R.D. 118, 122–23 (S.D.N.Y.1985); *Dixon v. Heckler, supra*, 589 F.Supp. at 1512.

### 2. Exhaustion

■ The requirement that a claimant exhaust administrative remedies prior to seeking judicial review of an unfavorable disability determination requires the claimant to "press[ ] his claim through all designated levels of administrative review." *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 2017, 80 L.Ed.2d 622 (1984). The exhaustion requirement is designed to preserve a variety of interests in the proper functioning of the administrative process. As the Supreme Court has described it,

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Weinberger v. Salfi, supra*, 422 U.S. at 765, 95 S.Ct. at 2467.

■ The exhaustion requirement of § 405(g) is waivable either by the Secretary, *id.* at 766–67, 95 S.Ct. at 2467–68, or by the court in appropriate circumstances. *See Mathews v. Eldridge, supra*, 424 U.S. at 330–32, 96 S.Ct. at 900–01; *City of New York v. Heckler, supra*, 742 F.2d at 736. Judicial waiver is appropriate where plaintiffs' legal claims are collateral to the demand for benefits, where exhaustion would be futile, or where the harm suffered pending exhaustion would be irreparable. *See City of New York v. Heckler, supra*, 742 F.2d at 736; *Mental Health Association of*

105 S.Ct. 3552, 87 L.Ed.2d 671 (1985). As defendants recognize, this Court is bound by the Second Circuit's decision for purposes of the

instant motions. Unlike the Secretary's claimed right in this proceeding, we, as a district court, cannot non-acquiesce in that ruling.

*Minnesota v. Heckler, supra,* 720 F.2d at 969–71; *see also Heckler v. Ringer, supra,* 104 S.Ct. at 2023.

In many Social Security class actions, the precise issue of exhaustion is whether claimants can become members of the class simply by virtue of having presented a claim for benefits to the Secretary without pursuing further administrative channels of review. *See, e.g., City of New York v. Heckler, supra,* 742 F.2d at 736–37; *State of New York v. Heckler, supra,* 105 F.R.D. at 122; *Dixon v. Heckler, supra,* 589 F.Supp. at 1511; *Hyatt v. Heckler,* 579 F.Supp. 985, 1003–04 (W.D.N.C.1984), *vacated and remanded,* 757 F.2d 1455 (4th Cir.1985); *Aldrich v. Schweiker,* 555 F.Supp. 1080, 1090 (D.Vt.1982); *see also Heckler v. Ringer, supra,* 104 S.Ct. at 2019 (individual claimants had filed Medicare reimbursement claims with fiscal intermediary but had not exhausted further administrative remedies). Because of the manner in which the class is defined in this case, however, no such exhaustion issue arises. As already noted, the class will include those claimants whose claims for benefits have been denied or terminated pursuant to ALJ hearings and who have pursued their claims through the Appeals Council level. Thus, by definition, all claimants will have pursued all avenues of administrative relief before becoming members of the class. At this point, administrative remedies will have been exhausted for purposes of § 405(g). *See Mathews v. Eldridge, supra,* 424 U.S. at 328, 96 S.Ct. at 899; *Lopez v. Heckler,* 713 F.2d 1432, 1439 (9th Cir.) ("Some of the named plaintiffs and an unknown number of the plaintiff class have exhausted all administrative remedies and obtained final decisions; these plaintiffs indisputably are properly before the district court."), *partial stay of district court order granted on other grounds,* 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (Rehnquist, J., as Circuit Justice), *application to vacate stay denied,* 464 U.S. 879, 104 S.Ct. 221, 78 L.Ed.2d 217 (1983), *order of district court aff'd in part and rev'd in part,* 725 F.2d 1489 (9th Cir.), *partial stay pending cert. granted,* — U.S. —, 104 S.Ct. 2164, 80 L.Ed.2d 548, *judgment vacated and remanded,* — U.S. —, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984), *order remanding and clarifying class definition,* 106 F.R.D. 268 (C.D.Cal.1984) (Ex. GG to Plaintiffs' Reply Memo), *partial stay denied,* 753 F.2d 1464 (9th Cir.1985).

### 3. *Sixty Day Limitation*

Under § 405(g), a claimant must seek judicial review of a final decision of the Secretary within sixty days of the mailing of notice of the decision to the claimant. Defendants contend that the class must therefore be limited to those claimants who received notice of their final determinations on or after June 4, 1984, *i.e.,* claimants whose final decisions were rendered on May 30, 1984. *See Dixon v. Heckler, supra,* 589 F.Supp. at 1550 n. 18 (class includes claimants whose final decisions were rendered sixty-five days prior to filing of complaint); *Holden v. Heckler, supra,* 584 F.Supp. at 503.[14]

Although Supreme Court precedent may be unclear as to whether the sixty day requirement is a non-waivable jurisdictional one, *compare Mathews v. Eldridge, supra,* 424 U.S. at 328 n. 9, 96 S.Ct. at 899 n. 9 (sixty day requirement is a statute of limitations waivable by the parties); *Weinberger v. Salfi, supra,* 422 U.S. at 763–64, 95 S.Ct. at 2465–66 (same); *and Heckler v. Lopez, supra,* 104 S.Ct. at 226 (Brennan and Marshall, JJ., dissenting) ("I am far from convinced that the injunction issued by the District Court was jurisdictionally barred.") *with Heckler v. Lopez, supra,* 104 S.Ct. at 223 (Stevens and Blackmun, JJ., dissenting) (district court had no juris-

---

**14.** We reject plaintiffs' contention that the 60 day limit should be determined based on the date of the filing of plaintiff Stieberger's original complaint, which was February 23, 1984. The original complaint contained no allegations concerning the Secretary's non-acquiescence or Bellmon Review policies; only the amended complaint constituted an action on behalf of the proposed class members herein challenging the legality of these policies. We cannot reasonably construe the original complaint as placing defendants on notice of the claims now pending before this Court. *Cf. Holden v. Heckler,* 584 F.Supp. 463, 503 (N.D.Ohio 1984).

diction under § 405(g) over class members who received final decision more than sixty days prior to filing of class action); *see also City of New York v. Heckler, supra,* 742 F.2d at 737 (Supreme Court's position on issue "is not free from doubt"), the Second Circuit has recently held that this requirement is a waivable statute of limitations. *City of New York v. Heckler, supra,* 742 F.2d at 738; *see also Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 973 n. 19 (sixty day requirement is waivable by the Secretary); *Johnson v. Heckler,* 604 F.Supp. 1070, 1073–74 (N.D.Ill.1985). *But see Hyatt v. Heckler,* 757 F.2d 1455, 1460–61 (4th Cir. 1985) (sixty day requirement is jurisdictional); *Whipp v. Weinberger,* 505 F.2d 800, 801 (6th Cir.1974) (same). In *City of New York v. Heckler,* the Second Circuit ruled that the sixty day period should be considered tolled for the period during which the SSA's policy of applying a challenged presumption concerning residual functional capacity was operative but undisclosed. The Court held as follows:

> All of the class members who permitted their administrative or judicial remedies to expire were entitled to believe that their Government's determination of ineligibility was the considered judgment of an agency faithfuly executing the laws of the United States. Though they knew of the denial or loss of benefits, they did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to court challenge. Where the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights, statutes of limitations have been tolled until such time as plaintiffs had a reasonable opportunity to learn the facts concerning the cause of action ... Since in this case the full extent of the Government's clandestine policy was uncovered only in the course of this litigation, all class members may pursue this action notwithstanding the 60-day requirement.

*Id.* at 738 (citations and footnotes omitted). A number of other courts have also held that the sixty day limitations period should be tolled. *See State of New York v. Heckler, supra,* 105 F.R.D. at 123–24; *Schisler v. Heckler, supra,* slip op. at 9–13; *W.C. v. Heckler,* C83–865R, slip op. at 10–12 (W.D. Wash. July 11, 1985) (Magistrate's Report and Recommendation).

 Application of these principles to the policies challenged in this case yields the conclusion that the sixty day period should be tolled. With respect to the non-acquiescence policy, plaintiffs had little basis to know, or reason to suspect, that the Secretary was refusing to apply the relevant precedents of judicial authorities in resolving their claims. Defendants note that the Secretary's policy was published in the Office of Hearings and Appeals ("OHA") Handbook used by ALJs in deciding disability cases, and that the Handbook is available for public inspection. *See* Mason Aff. ¶¶ 4–5. As a matter of availability and claimant awareness, however, we find it difficult to distinguish the internal SSA memorandum which contained the challenged policy in *City of New York v. Heckler* and the OHA Handbook at issue here. *See Schisler v. Heckler, supra,* slip op. at 12 (use of non-acquiescent disability termination standard which appeared in Disability Insurance State Manual provided to states and available to public was sufficiently secretive to toll sixty day limitations period). The non-acquiescence policy was not published in the United States Code or the Code of Federal Regulations. Unlike other non-acquiescence cases, *see, e.g., Lopez v. Heckler, supra,* 713 F.2d at 1434, the SSA in this case issued no SSR which expressed the Secretary's non-acquiescence in Second Circuit precedents dealing with treating physicians, pain or the ALJ's duty to develop the record in *pro se* claimant cases. There is no indication that either the ALJs who decided plaintiffs' cases or the Appeals Council which reviewed them expressly stated their disagreement with Second Circuit precedent on these issues. The only manner in which the policy could have been detected is by a careful comparison of the Secretary's rules and the relevant case law; but surely the claimants "were entitled to believe that their Govern-

ment's determination of ineligibility was the considered judgment of an agency faithfully executing the laws of the United States," *City of New York v. Heckler, supra,* 742 F.2d at 738, rather than the judgment of an agency which refused to adhere to Second Circuit precedent construing the Social Security Act. Where the allegation is that agency officials deliberately failed to apply federal appellate court precedents in rendering their determinations, the justification for tolling the sixty day period is substantial. We hold that insofar as non-acquiescence is concerned, the class need not be limited to those claimants who satisfied the sixty day requirement under § 405(g).

The circumstances surrounding the implementation of the Bellmon Review program also provide a strong basis for tolling the sixty day limitations period. While defendants are correct in noting that the concept of own motion review expressly authorized by the Bellmon Amendment was not concealed or otherwise undisclosed, the particular manner in which defendants chose to implement this statutory mandate was considerably more circumspect. The statute itself made no reference to the particular emphasis which the Secretary placed on allowance decisions but spoke only of own-motion review of "decisions" in general. A claimant interested enough in perusing Senator Bellmon's remarks concerning high allowance ALJs would also have been aware of the deletion of the Senate's proposal for ALJ targeting, thus giving the claimant reason to believe that such a practice was not in effect. The SSR issued by defendants in January 1982 made reference to the need for particular emphasis on allowance decisions, but made no

reference to the Secretary's policy of exclusively focusing on allowance decisions and placing primary reliance on ALJs with the highest allowance rates as the source of such decisions. No regulation was issued concerning the implementation of Bellmon Review; no publication of the program was made in the Federal Register or codified in the Code of Federal Regulations. A memorandum, written by defendant Louis B. Hays in September 1982, described the individual ALJ portion of Bellmon Review but was apparently restricted in its circulation to agency ALJs. *See* Ex. H,[15] at 204. A lawsuit filed in 1983 by the Association of ALJs challenging the legality of Bellmon Review, did not produce its written decision until September 1984, three months *after* the sixty day limitation cutoff point in this case. *See Association of Administrative Law Judges, Inc. v. Heckler,* 594 F.Supp. 1132 (D.D.C.1984) (*"AALJ v. Heckler"*), *motion for new trial denied,* No. 83–0124, Order (D.D.C. June 29, 1985) (annexed to Defendants' Memo on Recent Developments). This decision thus could not have constituted notice of the particulars of Bellmon Review to class members whose administrative appeals concluded prior to May 30, 1984. The primary evidence, then, of the manner in which the Secretary implemented Bellmon Review was contained in congressional reports—a January 1982 report written by the Secretary and submitted to Congress as required by statute,[16] and a October 1983 Senate Subcommittee report concerning Bellmon Review and non-acquiescence.[17]

While we do not understand plaintiffs to argue that mere lack of knowledge of one's legal rights is sufficient grounds for waiv-

---

**15.** Exhibit H is a record of the Hearing before the Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs of the United States Senate, S.Hrg. 98–296, 98th Cong., 1st Sess. (June 8, 1983), entitled "Social Security Disability Reviews: The Role of the Administrative Law Judge" ("Subcommittee Hearing").

**16.** *See* Implementation of Section 304(g) of Public Law 96–265, "Social Security Disability Amendments of 1980", Report to the Congress by the Secretary of Health and Human Services

(annexed to Defendants' Response to Plaintiffs' Post-Argument Brief).

**17.** *See* Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs of the United States Senate, "The Role of the Administrative Law Judge in the Title II Social Security Disability Insurance Program," S.Prt. 98–111, 98th Cong., 1st Sess. (October 1983) ("Subcommittee Report") (Ex. MM to Plaintiffs' Response to Defendants' Objections to Report).

ing the sixty day limit, there are at least some indications that such lack of awareness was not purely accidental in this case. Defendants knew well before October 1981 that individual ALJ review was controversial and raised serious legal questions. Yet no effort was made either to subject the program to APA provisions concerning publication, hearings, notice and comment or other form of public disclosure. ALJs were informed in September 1982 about the nature and scope of the Bellmon Review program during its first year of operation. Their reaction was emphatically negative, prompting the institution of a lawsuit less than four months later. And while defendants complied with their statutory reporting requirement, at least one court has concluded that the Secretary's failure to publish the Bellmon Review program in the Federal Register or subject the program to statutory notice and comment require-' ments constituted a violation of the APA's rulemaking provisions. *See W.C. v. Heckler, supra.* The Magistrate in that case found that the Secretary's failure to publish the details of the Bellmon Review program "may be viewed as an attempt to shield" the program from "public scrutiny," *id.* at 25, and that the sixty day limitation period should be tolled for claimants challenging the validity of the program. *Cf. State of New York v. Heckler, supra,* 105 F.R.D. at 124 (failure to publish disability determination rules in Federal Register, "if proved and proved to have been required," provides basis for tolling sixty day period). Finally, it is unclear at this stage of the proceedings whether, as a practical matter, the Secretary's report to Congress was accessible in such a manner that one could reasonably expect class members to have familiarized themselves with the program or even to have had an opportunity to do so. These circumstances, if proved, would support a conclusion that the sixty day limitations period should be tolled. Accordingly, jurisdiction over the proposed class is appropriate notwithstanding the sixty day rule.

Defendants also point out that the controversy surrounding Bellmon Review was "bruited in the nightly news" by virtue of an attorney's criticism of Bellmon Review on the February 14, 1983 segment of the McNeil-Lehrer Report, and that defendants disclosed information concerning the Bellmon Review program in response to Freedom of Information Act ("FOIA") requests. *See* Defendants' Objections to Report, at 42; Ex. 3–17 to Mason Aff. We are not persuaded that the former type of public disclosure, by an individual unaffiliated with the SSA to an obviously limited audience, constitutes either notice to class members or disclosure by the defendants of the Bellmon Review policy. As for the FOIA responses, we note that not all of the responses disclose the use of individual ALJ "targeting" as one of the means by which the Bellmon Amendment was implemented; of those that do, all but two were issued in or after September 1983. As with the SSA's submission of its Report to Congress, we do not believe that the SSA's performance of these statutory obligations obviates the difficulties noted earlier.

It is undisputed that the Secretary's particular interpretation and implementation of the Bellmon Amendment was not disclosed in the statute, a regulation, an SSR, an operating manual or a handbook. There is even some question as to whether the SSA's implementation of Bellmon Review failed to conform to the rulemaking requirements of the APA. We need not and do not decide whether the Bellmon Review policy was promulgated in violation of the APA's rulemaking provisions, thus invalidating cases in which decisions rendered by ALJs were subject to own motion review and reversal by the Appeals Council. *Cf. W.C. v. Heckler, supra,* slip op. at 27. We only find that the consequence of the SSA's failure to disclose its implementation of Bellmon Review in accordance with these procedures or in some other manner reasonably ascertainable by claimants is that such claimants should not be precluded from even presenting their constitutional and statutory challenge to Bellmon Review to the federal courts solely by virtue of their failure to do so within sixty days of their denials. It would be an unduly stringent interpretation of the congressional in-

tent underlying § 405(g)'s sixty day limitation to foreclose claimants from asserting a legal challenge to an agency policy which is in seeming conflict with the legislative intent underlying the authorizing statute itself, which raises colorable constitutional concerns, and where the specific methods used to implement the statute were disclosed in a less than obvious manner.

B. *Mandamus Jurisdiction: Section 1361*

■ Plaintiffs also assert that jurisdiction is proper under the mandamus statute, 28 U.S.C. § 1361. The significance of the availability of mandamus jurisdiction in this case is that the presentment and sixty day requirements of § 405(g) need not be satisfied where jurisdiction is predicated on § 1361. *See City of New York v. Heckler, supra,* 742 F.2d at 739 n. 7. In light of the uncertain state of the law concerning the sixty day requirement and the preliminary stage of these proceedings, we believe it appropriate to consider whether mandamus jurisdiction is available so as to properly include within the class those claimants whose final decisions were rendered between October 1, 1981 and May 30, 1984 (the cut-off date under § 405(g)).

The mandamus statute, 28 U.S.C. § 1361, provides that

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

The availability of mandamus jurisdiction in Social Security cases is complicated by § 405(h), which provides in pertinent part that "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."

■ The Supreme Court has repeatedly declined to resolve the question whether mandamus jurisdiction is available in cases involving claims arising under the Social Security Act notwithstanding the jurisdictional limitations expressed in § 405(h).

*See Heckler v. Ringer, supra,* 104 S.Ct. at 2022; *Califano v. Yamasaki,* 442 U.S. 682, 698, 99 S.Ct. 2545, 2556, 61 L.Ed.2d 176 (1979) (jurisdiction otherwise available under § 405(g)); *Norton v. Mathews,* 427 U.S. 524, 529–31, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976) (merits of mandamus claim clearly insubstantial); *Mathews v. Eldridge, supra,* 424 U.S. at 332 n. 12, 96 S.Ct. at 901 n. 12 (jurisdiction otherwise available under § 405(g)). A number of circuit and district courts, including the Second Circuit, have held that mandamus jurisdiction is available under circumstances where the writ would otherwise be available. *See Ganem v. Heckler,* 746 F.2d 844, 850 (D.C.Cir.1984); *City of New York v. Heckler, supra,* 742 F.2d at 739 (CA2) (and Second Circuit cases cited therein); *Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 968–69 (CA8); *Kuehner v. Schweiker,* 717 F.2d 813, 819 (3d Cir.1983), *vacated and remanded on other grounds,* — U.S. ——, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984); *Leschniok v. Heckler,* 713 F.2d 520, 522 (9th Cir.1983); *Martinez v. Richardson,* 472 F.2d 1121, 1125–26 (10th Cir.1973); *Dixon v. Quern,* 537 F.Supp. 990, 991–92 (N.D.Ill.1982); *McMahon v. Califano,* 476 F.Supp. 978, 983–84 (D.Mass.1979). The Second Circuit's precedent on this point is substantial, *see Dietsch v. Schweiker,* 700 F.2d 865, 867–68 (2d Cir.1983); *Ellis v. Blum,* 643 F.2d 68, 78–82 (2d Cir.1981); *Barnett v. Califano,* 580 F.2d 28, 31 (2d Cir.1978); *White v. Mathews,* 559 F.2d 852, 856 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), and the reasoning underlying these decisions has been thoroughly examined and persuasively established. *See Ellis v. Blum, supra* (Friendly, J.).

■ Given the principle that mandamus jurisdiction is available notwithstanding § 405(h), we need to determine whether the assertion of mandamus jurisdiction is appropriate in this case. A writ of mandamus will not issue unless (1) the plaintiffs have a right to have the act performed, (2) the defendant is under a clear nondiscretionary duty to perform the act requested,

and (3) plaintiff has exhausted all other avenues of relief. *See Heckler v. Ringer, supra,* 104 S.Ct. at 2022; *City of New York v. Heckler, supra,* 742 F.2d at 739. While the assertion of mandamus jurisdiction is not to be perfunctorily made, many courts have found that mandamus jurisdiction will lie where a constitutional challenge to a generally applicable Social Security policy or procedure is raised. *See City of New York v. Heckler, supra,* 742 F.2d at 739 (mandamus jurisdiction exists to require Secretary to make eligibility determinations for claimants with mental impairments based on individualized determinations of residual functional capacity, as required by statute, rather than challenged presumption); *Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 971–72 n. 17 (same) ("Thus the claim raised is procedural in nature and the order would not infringe the Secretary's duly delegated authority to make the eligibility determinations."); *Kuehner v. Schweiker, supra,* 717 F.2d at 819 (suit challenging standards used in Secretary's "high volume review" process for termination of disability benefits); *Ellis v. Blum, supra,* 648 F.2d at 68–71 (challenging adequacy of pre-termination notices to Social Security recipients); *Elliott v. Weinberger,* 564 F.2d 1219, 1225–27 (9th Cir.1977) (challenge to Secretary's failure to provide adequate notice and hearing prior to recoupment of excess Social Security benefit payments), *aff'd in part on other grounds sub nom. Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *Ryan v. Shea,* 525 F.2d 268, 271–72 (10th Cir.1975) (challenge to Secretary's failure to provide hearing prior to termination of disability benefits in transition from state to federal disability program). These courts have emphasized that the Secretary's duty to provide procedures which comply with constitutional requirements is not a discretionary one, but is an unambiguous duty with which compliance is mandated. *See Ellis v. Blum, supra,* 643 F.2d at 78; *Elliott v. Weinberger, supra,* 564 F.2d at 1226 (question of whether Secretary must provide pre-recoupment hearing "is a strict fifth amendment issue, and the question of dis-

cretion does not arise. The Secretary has either met his constitutional duty to provide a certain minimum, or he has not. He has no discretion to provide less than that constitutionally required."). Courts have also noted that the exercise of mandamus jurisdiction in these circumstances is appropriate since the relief sought is compliance with constitutional or statutory requirements governing the disability determination rather than the issuance of a particular substantive outcome with respect to such a determination. *See Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 971–72 n. 17 ("A writ of mandamus would not rule on the outcome of the factual determination, but merely would compel the same to be made lawfully"); *Ellis v. Blum, supra,* 643 F.2d at 82 (mandamus jurisdiction exists where plaintiff raises "procedural challenge, the adjudication of which will not affect the substantive question of continued entitlement to disability payments", rather than "run-of-mine type" claim to recover benefits); *cf. Heckler v. Ringer, supra,* 104 S.Ct. at 2021, 2023 (Secretary's decision whether particular medical service is "reasonable and necessary" and whether such decision should be promulgated by rule or adjudication "are clearly discretionary decisions"; since relief sought included declaration that expenses incurred by claimant for surgical procedure were reimbursable under Medicare Act, claim was "at bottom, a claim that [plaintiffs] should be paid for their BCBR surgery").

■ Judged under these standards, plaintiffs' claim that the Bellmon Review program deprived them of their right to a full and fair hearing by an impartial hearing examiner is well within the class of claims for which mandamus jurisdiction is appropriate. Plaintiffs contend that the Bellmon Review program has deprived them of their right to a determination by an impartial and unbiased hearing examiner. This claim relates to the overall fairness of the agency factfinding process and not to the substantive standards used by agency officials in rendering disability determinations. The issue confronting this

Court is not whether the Secretary may or may not decide to conform ALJ hearings to constitutional or statutory standards of fairness and impartiality; it is whether the Secretary has in fact provided claimants with hearings which conform to these legal requirements. The underlying merits of each claimant's disability claim is irrelevant for these purposes, and the exercise of mandamus jurisdiction will thus not be tantamount to an award of benefits. *Cf. Heckler v. Ringer, supra.* This is also not a challenge to an isolated instance in which an ALJ's failure to adhere to agency procedures resulted in an unfair hearing and was promptly remedied by the Appeals Council by providing a new hearing. *See Mercer v. Birchman,* 700 F.2d 828 (2d Cir. 1983). Rather, it is a case in which the Secretary's own policy and practice has allegedly resulted in unfair hearings for all claimants and can be remedied only by providing redeterminations subsequent to the Secretary's revocation of an agency-wide policy. While redeterminations before impartial ALJs may well increase claimants' chances for recovery of benefits, this Court, in exercising mandamus jurisdiction, will only be concerned with whether the Secretary has adhered to requirements of procedural fairness in rendering disability determinations pursuant to hearings before ALJs who were operating under the Bellmon Review program.

For similar reasons, mandamus jurisdiction is also appropriate with respect to the Secretary's non-acquiescence policy. Many courts have held in similar contexts that jurisdiction under § 1361 is appropriate. *See City of New York v. Heckler, supra,* 742 F.2d at 739 (failure to perform statutorily-required individualized assessment of residual functional capacity); *Schisler v. Heckler, supra,* slip op. at 13 (failure to apply medical improvement standard in termination cases); *Holden v. Heckler, supra,* 584 F.Supp. at 484 (failure to apply Sixth Circuit's medical improvement standard in termination cases); *Rivera v. Heckler,* 568 F.Supp. 235, 242–43 (D.N.J.1983) (non-acquiescence in Third Circuit decisions concerning weight given to opinion of treating physician and subjective complaints of

pain); *Aldrich v. Schweiker, supra,* 555 F.Supp. at 1089 (state agency's failure to apply Second Circuit decisions concerning weight given to treating physician's opinion, another agency's disability determination, and claimants' subjective complaints). *But see Hyatt v. Heckler, supra,* 757 F.2d at 1461 (§ 405(g) provides adequate remedy for challenge to Secretary's non-acquiescence policy). As with their Bellmon Review claim, plaintiffs do not seek an award of benefits, but only a redetermination of their claims in accordance with this Circuit's precedents. Plaintiffs assert that the Secretary is constitutionally required to render determinations in accordance with relevant judicial precedent and that they have a right to determinations made in this manner. While application of these requirements may eventually lead to awards of benefits, it will not be this Court's function to award this type of merits-based relief to class members; this Court will determine only whether claimants are entitled to the redeterminations they seek. In this respect, if plaintiffs ultimately prevail in this action, the Court would require only that certain guidelines be followed in rendering disability determinations rather than that certain results be reached.

The exercise of mandamus jurisdiction also requires a determination that other avenues of relief have been exhausted. We note that a number of courts have held that the analysis of the circumstances under which exhaustion under §§ 405(g) and 1361 should be waived are similar, and that claimants need not pursue administrative review procedures prior to raising their claims in federal court pursuant to § 1361 if exhaustion under § 405(g) is not required. *See City of New York v. Heckler, supra,* 742 F.2d at 739 n. 7; *Ellis v. Blum, supra,* 643 F.2d at 78–79; *Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 971 n. 16; *Kuehner v. Schweiker, supra,* 717 F.2d at 827 (Becker, J., concurring). All class members herein have exhausted or will exhaust their administrative remedies prior to seeking judicial resolution of their claims. It is readily apparent that little purpose would be served by requiring claimants to again

raise their claims to an agency which continues to adhere to policies which plaintiffs contend are unlawful. The potential harm to claimants from further administrative proceedings and the likely futility of further exhaustion clearly outweigh any benefit in requiring claimants to reassert their entitlement to benefits. Even if individual claimants were to succeed in obtaining an award of benefits, the policies of which they complain would remain in place and continue to affect other similarly situated claimants. If jurisdiction under § 405(g) is limited by the sixty day rule, some claimants will be precluded altogether from raising their constitutional and statutory challenges to the Secretary's policies in federal court.[18] In these circumstances, we find that claimants have no adequate alternative available to them for resolution of their claims.

Accordingly, this Court has mandamus jurisdiction under § 1361 over plaintiffs' claims.

### C. Standing of City of New York

The City of New York, as a named plaintiff suing in its own behalf, has asserted claims against the defendants concerning the Secretary's non-acquiescence and Bellmon Review policies. Defendants contend that the City of New York lacks standing to raise these claims.

 The Constitution requires at a minimum that a plaintiff have a "personal stake" in the outcome of a controversy. A plaintiff must show that it has suffered some actual or threatened injury, that such injury can be traced to the challenged action of the defendant, and that the injury is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In addition, a court must consider whether prudential considerations weigh against permitting a party to challenge the conduct at issue. A plaintiff must show that it asserts its own legal rights and not those of third parties, that its injury is not simply a "generalized grievance[ ]" which is shared by a large class of citizens, and that the plaintiff's interest falls within the "zone of interests" arguably protected or regulated by the law in question. *See id.* at 474–75, 102 S.Ct. at 759–60.

 The question of whether a governmental entity has standing to maintain an action such as this one in its own behalf has provoked conflicting responses.[19] *Compare State of New York v. Heckler,* 719 F.2d 1191, 1195 (2d Cir.1983) (New York State has standing to challenge Secretary's contraceptive notification regulation); *City of New York v. Heckler,* 578 F.Supp. 1109, 1119–22 (E.D.N.Y.) (City of New York has standing in its own behalf to challenge Secretary's procedures for determining residual functional capacity of disability claimants with mental impairments), *aff'd on other grounds,* 742 F.2d 729 (2d Cir.1984) (expressly reserving the issue), *and Dixon v. Heckler, supra,* 589 F.Supp.

---

**18.** Plaintiffs also allege § 1331, the general federal question provision, as a basis for jurisdiction over their claims. Although the Second Circuit has recently declined to determine this issue, *see City of New York v. Heckler,* 742 F.2d 729, 733 n. 3 (2d Cir.1984) (not reaching question whether § 1331 jurisdiction exists over alleged violations of APA and Due Process Clause), the existence of such jurisdiction over claimants' alleged violations of the APA, the Social Security Act and the Constitution appears doubtful. *See Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 2021–22, 2025–26, 80 L.Ed.2d 622 (1984) (§ 1331 jurisdiction not available for alleged violations of APA or Medicare Act regardless of whether claimant's challenge is to substantive determination of Secretary or to procedures followed in making determination);

*Mathews v. Eldridge,* 424 U.S. 319, 327, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976) (§ 1331 jurisdiction not available for alleged violation of procedural due process based on failure to provide Social Security benefits claimant with pre-termination hearing); *Weinberger v. Salfi,* 422 U.S. 749, 760–61, 95 S.Ct. 2457, 2464–65, 45 L.Ed.2d 522 (1975) (§ 1331 jurisdiction not available for claimant's constitutional challenge to Social Security Act's duration-of-relationship eligibility requirement); 42 U.S.C. §§ 405(h) (§ 1331 jurisdiction not available in suit to recover on claim arising under Title II of Social Security Act), 1383(c)(3) (same re Title XVI).

**19.** The City does not predicate its standing on a *parens patriae* theory.

at 1516 & n. 7 (New York State has standing as plaintiff-intervenor to challenge Secretary's severity regulation) *with Hyatt v. Heckler, supra,* 757 F.2d at 1462 (North Carolina Department of Human Resources lacks standing to sue in its own behalf to challenge Secretary's non-acquiescence policy; only beneficiaries may sue under § 405(g)) *and Doe v. Heckler,* 568 F.Supp. 681, 683 (D.Md.1983) (State of Maryland and its officials lack standing to sue in their own behalf to challenge Secretary's policy for termination of disability benefits). In this case, the City bases its standing on its role in providing public assistance benefits and other social services to individuals who have been improperly denied or terminated from disability benefits by reason of the defendants' non-acquiescence and Bellmon Review policies. *See* First Amended Complaint ¶ 6; McCorry Aff. ¶¶ 82, 83, 86. If in fact the challenged policies have resulted in the improper denial or termination of disability benefits and thereby relegated these claimants to state public assistance programs funded in part by city tax revenues, the City has indeed suffered its own economic "injury in fact" which likely will be redressed by a favorable decision in this case. Such a decision, if rendered, will result in the rendering of disability determinations pursuant to redeterminations by impartial ALJs in accordance with federal circuit court precedent and thus will likely result in the granting or restoration of disability benefits to at least some Social Security claimants. In addition, given the partial purpose underlying the Social Security disability and SSI programs to relieve state and local governments from the burden of providing for the disabled, and the unique and legitimate interest of such localities in insuring the appropriate and lawful administration of such programs, *see City of New York v. Heckler, supra,* 578 F.Supp. at 1121–22, we do not find (and defendants do not identify) any prudential considerations which should cause this Court to deny standing to the City. While claimants themselves have asserted their rights in this action to lawful disability determinations, the City also has a strong interest in obtaining relief for the Secretary's alleged unlawful ALJ review and non-acquiescence policies.

The decision of the Fourth Circuit in *Hyatt* does not compel a contrary conclusion. First, the purported standing of the state agency in *Hyatt* was based not on economic injury resulting from the Secretary's policies but on its role in administering the Social Security disability program at the initial state agency level. Second, while *Hyatt* correctly observed that only "individual" beneficiaries may seek judicial review of a final decision of the Secretary under § 405(g), this does not necessarily preclude the City from asserting its constitutional and other statutory challenges to the defendants' policies pursuant to this Court's general federal question or mandamus jurisdiction.[20] Finally, *D'Amico v.*

---

**20.** Although the courts which have granted standing to a state or municipal entity have not indicated the jurisdictional basis upon which the plaintiff's claim rested, there is authority which suggests that federal question jurisdiction over the City's claim in this case is available. Prior to *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), several courts held that § 1331 jurisdiction is available where the plaintiff in a Medicare Act case does not seek an award of benefits or its equivalent (*i.e.,* Medicare reimbursement) but instead challenges the legality of agency action unrelated to specific benefit claims. *See Colonial Penn Insurance Co. v. Heckler,* 721 F.2d 431, 436–39 (3d Cir.1983) (insurance company's statutory challenge to retroactive application of Secretary's regulation making Medicare benefits secondary to coverage provided by automobile insurance policies); *National Association of Home Health*

*Agencies v. Schweiker,* 690 F.2d 932, 939–41 (D.C.Cir.1982) (home health agencies' and trade association's statutory challenge to Secretary's regulations requiring home health agencies to seek Medicare reimbursement determinations and payment from government-designated regional intermediaries), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); *St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283, 291–92 (8th Cir.) (university's constitutional due process challenge to Secretary's procedures for determining Medicare reimbursements), *cert. denied,* 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976); *Abrams v. Heckler,* 582 F.Supp. 1155, 1157–59 (S.D.N.Y.1984) (state officials' statutory challenge to Secretary's regulation making Medicare benefits secondary to coverage provided by automobile insurance policies); *see also Daniel Freeman Memorial Hospital v. Schweiker,* 656 F.2d 473, 476 (9th Cir.

*Schweiker,* 698 F.2d 903 (7th Cir.1983), upon which *Hyatt* relies, is distinguishable.

1981) (§ 405(h) does not bar hospitals' statutory challenge to promulgation of Secretary's Medicare reimbursement manual provision concerning determination of average per diem cost of routine patient care); *cf. Heckler v. Ringer, supra,* 104 S.Ct. at 2027 (claimants' claims "are inextricably intertwined with what we hold is in essence a claim for benefits and ... § 1331 jurisdiction over all their claims is barred by § 405(h)"). *But cf. Hadley Memorial Hospital, Inc. v. Schweiker,* 689 F.2d 905, 908–10 (10th Cir.1982) (§ 405(h) bars § 1331 jurisdiction over hospitals' statutory challenge to Secretary's regulatory formula for Medicare reimbursement of malpractice costs); *American Association of Councils of Medical Staffs of Private Hospitals, Inc. v. Califano,* 575 F.2d 1367, 1370–73 (5th Cir.1978) (§ 405(h) bars § 1331 jurisdiction over association's statutory and constitutional challenge to Secretary's Medicare regulations concerning manner in which participating hospitals review their physicians' efforts, but does not necessarily preclude mandamus jurisdiction over such challenge), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1018, 59 L.Ed.2d 72 (1979). These courts emphasized that Congress could not have intended to preclude courts from exercising federal question jurisdiction where no other statutory review mechanism is available for the plaintiff to pursue its legal challenge. *See Colonial Penn Insurance Co. v. Heckler, supra,* 721 F.2d at 437; *National Association of Home Health Agencies v. Schweiker, supra,* 690 F.2d at 940; *cf. Heckler v. Ringer, supra,* 104 S.Ct. at 2027 (§ 1331 jurisdiction not available "simply because [claimant] has not satisfied the prerequisites for jurisdiction under § 405(g)").

Since *Heckler v. Ringer,* courts have disagreed about whether § 1331 jurisdiction is available under the circumstances described above. *Compare Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan,* 757 F.2d 91 (6th Cir.1985) (§ 1331 jurisdiction exists over Medicare providers' statutory challenge to Secretary's classification of certain family physicians separately from other medical specialists); *Good Samaritan Medical Center v. Heckler,* 605 F.Supp. 19, 22–24 (S.D.Ohio 1984) (§ 1331 jurisdiction exists over rural hospitals' constitutional challenge to Medicare Act provision authorizing Secretary to calculate separate schedules for reimbursement of Medicare providers according to whether hospital is within or without metropolitan statistical area); *Bio-Medical Applications of Providence, Inc. v. Heckler,* 593 F.Supp. 1233, 1235–36 (D.D.C.1984) (§ 405(h) does not bar jurisdiction over Medicare provider's statutory challenge to Secretary's promulgation, without notice and comment, of regulation concerning reimbursement of costs of tests used to monitor kidney dialysis patients); *David v. Heckler,* 591 F.Supp. 1033, 1039–40 (E.D.N.Y.1984) (§ 1331 jurisdiction exists over beneficiaries' constitutional challenge to Secretary's notice and appeal procedures surrounding denial of Medicare reimbursement un-

In *D'Amico,* the court held that administrative law judges lacked standing to challenge Medicare voluntary supplemental insurance program); *and National Association of Patients on Hemodialysis and Transplantation, Inc. v. Heckler,* 588 F.Supp. 1108, 1115–18 (D.D.C.1984) (§ 1331 jurisdiction exists over associations' statutory challenge to Secretary's regulations concerning reimbursement of facilities and physicians under renal disease program and payment of conditional primary benefits) *with American Federation of Home Health Agencies, Inc. v. Heckler,* 754 F.2d 896 (11th Cir.1984) (§ 405(h) bars jurisdiction over Medicare providers' statutory challenge to Secretary's modification of reimbursement procedures); *Starnes v. Schweiker,* 748 F.2d 217 (4th Cir.1984) (§ 405(h) bars jurisdiction over Medicare beneficiaries', physicians' and clinics' statutory challenge to Secretary's promulgation of nationwide and regional ceilings on Part B reimbursements for head scan procedure), *cert. denied,* — U.S. ——, 105 S.Ct. 2022, 85 L.Ed.2d 304 (1985); *Smith v. North Louisiana Medical Review Association,* 735 F.2d 168, 171–72 (5th Cir.1984) (§ 405(h) bars jurisdiction over Medicare providers' suit to prevent peer review organization from taking certain action which would hamper providers' ability to receive Medicare reimbursement); *and Miller v. Heckler,* 601 F.Supp. 1471, 1476–83 (E.D.Tex.1985) (§ 405(h) bars jurisdiction over nursing home residents' and medical equipment suppliers' challenge to Secretary's regulations for determining whether nursing home provides "skilled nursing care," thus preventing patients therein from receiving Medicare coverage for medical equipment).

Several courts which have held that § 1331 jurisdiction is unavailable in these circumstances have relied on the fact that jurisdiction was otherwise available in the Court of Claims (now the United States Claims Court). *See Bussey v. Harris,* 611 F.2d 1001, 1004–05 (5th Cir.1980); *Trinity Memorial Hospital of Cudahy, Inc. v. Associated Hospital Service, Inc.,* 570 F.2d 660, 667–68 (7th Cir.1977); *South Windsor Convalescent Home, Inc. v. Mathews,* 541 F.2d 910, 912–14 (2d Cir.1976). Since plaintiffs in this case seek only declaratory and injunctive relief and have sought, as an ultimate remedy, agency redeterminations rather than awards of benefits, jurisdiction in the United States Claims Court appears to be unavailable. *See Berdick v. United States,* 612 F.2d 533, 536, 222 Ct.Cl. 94 (1979); 28 U.S.C. § 1491(a)(3).

It is reasonable to conclude that a similar analysis would obtain under the Social Security Act. *See* 42 U.S.C. § 1395ii (Medicare Act incorporates § 405(h), Social Security Act's limitation on judicial review). In light of the nature of the plaintiff, the claim, and the relief sought, as well as the apparent unavailability of any alternative jurisdictional basis over the City's constitutional and statutory claims, we conclude that this Court has § 1331 jurisdiction over the City's claims.

lenge an instruction by the SSA that ALJs send certain notices to Social Security claimants who were terminated from disability benefits, which notice allegedly had as its objective the discouragement of claimant-initiated challenges to such terminations. The court's holding, however, was based on "the danger to judicial impartiality that is created by allowing judicial officers to sue the government because they think they are being asked to enforce unlawful policies." 698 F.2d at 906. Here, not only is there an absence of similar considerations favoring judicial restraint, but, ironically, the Bellmon Review policy which the City seeks to invalidate is alleged to have caused the very evil of judicial bias or lack of impartiality (albeit of a different character) which *D'Amico* sought to avoid.

Accordingly, we conclude that the City of New York has standing to challenge the Secretary's non-acquiescence and Bellmon Review policies.

## VI. PRELIMINARY INJUNCTION

### A. *The Standard*

█ In order to be accorded preliminary injunctive relief in this Circuit, a party must typically demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir.1979); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). "A movant seeking to avail himself of the first alternative need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985). As the Magistrate recognized, an additional factor that should be considered in determining whether to grant a preliminary injunction in a case such as

this one is whether the relief requested will adversely affect the public interest. *See Mental Health Association of Minnesota v. Heckler*, 720 F.2d 965, 972 (8th Cir.1983); *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir.1983). The burden is on the party seeking the preliminary injunction to establish its entitlement to such relief. *See Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 707 (2d Cir. 1982).

Defendants contend that the more rigorous standard of "substantial likelihood of success on the merits" applied in *Wali* should be applied in this case. *See* Defendants' Objections to Report, at 6–7. We do not agree. In *Wali*, the court emphasized that such a standard should be applied where the grant of preliminary injunctive relief "may serve to provide all the relief that is sought on the merits." *Abdul Wali v. Coughlin, supra*, 754 F.2d at 1026. In *Wali*, such standard was applied since the suit involved a claim by prisoners that prison officials unlawfully interfered with their receipt of a report concerning conditions at the Attica Correctional Facility, and the injunctive relief requested was an order prohibiting such officials from interfering with the receipt of the report. That is far from the case at hand. By virtue of this Court's grant of preliminary injunctive relief, plaintiffs have not been awarded agency redeterminations for the many claimants whose claims were decided by the SSA from October 1, 1981 to the present. In addition, plaintiffs have not been granted an injunction prohibiting defendants from continuing their Bellmon Review program. Even with respect to prospective relief for the Secretary's modified non-acquiescence policy, our order of preliminary injunctive relief expressly reserves the defendants' right to recover any benefits paid to claimants as an indirect consequence of this Court's order in the event that defendants ultimately prevail on the merits of this action. Finally, the scope of the relief granted here is considerably more circumscribed than is often the case in proceedings such as this one, where class-wide interim benefits and notice requirements

are not infrequently ordered. *See* page 1399 *infra.* The preliminary injunction standard we use is consistent with the standard employed by other courts in Social Security disability class action cases. *See, e.g., Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 972; *Dixon v. Heckler,* 589 F.Supp. 1494, 1501 (S.D.N.Y.1984); *Schisler v. Heckler,* 574 F.Supp. 1538, 1546 (W.D.N.Y.1983); *see also Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir.1983); *cf. Holden v. Heckler,* 584 F.Supp. 463, 490 (N.D.Ohio 1984) (plaintiff must generally show strong or substantial likelihood or probability of success on the merits). We conclude that plaintiffs' motion for preliminary injunctive relief should be evaluated in accordance with the likelihood of success standard.[21]

### B. *Irreparable Harm*

In order to properly analyze plaintiffs' request for preliminary injunctive relief, it must be understood that the proposed class essentially consists of two groups of claimants: those who have already presented their claim for benefits to all levels of the agency, and those who have yet to do so. With respect to the former "retrospective" group, plaintiffs request, for immediate relief with respect to both Bellmon Review and non-acquiescence, an order directing defendants to identify such claimants, to provide a summary of the basis for the Secretary's unfavorable determination of their claims and other information pertaining thereto, and to provide the docket number and court of any pending cases involving these claimants. *See* Ex. NN (proposed order of relief), at 3. We view this request as being more in the nature of a request for discovery made subsequent to the denial of a motion to dismiss, as has occurred herein. We assume that such discovery shall take place expeditiously subsequent to the filing of this decision and that such discovery shall include all information which is necessary and relevant to the complete identification of the claims of class

members and the administrative and judicial proceedings in which such class members have been involved. No further order of this Court is necessary at this time.

Plaintiffs also request that defendants notify claimants who have received an unfavorable decision from any ALJ and whose claims are currently pending in the administrative or judicial review process that they may raise the issue of non-acquiescence and Bellmon Review in their pending appeals. *Id.* at 3–4. We hereby instruct the Secretary to deem claimants currently in the administrative review process to have raised such objections, thus obviating the need for individualized notice to claimants at this early stage of the proceedings concerning legal challenges of which the Secretary is fully aware. With respect to claimants whose cases are pending before New York federal district courts, our previous discussion makes clear that these courts are well aware of this Circuit's treating physician rule and the Secretary's failure to adhere to this rule, and will take these factors into consideration to the extent they deem appropriate in deciding the cases pending before them.

In light of the above, and in the absence of any requests for further preliminary injunctive relief with respect to claimants who have already exhausted their administrative remedies, we conclude that such claimants will not be irreparably harmed if this Court does not order the retrospective relief which plaintiffs seek.

On the other hand, there is no question but that future class members will suffer considerable harm which will not be fully remedied by a retroactive award of benefits if injunctive relief is denied. Plaintiffs whose claims have yet to be resolved by the agency will be subject to erroneous deprivations of disability benefits if the policies they challenge are permitted to continue and are ultimately determined to be unlawful. Yet the withholding

---

**21.** Under the circumstances of this case, we believe that the "fair ground for litigation" test for preliminary injunctive relief is inappropriate. We are also of the opinion that were that standard to be applied, neither our grant nor our denial of preliminary injunctive relief would be altered. *Cf. Dixon v. Heckler,* 589 F.Supp. 1494, 1501 (S.D.N.Y.1984).

or erroneous termination of benefits in these circumstances is not an event of negligible monetary consequence. Whether or not "disabled" within the statutory meaning of the term, the class members in this case are physically and mentally impaired individuals who rely heavily on the receipt of disability benefits to provide for the bare necessities of life. All of the named plaintiffs, for example, rely on some form of public assistance and are barely, if ever, able to afford little more than rent, utilities, and transportation. Plaintiffs Stieberger and Happy have frequently been threatened with the loss of electricity because of their inability to pay their bills. Plaintiff Happy has had to borrow money from a friend in order to pay her rent. Plaintiffs Stieberger and Sullivan cannot even afford to buy their children new clothing. The loss or inability to obtain disability benefits is not simply an inconvenience for such claimants; it frequently involves a serious, detrimental impact on the individual's quality of life. And while these named plaintiffs are now receiving interim benefits by order of this Court, hundreds of similarly situated individuals will not be similarly provided for during the pendency of this action. Even if the Secretary goes beyond what is required under her own policy and acquiesces at the Appeals Council level in all Second Circuit decisions, claimants will nevertheless face considerable delays [22] while they attempt to press their claims through the lengthy administrative review process. There is also the considerable risk that some claimants will not succeed in reaping the ultimate benefits of the new non-acquiescence policy (see pages 1369–71 *infra*), thus being not just temporarily delayed but completely deprived of disability benefits. Finally, we recognize that the harm suffered by virtue of arguably erroneous denials of benefits for many claimants is not only monetary; protracting the adjudicatory process by requiring claimants to pursue potentially fu-

tile procedures is frequently therapeutically detrimental to a claimant's mental and physical condition. As one court has stated, "the irreparable harm inherent in the pursuit of administrative relief ... [is] not alleviated but rather [is] exacerbated by the high reversal rate on appeal." *Mental Health Association of Minnesota v. Heckler, supra,* 720 F.2d at 970; *Holden v. Heckler, supra,* 584 F.Supp. at 463. Indeed, the denial of injunctive relief in this case may well subject class members to two rounds of administrative review: one which will occur during the pendency of this action if preliminary relief is denied, and another which will occur if plaintiffs ultimately prevail. The City, too, will incur additional burdens on already overextended public assistance programs and facilities if claimants are wrongfully denied federal disability benefits and thus are forced to rely on state and local assistance in order to subsist. In short, the showing of irreparable harm in this case is compelling. *See Mental Health Association of Minnesota v. Schweiker,* 554 F.Supp. 157, 166 (D.Minn.1982), *aff'd,* 720 F.2d 965, 972 (8th Cir.1983); *Caswell v. Califano,* 583 F.2d 9, 14 (1st Cir.1978).

### C. *Likelihood of Success on the Merits*

#### 1. *Non-Acquiescence*

It is important at the outset to set forth the precise nature of the "non-acquiescence" with which we are concerned in this case. Defendants acknowledge that they are bound by the judgments or orders of federal courts in the specific cases in which they are issued. *See* Defendants' Memo on ALJs, at 3 n. 3. Thus, this case does not involve the "law of the case" doctrine or principles of *res judicata.* At the other end of the legal spectrum, plaintiffs do not contend that the Secretary is legally obligated to follow a circuit court decision in a circuit other than the circuit in which the decision was rendered. Thus, plaintiffs do not argue that the decision of

---

**22.** Proposed plaintiff-intervenor Vega waited over two years from the time of his initial application for benefits to the date of his Appeals Council decision. Vega Aff. ¶ 15, Kubitschek Aff. ¶ 4. Plaintiff Johnson waited almost two years. Johnson Aff. ¶¶ 5, 8. Plaintiffs Happy and Sullivan both waited well over a year. Happy Aff. ¶¶ 11, 16; Sullivan Aff. ¶¶ 7–9; Kubitschek Aff. ¶ 3.

the first circuit court to decide an issue should have controlling, nationwide effect. What is at issue in this case is the Secretary's refusal to follow a circuit court ruling in subsequent cases within the same circuit.

Apart from defending the legality of the SSA's policy of intra-circuit non-acquiescence, defendants contend as an initial matter that they are in fact acquiescing in Second Circuit rulings in Social Security disability cases and that the Secretary's challenged policies have been ratified by Congress as part of the 1984 amendments to the Social Security Act. Thus, defendants argue, this Court need not reach the issue of whether plaintiffs are likely to succeed in demonstrating that the Secre-

tary's non-acquiescence policy is invalid. Defendants also argue, based on *Hyatt v. Heckler*, 757 F.2d 1455 (4th Cir.1985), that preliminary injunctive relief is inappropriate under the circumstances of this case. We will address each of these arguments in turn.

### a. *Non-Acquiescence in Second Circuit Precedent*

Preliminarily, we address defendants' contention that there is no need for this Court to evaluate the legality of its non-acquiescence policy because the Secretary's standards for evaluating the opinion of a claimant's treating physician are consistent with Second Circuit decisions on this issue.[23]

---

**23.** In papers submitted in support of plaintiffs' preliminary injunction motion, plaintiffs contend that the Secretary has also failed to acquiesce in Second Circuit decisions regarding the evaluation of complaints of pain. *See* Plaintiffs' Response to ALJ Memo, at 18–20; McCorry Aff. ¶ 25; Stieberger Aff. ¶¶ 3–6; Sullivan Aff. ¶¶ 3–6. In her Report, the Magistrate concluded that plaintiffs had failed to demonstrate a likelihood of succeeding on their claim that defendants have not acquiesced in Second Circuit decisions regarding the evaluation of pain. *See* Report, at 29–33. Neither plaintiffs nor defendants have formally objected to this portion of the Report, *see* Defendants' Objections to Report, at 1 n. 1; Plaintiffs' Response to Defendants' Objections to Report, at 1, although plaintiffs do contend that preliminary injunctive relief is still appropriate with respect to the pain issue, *id.* at 29–31.

Regardless of whether the Secretary has failed to acquiesce in Second Circuit decisions on pain in the past, it is clear that in light of Congress' 1984 amendments to the Social Security Act, which included a new interim standard for evaluating complaints of pain, preliminary injunctive relief as to this issue is unwarranted. *See* Report, at 29. There is no evidence that defendants have failed to acquiesce in any Second Circuit decisions interpreting the new pain standard. *Cf.* Morawetz Declaration ¶ 4. Indeed, it is clear, and plaintiffs do not argue otherwise, that the newly adopted legislative standard is substantially the same as the Secretary's previous regulation on pain. *Compare* 42 U.S.C. § 423(d)(5)(A) *with* 20 C.F.R. § 404.1529; *see also Polaski v. Heckler*, 751 F.2d 943, 950 (8th Cir.1984); 1984 Conference Report, at 29, U.S. Code Cong. & Admin.News 1984, p. 3087 ("The statutory language providing for an interim standard for evaluation of pain is amended to more accurately reflect current policies."). Fur-

ther, even if the Secretary failed to acquiesce in Second Circuit precedents on pain in rendering disability determinations prior to the 1984 amendments, plaintiffs do not seek preliminary retrospective relief other than the production of information otherwise obtainable through discovery. Thus, with respect to defendants' alleged non-acquiescence in Second Circuit decisions on pain, preliminary injunctive relief similar to that ordered with respect to the treating physician rule, *see* Order ¶ 6d, is unwarranted. Therefore, we need not determine at this time whether defendants did not acquiesce in Second Circuit precedents concerning pain, or whether plaintiffs are entitled to the retrospective relief they seek on the merits, *i.e.*, new determinations in accordance with Second Circuit law, if such non-acquiescence is established at trial. *Cf. Hyatt v. Heckler*, 757 F.2d 1455, 1458–59 (4th Cir.1985); 42 U.S.C. § 423 note (new standard applies to determinations made prior to January 1, 1987).

In earlier stages of these proceedings, plaintiffs also claimed that the disability determinations for plaintiffs Stieberger, Happy, and Vega were in violation of Second Circuit precedents requiring ALJs to affirmatively assist the parties in developing the record in cases involving *pro se* claimants. *See* McCorry Aff. ¶ 28. This argument was not pursued in plaintiffs' subsequent memoranda to the Court nor in oral arguments conducted in conjunction with these motions. The Magistrate did not examine this issue in her Report and Recommendation, and plaintiffs have not formally objected to the Report on this basis.

Furthermore, we note a certain interrelationship between this particular non-acquiescence claim and plaintiffs' challenge to Bellmon Review. If ALJs were indeed pressured by productivity guidelines and a result-based review procedure to quickly and unfavorably dispose of

Defendants contend that its rules concerning the weight to be given to the opinion of a treating physician are not inconsistent with the various ways in which the Second Circuit has articulated these legal standards. Implicit in their argument are two propositions: the Second Circuit's standards are less than consistent, and the Secretary's policy is consistent with the Second Circuit's. We reject both propositions.

The Second Circuit's rules on the opinion of a treating physician are a firmly embedded part of its Social Security jurisprudence. The Second Circuit has recently written:

> It is well-established in this circuit that "[t]he expert opinions of a treating physician as to the existence of a disability are binding on the fact finder unless contradicted by substantial evidence to the contrary." *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978); *see also Donato [v. Secretary of Dept. of Health and Human Services]*, 721 F.2d [414] at 419 [2d Cir.1983] ("we have regarded a treating physician's diagnosis, to the extent it is uncontradicted, as binding"); *Rivera v. Schweiker*, 717 F.2d [719] at 723 [2d Cir. 1983] ("expert opinion of a treating physician on the subject of disability is binding on the Secretary unless substantial evidence is presented to the contrary"); *Eiden v. Secretary of Health, Education and Welfare*, 616 F.2d 63, 64 (2d Cir.1980) ("we have repeatedly stated

that when 'no contradictory evidence is presented, a treating physician's expert opinion is binding on the Secretary'") (quoting *Alvarado v. Califano*, 605 F.2d 34, 35 (2d Cir.1979) (per curiam)). Moreover, it is equally well-established that there is no requirement that the physician's "medical testimony 'be supported by "objective" clinical or laboratory findings.'" *Eiden*, 616 F.2d at 65 (quoting *Cutler v. Weinberger*, 516 F.2d [1282] at 1287 [2d Cir.1975]).

> *Bluvband v. Heckler*, 730 F.2d 886, 892–93 (2d Cir.1984); *see Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir.1983) ("The opinion of a treating physician is entitled to considerable weight ... and in the absence of contradictory evidence is binding on the Secretary") (citations omitted); *Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir.1980) ("It is settled law in this circuit that in the absence of substantial contradictory evidence, the opinion of the claimant's treating physician is binding on the Secretary.").

As the dates of the above decisions indicate, these rules are not novel or recent ones, but have origins which precede the October 1, 1981 date set forth in this Court's class definition. As early as 1972, the Second Circuit held that "[t]he expert opinions of [a claimant's] treating physicians as to [the claimant's] disability ... are binding upon the referee if not contro-

---

disability claims, the most obvious manner in which such pressure would have manifested itself is in failing to adequately develop the record surrounding a *pro se* claimant's allegedly disabling condition. *See, e.g.,* Stieberger Aff. ¶ 10. Likewise, the modifications in the Bellmon Review program may well have the effect of substantially reducing the likelihood of "non-acquiescence" in the *pro se* claimant duty rule.

In this connection, we are not as yet persuaded that the agency's policy or practice with respect to the *pro se* duty rule can be properly characterized as one of non-acquiescence. Plaintiffs do not contend that the Secretary has issued a policy statement or ruling that the SSA non-acquiesces in Second Circuit cases regarding the ALJ's duty to develop the record in *pro se* claimant cases, or that the Secretary has promulgated a rule or legal standard which is at variance with Second Circuit precedents, as they have done with the treating physician rule. In-

deed, the Secretary's policy appears to be to the contrary. *See* 20 C.F.R. §§ 404.944, 416.1444; *see also* Program Operations Manual System, Disability Insurance § 401.085. It is thus unclear at this stage whether an ALJ's alleged failure to develop the record as required by Second Circuit precedents constitutes agency non-acquiescence in these precedents or is instead a consequence or result of other policies of which plaintiffs complain. *See generally Garrett v. Richardson*, 363 F.Supp. 83, 90 (D.S.C. 1973) (hearing examiner's duty of impartiality includes duty to fully and fairly develop the facts); pages 1393–98 *infra*.

In light of our conclusion that the current Bellmon Review program should not be enjoined, we believe it is more prudent at this stage of the proceedings to refrain from ordering that specific instructions be given concerning the ALJ's duty to develop the record in *pro se* claimant cases.

verted by substantial evidence to the contrary." *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 42 (2d Cir.1972) (*quoting Walker v. Gardner,* 266 F.Supp. 998, 1002 (S.D.Ind.1967)). And by 1980, the Second Circuit had similarly established the rule that such opinions need not be supported by objective clinical or laboratory findings. *See Eiden v. Secretary of Health, Education and Welfare, supra.*

The court in *Bluvband* not only stated the general rule concerning treating physicians but also articulated a detailed methodology, established by prior cases, for application of the rule:

> The cited cases establish a sequence, and in effect posit an analytical framework, which the ALJ should follow. Initially, the ALJ should see whether the treating physician has determined that the claimant is disabled. He should then examine the record for conflicting evidence. Upon finding conflicting evidence, he should compare the probative value of the treating physician's opinion with the probative value of the conflicting evidence. He should do so with the recognition that the treating physician's determination is generally "entitled to more weight than that of a doctor who has only seen the claimant once...." *Rosa v. Weinberger,* 381 F.Supp. 377, 380 (E.D.N.Y.1974).

*Id.* at 893. The court then indicated how the agency determination at issue had departed from this well-established rule. First, the court noted that the ALJ failed at the outset to accord the treating physician's opinion appropriate weight:

> In contrast to the above sequence, the ALJ herein assumed, *ab initio,* that "the weight to be given to [Dr. Nash's] statement ... depends upon the extent to which it is supported by specific and complete clinical findings...." App. 7. It was improper for the ALJ to disregard the above framework by requiring from the start that Dr. Nash's expert opinion be accompanied by concrete and detailed

clinical support.. Obviously, this does not mean that specific and concrete clinical findings supporting a treating physician's position would not be useful to the Secretary in evaluating such an opinion of disability in light of conflicting evidence.

*Id.* The court then found that apart from the failure to give the treating physician's opinion appropriate weight, the ALJ improperly rejected the opinion in the absence of substantial contradictory evidence. The court thus concluded that "Since Dr. Nash's opinion is not 'contradicted by substantial evidence to the contrary,' *Bastien v. Califano,* 572 F.2d at 912, his 'expert opinion ... on the subject of disability is binding on the Secretary....' *Rivera v. Schweiker,* 717 F.2d at 723." *Id.* at 895.

Defendants cite two other decisions— *Mongeur v. Heckler,* 722 F.2d 1033 (2d Cir.1983) and *Aponte v. Secretary of Health and Human Services,* 728 F.2d 588 (2d Cir.1984)—as evidence of the "variety of ways" in which the Second Circuit has articulated the treating physician rule. *See* Defendants' Objections to Report, at 50–52. Acknowledging the fact that the treating physician rule has been articulated in opinions written by no fewer than five circuit judges in the cases cited above and that slight linguistic variations will thus inevitably occur, we find these two decisions entirely consistent with the standard articulated in *Bluvband* and the cases cited therein. In *Mongeur,* the court stated that "the opinion of a treating physician is not binding if it is contradicted by substantial evidence, ... and the report of a consultative physician may constitute such evidence[,]" 722 F.2d at 1039 (citations omitted), a negative articulation of the treating physician standard which is virtually identical to *Bluvband.* In *Aponte,* the court noted that "the opinions of a treating physician deserve special respect" but that "genuine conflicts in the medical evidence are for the Secretary to resolve." 728 F.2d at 591. The court cited *Carroll, supra,* and *Parker v. Harris,* 626 F.2d 225 (2d Cir.1980), which essentially reiterates the standard enunciated in *Bastien, supra.* [24]

---

**24.** In *Aponte,* the ALJ rejected the opinions of two treating physicians in favor of the opinions

of two examining physicians and the testimony of the claimant's daughter-in-law, all of which

In short, ten different decisions of the Second Circuit have established one consistent standard concerning the opinions of treating physicians in disability cases: absent substantial evidence to the contrary, such opinions are binding on the Secretary; these opinions need not be supported by objective clinical or laboratory findings in ·order to be accorded such weight.

The Secretary's rule on treating physicians is contained in Social Security Ruling ("SSR") 82–48c (Oct. 1982), which provides that other things being equal, the fact that a physician treated a claimant will increase the weight which his or her opinion is accorded. This standard is derived from the Fifth Circuit's statement in *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981), that "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." In addition, the Secretary's regulations suggest that the opinion of a treating physician must be supported by clinical or laboratory findings in order to be considered as evidence of disability. *See* 20 C.F.R. §§ 404.1526(b), 416.926(b); *see also Oldham v. Schweiker, supra*, 660 F.2d at 1084.

A comparison of the standards used by the Second Circuit and the SSA reveals a significant difference in the weight accorded to the opinion of a treating physician. Under the Secretary's standard, a treating physician's opinion is generally weightier than that of a non-treating physician. No mention is made, however, that such an opinion is itself binding on the Secretary absent substantial evidence of a contradictory nature. Plaintiffs also point to a number of SSRs which instruct ALJs to treat a state agency physician as a medical expert and to give "appropriate" or "probative" weight to the opinion of such a physician, without mentioning the relative

weight to be given to a treating physician. *See* Plaintiffs' Response to Defendants' Memo on ALJs, at 17–18. Also, plaintiffs observe that the Secretary has also adopted a Seventh Circuit decision, *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir.1982), which states that a treating physician who had greater knowledge of the claimant's medical condition and had examined him more extensively than anyone else "might have been leaning over backwards to support the application for disability benefits" and that his conclusion was therefore not entitled to controlling weight. SSR 83–6c (1983). The Secretary's standards also suggest that a treating physician's opinion may be rejected if unsupported by clinical or laboratory findings even in the absence of contradictory evidence. Read together, these various SSRs and the language of the Secretary's treating physician rule strongly convey an approach to the treating physician's opinion which understates the significance of such an opinion and which is not in accord with the views of the Second Circuit.

Defendants point to § 401.085 of the Disability Insurance Program Operations Manual System as evidence of the SSA's recognition that "treating physicians are 'unique' and 'invaluable' sources of medical information whose evidence should be sought '[w]herever possible' ". Defendants' Objections to Report, at 52. While this provision does describe the treating physician in somewhat more flattering terms than SSR 82–48c, this section nevertheless does not refer to the weight to be given to a treating physician's opinion but merely the importance of obtaining evidence of one. Defendants' argument that § 401.085 is evidence of acquiescence in Second Circuit treating physician precedents is therefore unpersuasive.

Any doubt that the standards applied by the Second Circuit and the Secretary are

---

supported the ALJ's conclusion that the claimant had the residual functional capacity to perform light work. The Court concluded that there was substantial evidence to support the finding of no disability due to physical impairments or pain, but remanded to the Secretary

for further consideration of the claimant's psychiatric impairment in light of the evidence in the record to support a finding of disability on this basis and the ALJ's failure to state the basis for his contrary finding. 728 F.2d at 591–93.

indeed different, and that defendants have not been applying the Second Circuit's standard, is put to rest by the Secretary's litigation record on this issue. The sheer volume of cases in this Circuit in which an administrative denial of benefits was overturned due to a failure to properly apply the Second Circuit's treating physician rule is strong evidence that the Secretary's policy on the weight to be given to treating physician opinions is not in accord with Second Circuit case law. While ALJ determinations in this area have been overturned with more than modest frequency in this Circuit for some time, *see, e.g., Aubeuf v. Schweiker*, 649 F.2d 107, 112 (2d Cir. 1981); *Parker v. Harris, supra*, 626 F.2d at 232–33; *Singletary v. Secretary of Health, Education and Welfare*, 623 F.2d 217, 219 (2d Cir.1980); *Eiden v. Secretary of Health, Education and Welfare*, 616 F.2d 63, 64 (2d Cir.1980) (treating physician rule "has been ignored in this case"); *Alvarado v. Califano*, 605 F.2d 34 (2d Cir.1979); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978), the pace of such reversals has increased markedly in recent years. *See, e.g., Bluvband v. Heckler, supra*, 730 F.2d at 892–93; *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983) (ALJ should not have "rejected summarily" the expert opinions of treating physicians); *Donato v. Secretary of Health and Human Services*, 721 F.2d 414 (2d Cir.1983); *Rivera v. Schweiker*, 717 F.2d 719, 723–24 (2d Cir.1983); *Carroll v. Secretary of Health and Human Services, supra*, 705 F.2d at 642–43. In the last two years alone, no fewer than 26 reported decisions have been issued by 18 different judges of the federal district courts of New York in which a disability determination of the Secretary was overturned based upon its inconsistency with the Second Circuit's treating physician rule. *See, e.g., Pagan v. Heckler*, 605 F.Supp. 1237, 1240–41 (S.D.N.Y.1985) (Carter, J.) (ALJ incorrectly concluded at the outset that treating physician's report was entitled to less weight than consultative physician's report based on lack of clinical findings); *Carrillo v. Heckler*, 599 F.Supp. 1164, 1169 (S.D.N.Y.1984) (Keenan, J.) (insufficient evidence to rebut opinion of treating physician); *Hughes v. Heckler*, 598 F.Supp. 765, 767 (W.D.N.Y.1984) (Elfvin, J.) (Appeals Council improperly rejected unrebutted conclusions of treating physician); *Frost v. Heckler*, 596 F.Supp. 1132, 1138 (S.D.N.Y.1984) (Cooper, J.) (ALJ gave insufficient weight to treating physicians' opinions); *Masella v. Heckler*, 592 F.Supp. 621, 624 (S.D.N.Y.1984) (Elfvin, J.) (ALJ failed to properly evaluate treating physician's opinion as to claimant's residual capacity); *Irvin v. Heckler*, 592 F.Supp. 531, 540–41 (S.D.N.Y.1984) (Ward, J.) (Secretary failed to give proper weight to unrefuted opinion of treating physician; Secretary's determination was "patently contrary to the well-settled principles governing disability benefits proceedings" and was "in direct contradiction with the overwhelming weight of precedent in the Second Circuit"); *Sellers v. Heckler*, 590 F.Supp. 1141, 1145–46 (S.D.N.Y.1984) (Edelstein, J.) (Secretary incorrectly discounted treating physician's opinion based on alleged lack of objective clinical findings and testimony of non-examining physician); *McGuire v. Heckler*, 589 F.Supp. 718, 721–24 (S.D.N.Y.1984) (Weinfeld, J.) (ALJ's decision "not rendered with due regard for the rules governing the consideration of expert medical opinions," including reliance on questionable observation regarding lack of supporting objective clinical findings "directly contrary to the repeated admonition by our Court of Appeals" regarding absence of such a requirement); *LaFace v. Heckler*, 589 F.Supp. 192, 196–97 (S.D.N.Y.1984) (Sand, J.) (ALJ improperly rejected opinion of treating physician in absence of substantial contradictory evidence); *O'Grady v. Heckler*, 588 F.Supp. 850, 855 (E.D.N.Y.1984) (Wexler, J.) (Secretary improperly rejected opinions of treating physicians in absence of substantial contradictory evidence); *Mazzella v. Secretary of Health and Human Services*, 588 F.Supp. 603, 606 (S.D.N.Y.1984) (Ward, J.) (Secretary improperly rejected uncontradicted opinion of treating physician); *Walker v. Heckler*, 588 F.Supp. 819, 822–24 (S.D.N.Y.1984) (Weinfeld, J.) (ALJ improperly rejected treating physician's opinion based, *inter alia*, on fact

that opinion was based on symptomology rather than on clinical findings); *Keppler v. Heckler*, 587 F.Supp. 1319, 1322–23 (S.D. N.Y.1984) (Ward, J.) (ALJ improperly rejected uncontroverted opinions of treating and examining physicians based on fact that opinions were based on symptoms rather than objective findings); *Moruzzi v. Secretary of Health and Human Services*, 587 F.Supp. 16, 18 (S.D.N.Y.1984) (Sweet, J.) (ALJ improperly rejected uncontradicted opinion of treating physician); *Hernandez v. Heckler*, 585 F.Supp. 338, 342 (S.D.N.Y. 1984) (Pollack, J.) (ALJ improperly disregarded opinions of consultative physicians and treating hospital); *Scanlon v. Heckler*, 584 F.Supp. 791, 796–98 (S.D.N.Y. 1984) (Kram, J.) (ALJ improperly discredited opinion of treating physician "based upon an apparent failure to apply proper legal principles"); *Queenan v. Heckler*, 581 F.Supp. 1216, 1219 (S.D.N.Y.1984) (Owen, J.) (Appeals Council improperly rejected ALJ's recommendation where opinion of treating physician was uncontradicted); *Barrett v. Secretary of Health, Education and Welfare*, 581 F.Supp. 484, 489 (S.D.N.Y.1984) (Sofaer, J.) (Appeals Council improperly remanded case to ALJ based on determination that ALJ, in favoring the report of treating physician, was stating a general rule that opinion of treating physician is necessarily more persuasive than that of consulting physician); *Bayersdorfer v. Secretary of Health and Human Services*, 578 F.Supp. 131 (S.D.N.Y.1983) (Broderick, J.) (ALJ improperly rejected opinion of treating physician in absence of substantial contradictory evidence); *Zayas v. Heckler*, 577 F.Supp. 121, 126–27 (S.D.N.Y.1983) (Duffy, J.) (Appeals Council improperly rejected opinion of treating physician); *Brown v. Heckler*, 576 F.Supp. 289, 292 (S.D.N.Y.1983) (Carter, J.) (Appeals Council improperly rejected ALJ's findings which were based, *inter alia*, on opinion of treating physician); *Sherrer v. Secretary of Health and Human Services*, 575 F.Supp. 1503, 1504 (S.D.N.Y.1983) (Weinfeld, J.) (remanding case based in part upon failure to explain why opinions of treating physicians were "virtually rejected out of hand ... the record is bare of any indica-

tion that the ALJ or the Appeals Council acknowledged the weight to be accorded opinions of treating physicians"); *Tingling v. Secretary of Health and Human Services*, 575 F.Supp. 905, 908–09 (S.D.N.Y. 1983) (Carter, J.) (ALJ improperly rejected opinion of treating physician based on opinion of non-examining doctor); *Edwards v. Secretary of Health and Human Services*, 572 F.Supp. 1235 (E.D.N.Y.1983) (Weinstein, J.) (ALJ improperly rejected opinion of treating physicians in absence of substantial contradictory evidence and improperly required opinion to be supported by objective findings); *Chrzan v. Heckler*, 572 F.Supp. 844 (W.D.N.Y.1983) (Telesca, J.) (Secretary improperly rejected opinions of treating and examining physicians); *Newton v. Heckler*, 568 F.Supp. 1044, 1046–47 (W.D.N.Y.1983) (Telesca, J.) (ALJ improperly rejected opinions of treating physician which were consistent with those of two other examining physicians in favor of form completed by non-examining physician).

Most recently on the appellate level, in *DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930 (2d Cir.1984), the Second Circuit reversed an ALJ's denial of disability benefits based on the improper application of three legal standards: the failure to apply the medical improvement standard (a standard in which the Secretary had previously expressed her non-acquiescence; *see* pages 1366–67 *infra*), the failure to consider the claimant's impairments in combination (a standard which was held unlawful in *Dixon v. Heckler*, 589 F.Supp. 1494 (S.D.N.Y.1984)), and the failure to give proper weight to the treating physician's testimony. As for the last error, the Court observed that "[t]he cases in this circuit are almost legion where the court has reversed administrative findings due to the factfinder's failure to give appropriate weight to the expert opinion of the treating physician ... Once again, we find that the Secretary failed to give sufficient weight to the evidence of the treating mental health professionals and gave no justification for not doing so." *Id.* at 937–38 (citations omitted). The Court rejected

the ALJ's determination and awarded attorney's fees to the claimant under the Equal Access to Justice Act. *Id.* at 938.

The evidence of agency non-acquiescence in the Second Circuit's treating physician rule is overwhelming. One or two decisions reversing an ALJ's improper consideration of treating physician opinion testimony might be nothing more than the ordinary aberrations of the administrative agency adjudicative process. The striking pattern of consistent disregard for clear, repeatedly articulated standards is evidence of a wholly different character. Moreover, while the present record is not complete with full administrative records of plaintiffs' individual disability determinations, defendants have made no attempt to even begin to refute the assertions of non-acquiescence contained in the affidavits of the individual plaintiffs, *see* Ex. C, D, E, F, G to Plaintiffs' Motion for a Preliminary Injunction; *see also* Kubitschek Aff. ¶ 10–20, concerning the agency's blatant disregard of the Second Circuit's treating physician rule.

Defendants may well be correct in observing that cases involving the opinion of a treating physician involve a panoply of different factual circumstances including, *inter alia*, the nature of the physician's opinion (*i.e.*, medical, vocational, or a "legal" opinion on the ultimate issue of disability); the length of the doctor/patient relationship; the physician's expertise in the subject matter of his or her opinion, or the consistency of a treating physician's opinion with that of another treating physician. We fail to see, however, how these variables in any way refute or explain the overwhelming evidence of the Secretary's persistent failure to apply the Second Circuit's legal standards governing the evaluation of the opinion of a claimant's treating physician. While the Secretary's non-acquiescence could arguably be even more explicit, such as in those situations in which the Secretary issues a formal statement of non-acquiescence, we believe that the preliminary showing here is virtually as strong a showing of *de facto* non-acquiescence as can be made.

We are mindful of the fact that the relationship between the judiciary and the executive branch's administrative agencies is normally one of respect and deference, and that this relationship goes to the essence of the administrative process and the intent of Congress in initially creating such agencies. The administrative agency is typically entrusted with the faithful execution of the laws, and deference is accorded to the agency's institutional expertise and judgment in implementing the letter and spirit of the laws. However, the sheer volume of decisions in which courts have overturned determinations of the SSA based on irreconcilability with this Circuit's treating physician rules has frustrated the courts' ability to accord such deference to determinations of this agency, and reveals without ambiguity the SSA's non-acquiescence in this Circuit's decisional law.

b. *Congressional Ratification of Defendants' Treating Physician Rule*

Defendants contend that the Secretary's rules with respect to a treating physician's opinion have been ratified by Congress in the 1984 amendments to the Social Security Act. We note at the outset that the section of the 1984 amendments to which defendants refer, section 9(b)(1), applies only to determinations rendered on or after October 9, 1984, the date of the amendment's enactment. *See* Social Security Disability Benefits Reform Act of 1984, Pub.L. 98–460, § 9(b)(2), 98 Stat. 1794, 1804 (1984) (codified at 42 U.S.C. § 423 note). Thus, this provision is inapplicable to plaintiffs Stieberger, Sullivan, and Johnson, all of whom completed their administrative proceedings prior to this date, and all other class members who similarly completed their administrative proceedings prior to this date.

More importantly, we find defendants' argument wholly unpersuasive. Section 9(b)(1) provides as follows:

In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Secretary shall consider all

evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Secretary shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C. § 423(d)(5)(B). Defendants argue that § 9(b)(1) is consistent with and ratifies the Secretary's policy on evaluating the opinion of a treating physician. Defendants' Memo in Support of Motion to Dismiss, at 22. Defendants rely on a statement in the Senate Report that "[t]he Committee does not intend to alter in any way the relative weight which the Secretary places on reports received from treating physicians and from consultative examinations." S.Rep. No. 466, 98th Cong., 2nd Sess. 26 (1984).

Weighed against the statute and the accompanying Conference Committee Report, we believe defendants place inordinate weight on this Senate Report statement. Both the Conference Committee report and the statute as enacted evince a concern solely with the acquisition of evidence from treating physicians and the order in which medical evidence from physicians is to be evaluated. See 42 U.S.C. § 423(d)(5)(B); H.R. No. 1039, 98th Cong., 2d Sess. 34–35, reprinted in 1984 U.S.Code Cong. & Ad. News 3038, 3080, 3092–93 ("1984 Conference Report"). Neither the statute nor the report addresses itself to the issue of the weight to be accorded the opinions of treating physicians, once such evidence is obtained. Neither demonstrates any intent to alter or ratify the Secretary's policy on evaluating treating physician opinions. In neither source is there any concrete indication of the standard presently applied by the Secretary, or the standard to be applied in the future. We find it difficult to conclude that Congress has adopted an agency

standard concerning such an integral part of the disability review process without any indication that it was aware of the substantive standard being applied and its apparent inconsistency with Second Circuit case law, or that it intended to resolve this conflict by adopting the agency's standard. Cf. 42 U.S.C. § 423(d)(5)(A) (adopting Secretary's standard for evaluating pain); 1984 Conference Report, at 29 (expressing congressional intent to statutorily adopt Secretary's regulatory policy on evaluating pain). In light of the above, we conclude that the 1984 amendments to the Social Security Act do not ratify or adopt the Secretary's rules on evaluating the opinion of a treating physician.

Having rejected defendants' arguments against the need to evaluate the legality of its non-acquiescence policy, we now turn to such an evaluation.

c. *The Legality of Non-Acquiescence*

As we stated at the outset of our discussion of plaintiffs' motion for preliminary injunctive relief, class members who already have exhausted their administrative remedies will not be irreparably harmed if the retrospective relief sought is denied. *See* pages 1341–42 *supra*. However, in order to properly understand the nature of the Secretary's various non-acquiescence policies, the significance of the changes which have recently occurred, and the propriety of injunctive relief against the policy currently in effect, an examination of the Secretary's previous policy is warranted. Indeed, in order to fully explain our conclusion that plaintiffs are likely to succeed in showing that the current non-acquiescence policy is invalid, we believe it is essential to explain why we believe that non-acquiescence as formerly practiced by the Secretary is likely to be found invalid, and why the changes reflected in the current policy do not alter this conclusion. Therefore, in assessing plaintiffs' challenge to the legality of defendants' policy of non-acquiescence, we first will examine the legality of defendants' non-acquiescence policy as it existed prior to June 3, 1985. We then will

consider the legality of defendants' modified non-acquiescence policy adopted on June 3, 1985, subsequent to the Magistrate's Report and Recommendation, and embodied in Interim Circular No. 185₆

### (i) *The Original Non-Acquiescence Policy*

 Although the defendants deny its impact on the plaintiffs, the defendants do not dispute the fact that they have in fact adhered to a general policy of non-acquiescence in circuit court decisions with which they disagree. This policy has been expressed in a variety of different forms. Section 1–161 of the OHA Handbook, containing instructions for ALJs to follow in deciding Social Security cases, provided that

> While the ALJs are bound by decisions of the United States Supreme Court, they should also make every reasonable effort to follow the district or circuit court[']s views regarding procedural or evidentiary matters when handling similar cases in that particular district or circuit.

> However, where a district or circuit court[']s decision contains interpretations of the law, regulations, or rulings [that] are inconsistent with the Secretary's interpretations, the ALJs should not consider such decisions binding on future cases simply because the case is not appealed. In certain cases SSA will not appeal a court decision it disagrees with, in view of the special circumstances of the particular case (e.g., the limited effect of the decision).

> When SSA decides to acquiesce in a district court decision, or a circuit court decision [that] is inconsistent with our previous interpretation of the law, regulations, or rulings, SSA will take appropriate action to implement changes by means of regulations, rulings, etc. ALJs will be promptly advised of such action.

This rule was in effect from 1976 until June 3, 1985. *See* Baker Aff. ¶ 2 (March 1, 1985).

In a January 7, 1982 memo to agency ALJs, defendant Louis B. Hays, former OHA Associate Commissioner, stated unequivocally that

> [T]he federal courts do not run SSA's programs ... ALJs are responsible for applying the Secretary's policies and guidelines regardless of court decisions below the level of the Supreme Court. Court decisions can result in the changing of policies, but it is not the role of ALJs to independently institute those changes.

Subcommittee Hearing, at 217.

The Secretary's policy has been reiterated both by the Appeals Council, *see Hillhouse v. Harris*, 547 F.Supp. 88, 92 (W.D.Ark.1982) ("[T]he Secretary is bound only by the provisions of the Social Security Act, regulations and rulings, and by United States Supreme Court decisions. A district or circuit court decision is binding only in the specific case it decides.") (quoting Appeals Council), *aff'd per curiam*, 715 F.2d 428, 430 (8th Cir.1983) (same), and by the highest ranking officials of HHS, *see* Baker Aff. ¶ 1 (March 1, 1985), and has been defended as a valid exercise of administrative agency power, *see id.* ¶ 2 ("It is the position of HHS and the United States that there is no statutory or constitutional bar to the policy of non-acquiescence."). The Solicitor General of the United States has also expressed opposition to legislative proposals to prohibit the SSA from continuing to adhere to its non-acquiescence policy. 130 Cong.Rec. 11,454–55 (Sept. 19, 1984) (letter from former Solicitor General Rex E. Lee to Senator Robert Dole).

The SSA has implemented its non-acquiescence policy in two ways. First, the SSA may simply ignore a circuit court decision by leaving unaltered and continuing to adhere to an agency regulation or other interpretive guideline which conflicts with the decision. Second, the Secretary has from time to time promulgated Social Security Rulings which specifically direct agency personnel, including ALJs, not to abide by a particular circuit court decision. Ten SSRs have been issued since 1966, seven of which are still in effect. SSRs are not published in the Federal Register and, unlike the Secretary's formal regulations, do not appear in the Code of Federal Regula-

tions. SSRs are available for sale to the public. 20 C.F.R. § 422.410.

Defendants advance a number of interrelated legal arguments in support of an overall theory of why its policy of intracircuit non-acquiescence is lawful. Briefly stated, defendants first contend that the SSA, as part of a co-equal branch of the federal government, is not bound by the doctrine of *stare decisis, i.e.,* the deference accorded to a prior judicial determination of a legal issue sought to be relitigated. Defendants stress the flexible nature of the doctrine of *stare decisis* and assert the right, generally held by other litigants (*e.g.,* private parties), to continue to adhere to and advocate its own view of what the law should be, free of any duty to continually conform its conduct to what the law has been said to be by a federal circuit court. Defendants note that the SSA, as a governmental agency with a duty to administer nationwide legal standards in Social Security matters, is also different from the ordinary civil litigant and accordingly must be permitted to follow a policy of non-acquiescence in unfavorable circuit court decisions in order to preserve what it believes are the correct uniform legal standards under the Social Security Act. Defendants assert that the right to relitigate adverse circuit court rulings through a non-acquiescence policy is supported by the Supreme Court's decision in *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), in which the Court held that the

doctrine of non-mutual collateral estoppel does not apply against the United States.[25]

While the Supreme Court has apparently not directly confronted the issue of whether intra-circuit non-acquiescence is a lawful exercise of administrative agency authority, individual Justices have indicated that the matter is at least one of serious concern. In dissenting from the Court's refusal to vacate a stay of the district court's injunction in *Lopez v. Heckler,* 572 F.Supp. 26 (C.D.Cal.1983), Justice Brennan, in discussing the perceived judicial interference with the administrative process which prompted the original granting of the stay by Justice Rehnquist, observed that "it is clear to me that it is the Secretary who has not paid due respect to a coordinate branch of government by expressly refusing to implement the binding decisions of the Ninth Circuit." *See Heckler v. Lopez,* 464 U.S. 879, 104 S.Ct. 221, 226–27, 78 L.Ed.2d 217 (1983) (Brennan and Marshall, JJ., dissenting). In *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984), the Court held that the government is bound by collateral estoppel only in cases of mutuality between the parties. Justice White concurred in the result on the understanding that the government would not be precluded from relitigating an issue in such circumstances within another circuit which adhered to a contrary rule. In comparing the consequences of such an understanding (permitting the government to relitigate an issue

---

**25.** Defendants also argue that ALJs are subordinates of the Secretary and thus are obligated to adhere to and apply the Secretary's policy as embodied in her rules and regulations, even if contrary to the decision of a federal circuit court. *See* Defendants' Memo on ALJs, at 5–9. We fail to see how this argument is responsive to plaintiffs' contention that the Secretary's instruction to ALJs—that they need not consider a circuit court decision as binding if it conflicts with the Secretary's own policy—is unlawful, and that ALJ decisions rendered pursuant to such instructions are therefore invalid.

While we recognize that federal courts should avoid constitutional issues if a controversy can be resolved on statutory grounds, *see Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), we reach such issues because of the considerable doubts surrounding

plaintiffs' *statutory* challenge to the Secretary's nonacquiescence policy. We fail to see how this policy threatens, interferes with or violates any rights of claimants to independent and impartial ALJs under the APA. If nonacquiescence is of dubious validity, it is because the policy requires ALJs and other agency officials to decide disability claims pursuant to SSA policy without regard to conflicting circuit court precedent, not because of any bias on the part of these officials. Also, while the Secretary's failure to apply this Circuit's rules on treating physicians is inconsistent with the Social Security Act as interpreted by the Second Circuit, plaintiffs challenge not simply the aberrational rendering of disability determinations which are inconsistent with the Act's judicially interpreted standards but the SSA's asserted power to generally disregard judicial interpretations in making disability determinations.

against the same party in a different circuit) and a contrary rule (requiring the government to apply one rule to the mutual party and a contrary rule to other litigants within the same circuit), Justice White opted for an approach which countenanced the former but avoided the latter: "[T]o the extent the policy against inconsistent decisions remains relevant when a circuit conflict exists ... [a]t least some measure of consistency and certainty is obtained by even-handed application of rules within individual circuits." *Id.* at 178, 104 S.Ct. at 582.

Although not specifically dealt with by the Supreme Court, the SSA's non-acquiescence policy has been the subject of almost universal condemnation by those courts which have considered its legality. Numerous circuit and district courts—in the Second, Fourth, Sixth, Eighth, Ninth and Tenth Circuits—have confronted and either expressly or implicitly rejected the Secretary's contention that SSA may refuse to follow a federal circuit court decision in subsequent cases within the circuit. *See, e.g., Douglas v. Schweiker,* 734 F.2d 399, 400 (8th Cir.1984) (Secretary's assertion that claimant has burden of establishing inability to perform light or sedentary work "is wrong and the Secretary knows it is wrong... The Secretary has not appealed from our decision on this point in any of the cited cases or in any other cases in which we have so held. Thus, this view is the law of the Circuit and must be followed in all cases in this Circuit. Administrative law judges must recognize and apply this law in their decisions.") (citations omitted); *Capitano v. Secretary of Health and Human Services,* 732 F.2d 1066, 1070 n. 9 (2d Cir.1984) (noting that court "expect[ed *Rosenberg v. Richardson,* 538 F.2d 487 (2d Cir.1976), a decision with which the Secretary disagreed] to be followed henceforth. We are not alone in our sensitivity to the Secretary's policy of non-acquiescence in what she regards as unfavorable circuit court decisions."); *Layton v. Heckler,* 726 F.2d 440, 442 (8th Cir.1984) (reversing ALJ's denial of disability benefits based on failure to properly evaluate claimant's complaints of pain; "we shall continue to upset the findings of the Secretary until such time as she sees fit to comply with the decisions of this Court"); *Lopez v. Heckler,* 725 F.2d 1489, 1497, 1503 (9th Cir.) (noting, in holding that exhaustion of remedies would be futile and therefore was not required, inconsistency of Secretary's non-acquiescence policy with separation of powers and rule of law as established in *Marbury v. Madison), vacated and remanded on other grounds,* — U.S. —, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984); *Hillhouse v. Harris, supra,* 547 F.Supp. at 91–93 (dicta) (upholding denial of benefits in "pain" case but rejecting Secretary's non-acquiescence policy), *aff'd per curiam,* 715 F.2d 428, 430 (8th Cir.1983) (same); *Polaski v. Heckler,* 585 F.Supp. 1004, 1010–11 (D.Minn.) (plaintiffs likely to succeed in showing that application of erroneous pain standard on systemwide basis violates separation of powers, due process and Social Security Act), *remanded on other grounds,* 751 F.2d 943 (8th Cir.1984); *Holden v. Heckler, supra,* 584 F.Supp. at 490–91 (rejecting as "utterly meritless" Secretary's argument in support of agency non-acquiescence in Sixth Circuit's medical improvement standard for terminating disability benefits); *Doe v. Heckler,* 576 F.Supp. 463, 472 (D.Md.1983) (enjoining Secretary from terminating disability benefits without showing medical improvement as required by *Dotson v. Schweiker,* 719 F.2d 80 (4th Cir.1983); "in this circuit the Secretary must comply with the *Dotson* ruling"); *Valdez v. Schweiker,* 575 F.Supp. 1203 (D.Colo.1983) (Secretary's refusal to follow *Ryan v. Shea,* 525 F.2d 268 (10th Cir.1975) violates separation of powers); *Chee v. Schweiker,* 563 F.Supp. 1362, 1365 (D.Ariz.1983) (Secretary's position of non-acquiescence in *Finnegan v. Matthews,* 641 F.2d 1340 (9th Cir.1981) "falls far short of being substantially justified and was in fact a position taken in bad faith", thus justifying attorney's fee award to plaintiff); *Siedlecki v. Schweiker,* 563 F.Supp. 43, 47–48 (W.D.Wash.1983) ("The SSA must follow the Ninth Circuit's decision [in *Finnegan v. Matthews, supra* ] within this jurisdiction." (citing, *inter alia, ITT World Communications Inc. v. FCC,* 635 F.2d 32 (2d Cir.1980)).

Courts are not alone in their condemnation of the Secretary's non-acquiescence policy. Members of Congress have also expressed considerable concern with respect to the legality and wisdom of the Secretary's non-acquiescence policy. *See, e.g.,* 1984 Conference Report, at 37–38 (noting undesirability and questionable legality of non-acquiescence policy); Subcommittee Report, at 24–30, 37 (noting harm caused by non-acquiescence policy to claimants and ALJs and recommending that SSA "immediately cease" policy). Members of the executive branch itself have noted their disagreement with the policy by refusing to defend or adhere to the policy in judicial proceedings. *See* Ex. M to Plaintiffs' Motion for a Preliminary Injunction (June 25, 1984 letter from United States Attorney for the Southern District of New York to Chief Judge Motley stating that

It is our view that this policy, whatever it does permit, surely does not allow the United States Attorney's Office, HHS or any other federal agency to refuse to follow clear rules of law decided by the United States Court of Appeals ... [T]here has never been any support to my knowledge for the notion that federal agencies within a particular Circuit could disagree with and refuse to follow clear rulings of that Circuit. We have not defended cases in the past by disregarding the law of this Circuit and will not do so in the future.).[26]

Even ALJs have objected to the policy, not only on constitutional grounds but also because Appeals Council reversal of ALJ decisions which are consistent with federal court precedent makes ALJ decisionmaking appear unduly erroneous and thus subjected ALJs at one time to more frequent Bellmon Review. *AALJ v. Heckler, supra,* 594 F.Supp. at 1138; Subcommittee Hearing, at 75; *see* pages 1392–93 *infra.*

These authorities have stated the legal basis for their disapproval of the non-acquiescence policy by invoking several well-established legal doctrines: separation of powers; the rule of law; *stare decisis;* due process; equal protection. The policy has been challenged on statutory grounds as well. Although legal theories have varied, these authorities have spoken with virtual unanimity in their condemnation of the practice of intra-circuit non-acquiescence and in their determination that such a policy is unlawful.

Nor is the SSA the first executive agency to assert the right to disregard, or continue to challenge, circuit court decisions in subsequent cases within the same circuit, only to have this assertion rejected by the courts. This Circuit, in *Ithaca College v. NLRB,* 623 F.2d 224 (2d Cir.), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980), addressed the National Labor Relations Board ("NLRB")'s attempt to justify its failure to conduct a hearing to determine, in accordance with the Second Circuit's decision in *NLRB v. Yeshiva University,* 582 F.2d 686 (2d Cir.1978), *aff'd,* 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 715 (1980), whether full-time faculty members of Ithaca College were ineligible for inclusion in a collective bargaining unit. In response to the NLRB's suggestion that it had not acquiesced in the Second Circuit decision in *Yeshiva* and thus considered a hearing unnecessary, the Second Circuit replied:

The position of the Board is one in which we cannot acquiesce. While deference is to be given to an agency's interpretation of the statute it administers, ... it is the courts that have the final word on matters of statutory interpretation ... 'The position of any administrative tribunal whose hearings, findings, conclusions and orders are subject to direct judicial review is much akin to that of a United States District Court,' ... and as must a district court, an agency is bound to follow the law of the Circuit ...

Of course, we do not expect the Board or any other litigant to rejoice in all the opinions of this Court. When it disagrees in a particular case, it should seek

---

26. As a consequence of this position, the memoranda submitted with respect to the validity of the SSA's non-acquiescence policy have been prepared by the Department of Justice's Washington, D.C. Civil Division and HHS' General Counsel's Office.

review in the Supreme Court. During the interim before it has sought review or while review is still pending, it would be reasonable for the Board to stay its proceedings in another case that arguably falls within the precedent of the first one. However, the Board cannot, as it did here, choose to ignore the decision as if it had no force or effect. Absent reversal, that decision is the law which the Board must follow. The Board cites no contrary authority except its own consistent practice of refusing to follow the law of the circuit unless it coincides with the Board's views. This is intolerable if the rule of law is to prevail.

623 F.2d at 228 (citations omitted). In so holding, the court relied on the Third Circuit's earlier rejection of a similar argument by the NLRB in *Allegheny General Hospital v. NLRB,* 608 F.2d 965, 970 (3d Cir.1979). In *Allegheny,* the NLRB refused to follow earlier Third Circuit decisions regarding the determination of an appropriate bargaining unit for hospital employees. The Third Circuit's response was as follows:

[O]ur judgments in *Memorial Hospital [v. NLRB,* 545 F.2d 351] and *St. Vincent's Hospital [v. NLRB,* 567 F.2d 588] [the Third Circuit's previous decisions] are binding on all inferior courts and litigants in the Third Judicial Circuit, and also on administrative agencies when they deal with matters pertaining thereto ... [T]he Board is not a court nor is it equal to this court in matters of statutory interpretation. Thus, a disagreement by the NLRB with a decision of this court is simply an academic exercise that possesses no authoritative effect ... Congress has not given to the NLRB the power or authority to disagree, respectfully or otherwise, with decisions of this court ... For the Board to predicate an order on its disagreement with this court's interpretation of a statute is for it

to operate outside the law. Such an order will not be enforced.

*Id.* at 970; *accord Beverly Enterprises v. NLRB,* 727 F.2d 591, 593 (6th Cir.1984) ("The basic doctrine that, until reversed, the dictates of a Court of Appeals must be adhered to by those subject to the appellate court's jurisdiction applies equally to the precedential rule of *stare decisis* and the policy rule respecting the law of the case ... Administrative agencies are no more free to ignore this doctrine than are district courts.") (citation omitted); *PPG Industries, Inc. v. NLRB,* 671 F.2d 817, 823 n. 9 (4th Cir.1982) ("It is the duty of the NLRB to apply the law of the Circuit."); *Mary Thompson Hospital, Inc. v. NLRB,* 621 F.2d 858, 862 (7th Cir.1980); *Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245, 1251–52 (5th Cir.1978); *see also NLRB v. HMO International/California Medical Group Health Plan, Inc.,* 678 F.2d 806, 809, 812 (9th Cir.1982); Feeney, Conflicts Involving Federal Law: A Review of Cases Presented to the Supreme Court, 67 F.R.D. 301, 354 (1975) (NLRB intracircuit non-acquiescence "serve[s] little purpose except to provoke appeals") (*quoting* C. Summers, Report on Labor Law Cases in the Federal Appellate System 13–14 (1974)). *But cf. Yellow Taxi Co. of Minneapolis v. NLRB,* 721 F.2d 366, 381–83 (D.C.Cir.1983) ("We acknowledge that the Board is not required to conform its rulings to every decision by a court of appeals and that no absolute rule can be applied to every case. But when the law has been firmly established, as is the applicable law here, the Board in our opinion is required to give those courts greater deference than the Board did in this case.") (footnote omitted); *id.* at 384–85 (Wright, J., concurring) (suggesting that administrative agency may decline to follow circuit court decisions with which it disagrees even within same circuit).[27]

The Railroad Retirement Board's refusal to acquiesce in a decision of the Second

---

**27.** Defendants appear to suggest that Judge Wright's suggestion is the better view, that *Ithaca College* is no longer good law, and that the SSA is distinguishable from the NLRB insofar as intra-circuit non-acquiescence is concerned.

As for the first suggestion, we disagree for the reasons discussed both in the NLRB decisions of other circuits (the overwhelming number of which follow the Second Circuit position articulated in *Ithaca College* ) and for the other reasons discussed above. In any event, *Ithaca Col-*

Circuit has also met with strong disapproval. In *Kirkland v. Railroad Retirement Board*, 706 F.2d 99 (2d Cir.1983), the Board expressly refused to apply the Second Circuit's ruling in *Rosenberg v. Richardson*, 538 F.2d 487 (2d Cir.1976), governing the circumstances under which a subsequent wife could collect widow's benefits under § 216(h)(1)(B) of the Social Security Act, a provision expressly incorporated into the Railroad Retirement Act. The Second Circuit vacated the Board's order denying benefits and noted:

> [T]he Board has continually resisted application of the rule enunciated in *Rosenberg v. Richardson, supra.* It is, of course, distinctly the province of the judiciary to interpret the law, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and we strongly caution the Board against ignoring rules of law established by this Court and other Courts of Appeals which have not been overruled by the Supreme Court. Respondent may urge reconsideration of decisions to which it objects, but it has no discretion to substitute its views of the law for those principles which we have already formulated. *Ithaca College v. NLRB*, 623 F.2d 224 (2d Cir.), *cert. de-*

*nied*, 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980).

706 F.2d at 104.

The Second Circuit has similarly rejected an attempt by the Federal Communications Commission to adopt an interpretation of the Communications Act of 1934 at variance with previous circuit decisional authority. *See ITT World Communications Inc. v. FCC*, 635 F.2d 32 (2d Cir.1980). In rejecting the FCC's argument that the agency's rule was preferable and that a recent Second Circuit decision "invited" the agency to adopt the dissent's view in the previous case, the court stated that the dissent

> does not represent the law of this Circuit and the FCC has no right to treat it as such ... The majority opinion firmly establishes the law of the Circuit ... '[T]he Board is not a court nor is it equal to this court in matters of statutory interpretation.' [citing *Allegheny General Hospital*] ... The Commission is obligated to enforce its statutory duties as thus construed, not as it would like to have them enlarged.

*Id.* at 43 (citations omitted).[28]

We find the reasoning of these decisions fully applicable here. Our system of con-

---

*lege* is the rule in this circuit, and we are bound to adhere to that rule. *See* fn. 13 *supra*.

As for the second argument, we again disagree. The government cites a number of NLRB cases in support of its contention that its non-acquiescence policy is lawful. In these cases—*NLRB v. Action Automotive, Inc.*, —— U.S. ——, 105 S.Ct. 984, 83 L.Ed.2d 986 (1985); *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984); *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), and *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975)—the Supreme Court upheld an NLRB interpretation of the National Labor Relations Act in situations where the circuit court had rejected the NLRB's interpretation as inconsistent with a prior decision of that circuit. In light of the fact that certiorari was granted in these cases on the underlying merits of the dispute and not on the non-acquiescence issue, *see* Report, at 24; that certiorari was not sought on the non-acquiescence issue, nor is it apparent that the issue was raised, by either party to the case; that circuit courts which have addressed the non-acquiescence issue have virtually unanimously re-

jected the NLRB's assertion of authority to non-acquiesce in circuit court decisions, *see* pages 1354–1355 *supra*; and that these courts have not even mentioned *J. Weingarten* in their respective decisions, let alone acknowledged its applicability to the non-acquiescence issue, we are unwilling to conclude that the Supreme Court has implicitly overruled these circuit court decisions and thus upheld the validity of the intra-circuit non-acquiescence policy adhered to by the SSA.

As for the third argument, we believe that the proposition that the NLRB is different from the SSA has implications which disfavor the legal conclusion advocated by defendants. *See* pages 1363–65 *infra*.

**28.** Two other administrative agencies have at times refused to acquiesce in a prior circuit court decision. One instance involved intra-circuit non-acquiescence, *see S & H Riggers & Erectors, Inc. v. Occupational Safety & Health Review Commission*, 659 F.2d 1273, 1278 (5th Cir.1981), and the other involved inter-circuit non-acquiescence where the agency had previously litigated the same issue in five other circuit courts and 18 district courts, *see Goodman's*

stitutional government is undoubtedly a unique and complex one, with three distinct branches of government with independently derived legal authority and substantially separate functions—the legislature, to enact the law; the judiciary, to interpret the law; and the executive (and its administrative agencies), to enforce the law. Undoubtedly, too, the lines of separation between these functions are not always clearcut. The judiciary necessarily exercises enforcement-related functions as an incident of its interpretive and adjudicative activities, while the executive, particularly in the modern era of elaborate administrative agency regulation of a multitude of commercial, social, economic, scientific and employment-related affairs, is permitted to exercise a degree of interpretive authority in its enforcement of the law. However, only a fundamental reordering of this constitutional balance would permit the SSA to exercise the power to which it claims an entitlement in this case. The fundamental principles of our constitutional scheme, as articulated in decisions such as *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) (judicial determination of constitutionality of congressional legislation), *Cooper v. Aaron,* 358 U.S. 1, 17–19, 78 S.Ct. 1401, 1409–10, 3 L.Ed.2d 5, 19 (1958) (state executive and legislative officials' duty to obey federal court decisions), and *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (judicial determination of scope of presidential power), establish the authority of federal courts to render decisions which bind all other participants in our constitutional system of government. Thus, the SSA's status as an agency of a co-equal branch of the federal government clearly is not an impediment to the imposition of a requirement that it adhere to decisions of federal courts in accordance with the doctrine of separation of

powers. The judiciary's duty and authority, as first established in *Marbury,* "to say what the law is" would be rendered a virtual nullity if coordinate branches of government could effectively and unilaterally strip its pronouncements of any precedential force. We agree with those courts which have interpreted and applied the principles underlying *Marbury* in intracircuit non-acquiescence cases to mean that an administrative agency cannot routinely be permitted to apply and enforce a rule against persons residing within a circuit whose Court of Appeals has announced a rule to the contrary.

Defendants contend that the separation of powers principles articulated in *Marbury* are not inconsistent with the SSA's refusal to acquiesce in decisions of federal circuit courts. While the question of whether the decisions of lower federal courts and the Supreme Court are equally binding on administrative agencies is not as easily answered as plaintiffs appear to suggest, we nevertheless entertain serious doubts about the limiting construction on *Marbury* which defendants propose. While it is true that *Marbury v. Madison, Cooper v. Aaron,* and *United States v. Nixon* all dealt specifically with the duty and authority of the Supreme Court to render binding interpretations of the law, these decisions, fairly (and literally) read, do not hinge on this particular circumstance. *See Marbury v. Madison, supra,* 5 U.S. at 177 ("It is, emphatically, the province and duty of the *judicial department,* to say what the law is ... If two laws conflict with each other, the *courts* must decide on the operation of each.") (emphasis added); *Cooper v. Aaron, supra,* 358 U.S. at 18, 78 S.Ct. at 1410 ("[T]he *federal judiciary* is supreme in the exposition of the law of the Constitution ... 'If the legislatures of the several states may, at

*Furniture Co. v. United States Postal Service,* 561 F.2d 462, 463 (3d Cir.1977). In the former case, the Fifth Circuit "assume[d] without deciding that the Commission is free to decline to follow decisions of the courts of appeals with which it disagrees, even in cases arising in those circuits." 659 F.2d at 1278. The Court then noted the existence of contrary authority, *see id.* n. 7 (citing *Ithaca College* ) and overturned the agen-

cy's determination. In the latter case, the Third Circuit noted substantial agreement with the concurring opinion of Judge Weis, who expressed strong disenchantment with the Postal Services' "circuit shopping." 561 F.2d at 465. As noted at the outset of this discussion, the legality or propriety of agency "circuit shopping," or inter-circuit non-acquiescence, is not challenged by plaintiffs.

will, annul the judgments of the *courts of the United States*, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery....' ") (*quoting United States v. Peters*, 9 U.S. (5 Cranch) 115, 136, 3 L.Ed. 53 (1809) ) (emphasis added). Defendants' interpretation of *Marbury* is not only inconsistent with the Second Circuit's ruling in *Ithaca College v. NLRB* but also has been addressed and rejected in the context of the SSA's non-acquiescence policy. *See Lopez v. Heckler, supra*, 725 F.2d at 1497 n. 5 ("What the Court said [in *Marbury* and *Cooper*] with regard to the Constitution applies with full force with regard to federal statutory law, which is also the 'supreme Law of the Land,' U.S. Const. art. VI, cl. 2 ('This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land.'), and applies just as strongly to federal executive officers, who, as the President's representatives, are required by the Constitution itself to 'faithfully execute' the law. U.S. Const. art. II, § 3."); *see also Valdez v. Schweiker, supra*, 575 F.Supp. at 1205. Accordingly, we are unable to accept the narrow interpretation of *Marbury* which defendants propose.

Defendants are correct that the federal government is not simply just another civil litigant and that ordinary rules regarding the binding effect of judicial pronouncements do not apply with equal force to the federal government. Thus, in *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the Supreme Court held that the government, unlike a private litigant, is not subject to the doctrine of non-mutual collateral estoppel. *Mendoza* involved a claim by a Filipino national that he had been denied due process of law by the government's administration of the Nationality Act of 1940. The Ninth Circuit held that the government was estopped from litigating this issue since it had already been decided against the government in a 1975 case decided by the Northern District of California, a decision which the government had not appealed. The Supreme Court reversed, holding that despite the previous unfavorable determination of the due process issue, the government was not collaterally estopped from relitigating the issue in a subsequent case involving a different party.[29] The Court relied primarily on three considerations in support of its conclusion: (1) the desire to preserve the opportunity for "thorough development of legal doctrine by allowing litigation in multiple forums" and thus avoid "thwart[ing] the development of important questions of law by freezing the first final decision rendered on a particular legal issue"; (2) the interest in permitting the government, through the Solicitor General, to continue to exercise discretion in considering a variety of prudential factors in determining whether to seek appellate review of an unfavorable decision, rather than forcing it "to appeal every adverse decision"; and (3) the variation in policy choices of successive administrations of the Executive Branch and the interest in allowing for such variation in the conduct of government litigation.[30] *Id.* at 159–63, 104 S.Ct. at 573–74.

---

**29.** The government's conduct in *Mendoza,* a case instituted in the Central District of California, essentially constituted nonacquiescence in the decision of a federal district judge from the Northern District of California. It has been recognized that the decision of a federal district judge is generally regarded as persuasive, but not binding, authority by other judges within the same district. *See United States v. Anaya,* 509 F.Supp. 289, 293 (S.D.Fla.1980) (en banc), *aff'd on other grounds sub nom. United States v. Zayas-Morales,* 685 F.2d 1272 (11th Cir.1982); *Buna v. Pacific Far East Line, Inc.,* 441 F.Supp. 1360, 1365 (N.D.Cal.1977); *White v. Baltic Conveyor Co.,* 209 F.Supp. 716, 722 (D.N.J.1962); *see also Starbuck v. City and County of San Francisco,* 556 F.2d 450, 457 n. 13 (9th Cir.1977). We do not understand plaintiffs to challenge any failure of the Secretary to acquiesce in the decisions of federal district courts. *See* Ex. NN (proposed order of relief); Tr. I 48.

**30.** A factor noted by the Supreme Court in *Mendoza* as one explanation for the government's failure to adhere to a decision from which an appeal was initially contemplated but then abandoned, was that in the interim there had been a change in administrations. 464 U.S. at 157 n. 2, 104 S.Ct. at 571 n. 2. Here, no change in administrations has occurred since the Second Circuit's repeated reaffirmations of its treating physician rule up to the time of the instant case.

Defendants are also correct in noting that *Mendoza* establishes that the Executive Branch may "relitigate issues of law it has lost against some litigants against persons were were not parties to that earlier litigation." Defendants' Objections to Report, at 78. Defendants note that the SSA, unlike the NLRB, does not adjudicate cases involving two private adverse parties and thus cannot rely on a non-prevailing litigant to challenge a circuit court ruling with which the agency disagrees. Thus, defendants argue, the SSA must be permitted to non-acquiesce in unfavorable circuit court decisions in order to preserve its opportunity to relitigate the issue in question. *See* Defendants' Objections to Report, at 82–84.

Nothing in either the language or policy considerations underlying *Mendoza*, however, supports the right of the Executive Branch to refuse to adhere to a federal circuit court ruling in anything other than the case in which such ruling was rendered. More precisely, *Mendoza* does not support the right asserted by defendants to refuse to apply the legal rules enumerated in a *circuit court decision* in subsequent cases *within the same circuit*. None of the three considerations relied upon in *Mendoza* is in any significant way threatened by a rule of mandatory intra-circuit acquiescence in circuit court decisions; indeed, the Court specifically noted in *Mendoza* that its holding would permit the informal development of the law to occur "by allowing litigation in multiple forums." 464 U.S. at 163, 104 S.Ct. at 574. Certainly, the Secretary's non-acquiescence policy is not necessary to preserve the government's interest in discretionary decisionmaking in the appellate review process or the legal system's interest in maintaining the process of inter-circuit percolation which leads to the more thorough and informed development of legal doctrine.

Even without its particular brand of non-acquiescence, the SSA is free, when confronted with an unfavorable Second Circuit decision, to appeal to the reasoning of a wide variety of other lawmakers in seeking acceptance of its preferred view of the law and to continue to apply its view of the law elsewhere in the interim. First, the SSA is still free to apply and advocate its legal position in the eleven other federal judicial circuits in the country. This course of action will permit the SSA a substantial opportunity to relitigate the disputed legal issue in the hopes of gaining judicial acceptance of its legal position. If successful, the SSA will reaffirm its right to adhere in other forums to what it believes is the preferred view of the law, will create the conditions which maximize the likelihood of Supreme Court review of the issue (*i.e.*, the creation of inter-circuit conflicts) and possible nationwide resolution of the issue in the SSA's favor, and may even create the conditions for possible re-examination of the adverse decision by the very circuit which rendered it.[31]

Defendants suggest that this alternative leaves them at the mercy of claimants, whose decision to appeal becomes a precondition to Supreme Court review, absent a decision by the Solicitor General to seek review of the unfavorable decision in the first instance. Certainly, defendants cannot seriously contest the fact that claimants will create the opportunity for Supreme Court review by appealing unfavorable decisions (*i.e.*, decisions favorable to the Secretary) of other circuit courts. Indeed, the Supreme Court, in *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984), the companion case to *Mendoza*, rejected an argument by the Environmental Protection Agency to the contrary. *See* 464 U.S. at 173 n. 6, 104 S.Ct. at 588–89 n. 6. As for the appropriateness of the Supreme Court review sought by a claimant in a particular case, the Solicitor General not only takes

---

**31.** This phenomenon is by no means hypothetical. *See, e.g., Hartman Tobacco Co. v. United States,* 471 F.2d 1327 (2d Cir.1973) (Second Circuit overruled 1957 decision which had been subsequently criticized by commentators and rejected by Fourth, Fifth, Ninth and Tenth Circuits; "[g]iven this background, we think it best to clear up any confusion on the issue that there may be in this circuit and to align the Second Circuit with every other circuit which has confronted the question").

into account prudential considerations which make it undesirable for the *government* to seek appellate review, but also has the unique opportunity, as the executive branch's principal spokesperson before the Court, to explain to the *Supreme Court* why *it* should not grant review in a particular case. Thus, the fact that Supreme Court review of an unfavorable circuit court decision will often be claimant-initiated should not interfere with the SSA's ability to insure that such review occur only in cases which it considers appropriate vehicles for Supreme Court review.

The Secretary also retains the full ability to seek more immediate review of an unfavorable decision if the conditions for doing so are in fact appropriate. The Secretary can petition for review of a circuit court decision either by the panel that rendered the decision or by the circuit court *en banc.* If unsuccessful, the Secretary can seek Supreme Court review if the circuit court's decision either conflicts with those of other circuits, thus making the issue ripe for Supreme Court resolution, or is *consistent* with those of several other circuits, thus making a Supreme Court decision on the issue the only realistic judicial alternative to further, potentially fruitless inter-circuit consideration of the issue. While the decision to seek Supreme Court review of an unfavorable circuit court ruling is a complicated one to which both legal and policy considerations apply, we perceive a certain illogic in permitting the Secretary to so heavily rely on this circumstance in support of a non-acquiescence policy which essentially renders Supreme Court review of an unfavorable decision either unnecessary (because the agency can simply refuse to follow the circuit court decision in subsequent cases) or undesirable (because the Supreme Court may affirm the unfavorable decision, thus giving it nationwide effect). The government cites numerous and compelling factors upon which it presently relies in declining to seek Supreme Court review of many unfavorable circuit court decisions; we seriously question whether the power to simply ignore the unfavorable decision within the circuit which rendered it can be lawfully added to the list.

The Secretary is also free to pursue a legislative remedy for an unfavorable circuit court decision by seeking congressional amendment of the relevant provision of the Social Security Act. This alternative has long been a feature of our tripartite system of government, a feature which is both solicitous of the rights and interests of the party advocating reform, and faithful to the separation of powers which underlies our system of government. It also results in the resolution of legal disputes in a manner which best exemplifies this separation of powers, *i.e.,* a resolution by Congress of a disagreement between the executive and the judiciary over the proper interpretation of a federal statute. Indeed, in the Conference Report issued in conjunction with the 1984 amendments to the Social Security Act, the Conference Committee expressly urged the Secretary to pursue this remedy as an alternative to the policy of non-acquiescence. 1984 Conference Report, at 38. This alternative, one which defendants themselves recognize, *see* Defendants' Objections to Report, at 86 n. 77, provides another means by which the Secretary can avoid having to apply a statutory interpretation contrary to her own.[32]

32. Plaintiffs suggest an additional procedure for the Secretary to utilize in challenging an unfavorable circuit court decision without subjecting claimants to the adverse consequences of non-acquiescence—the institution of a declaratory judgment action under 28 U.S.C. § 1345. This statute authorizes federal district courts to exercise jurisdiction over all civil actions commenced by an officer or agency of the United States expressly authorized to sue by Act of Congress. Defendants contend that this alternative would violate Article III's "case or controversy" requirement in that the Secretary could not challenge a policy in court if the SSA was actually applying that policy and claimants had received benefits in accordance with the Secretary's "acquiescence." *See* Defendants' Reply Memo, at 3. Plaintiffs suggest that such a suit could be brought in federal court against a claimant who received benefits since the Secretary would essentially be paying disability benefits to a claimant pursuant to a policy with which it disagreed, thereby incurring a financial detriment sufficient for Article III purposes. *See* Plaintiffs' Response to ALJ Memo, at 5. Plaintiffs also argue that this procedure should be permissible notwithstanding § 405(h)'s limitations on the reviewability of final decisions of the Secretary. *Id.* at 6.

In sum, while the government's status as a civil litigant in federal court is certainly a unique one, we believe the SSA reads far too much into *Mendoza* in attempting to utilize that decision to justify its policy of intra-circuit non-acquiescence. *Mendoza* neither legitimizes the reasoning of the SSA's non-acquiescence policy nor is threatened by a conclusion that this policy is likely to be found unlawful. While defendants repeatedly emphasize the government's unique litigant status in seeking to demonstrate the legal justification for its challenged policy, defendants pay too little heed to the other consequences of this status—that the SSA, unlike other civil litigants, is charged with the responsibility of administering and enforcing federal laws applicable to thousands of this country's citizens. We do not believe that either *Mendoza* or this Circuit's non-acquiescence decisions in the labor and communications area can be fairly read to permit the SSA to simply disregard a circuit court ruling with which it disagrees. It is one thing to say, as the Court did in *Mendoza*, that the government cannot be precluded from *ever* relitigating an issue once it is decided adversely; it is quite another to assert the legal authority to regularly disregard circuit court decisions with which it disagrees by refusing to apply them in subsequent cases within the same circuit. We therefore agree with other courts that have addressed the issue that the *Mendoza* decision does not support the defendants' contention that the SSA's non-acquiescence policy is lawful. *See Lopez v. Heckler, supra,* 725 F.2d at 1497 n. 5; *Holden v. Heckler, supra,* 584 F.Supp. at 491; *Hyatt v. Heckler, supra,* 579 F.Supp. at 1001–02.

Defendants also assert that it is the duty of the SSA to administer the Social Security Act in a way which promotes nationwide uniformity, and that its intra-circuit non-acquiescence policy is necessary to achieve this goal. In support of this argument, defendants point to § 10 of the 1984 amendments to the Social Security Act, which requires the Secretary to "establish by regulation uniform standards which shall be applied at all levels of determination, review, and adjudication in determining whether individuals are under disabilities as defined in section 216(i) or 223(d) [containing the Social Security Act's definition of disability]." *See* 42 U.S.C. § 421(k)(1).

The defendants' argument not only fails to dispel the serious doubts concerning the legal validity of its policy, but in fact highlights some of the most troubling consequences of that policy. At the outset, we note that the desire for uniform national standards in disability cases as expressed by Congress does not necessarily lead to the conclusion that intra-circuit non-acquiescence is a necessary or appropriate means of achieving this goal. As noted previously, while Congress considered legislation to eliminate (the House version) or regulate (the Senate version) the SSA's non-acquiescence policy, its decision not to legislate on the issue was hardly an endorsement either of the policy or its legality. The Conference Report states as follows:

> The conference agreement deletes both the House and Senate language. The conferees do not intend that the agreement to drop both provisions be interpreted as approval of "non-acquiescence" by a federal agency to an interpretation of a U.S. Circuit Court of Appeals as a general practice. On the contrary, the conferees note that questions have been raised about the constitutional basis of non-acquiescence and many of the conferees have strong concerns about some of the ways in which this policy has been applied, even if constitutional. Thus, the

In view of the many other alternative avenues of relief which the Secretary may pursue in response to an unfavorable circuit court decision, we need not decide at this stage of the litigation whether this additional avenue of relief is permissible under 28 U.S.C. § 1345 and not precluded by 42 U.S.C. § 405(h). We do note, however, that a general requirement of

intra-circuit acquiescence would not necessarily preclude the Secretary from relitigating an unfavorable circuit court ruling within the same circuit, *i.e.,* in cases where a claimant is denied benefits despite agency application of the circuit court rule and subsequently appeals that denial to the courts.

conferees urge that a policy of non-acquiescence be followed only in situations where the Administration has initiated or has the reasonable expectation and intention of initiating the steps necessary to receive a review of the issue in the Supreme Court.

*The conferees reaffirm the congressional intent that the Secretary resolve policy conflicts promptly in order to achieve consistent uniform administration of the program. This objective may be achieved in at least two ways other than non-acquiescence when the agency is faced with conflicting interpretations of the meaning and intent of the Social Security Act: either to appeal the issue to the Supreme Court, or to seek a legislative remedy from the Congress.*

When there are court rulings which the Secretary believes are inconsistent with the meaning and intent of the law, the Secretary should diligently pursue appropriate appeals channels on an expeditious basis. By refusing to apply circuit court interpretations and by not promptly seeking review by the Supreme Court, the Secretary forces beneficiaries to re-litigate the same issue over and over again in the circuit, at substantial expense to both beneficiaries and the federal government. This is clearly an undesirable consequence. The conferees also feel that in addition to the practical administrative problems which may be raised by non-acquiescence, the legal and Constitutional issues raised by non-acquiescence can only be settled by the Supreme Court. The conferees therefore urge the Administration to seek a resolution of this issue.

The conferees recognize that the realities of litigation do not make it appropriate or feasible to appeal every adverse decision with which the Secretary continues to disagree. In such instances, however, the conferees strongly insist that Congress' judgment as to the appropriate policy should prevail. The conferees expect the Secretary to propose what she believes to be appropriate remedial legislation for congressional consideration.

It is clearly undesirable to have major differences in statutory interpretation between the Secretary and the courts remain unresolved for a protracted period of time. The conferees believe this legislation takes a major step toward removing the obstacles to resolution by clarifying the statutory language and congressional intent.

1984 Conference Report, at 37–38 (emphasis added), U.S.Code Cong. & Admin.News 1984, pp. 3095, 3096.

This passage is informative in highlighting a number of important considerations. First, as noted earlier, the SSA has a number of other methods by which it can achieve uniformity in the legal standards governing disability cases. Suffice it to say some members of Congress appear to have similarly concluded that such alternatives are far more preferable (and unquestionably legal) to the SSA's non-acquiescence policy.

Second, and equally important, is the inherent unfairness of the Secretary's policy to the very persons whom the Social Security Act was designed to protect. Nothing tests more acutely the sincerity of our nation's commitment to the concept of "Equal Justice Under the Law" than the manner in which our governmental agencies respect the legal rights of its poorest and least influential citizens. This is especially so in dealing with the rights of those who are often unable to obtain legal representation and are unaware of their rights. It is unfortunate that in its desire to promote uniform legal standards for the disabled, the government has lost sight of the similarly compelling evil of disuniformity which its non-acquiescence policy entails. The consequence of the SSA's non-acquiescence policy is simply this: one set of rules applies to those claimants fortunate enough to procure legal representation, persistent enough to appeal an adverse determination of the various non-acquiescing levels of the agency to a federal court bound to follow the Court of Appeals ruling, and healthy enough to endure this belabored process; a different and adverse

rule will govern the rights of those claimants who are unrepresented, insufficiently persistent in their efforts to invoke the benefits of favorable judicial rulings, or incapable of doing so. The arbitrariness of such a system is evident simply from its description.

The Secretary emphasizes the disuniformity of a rule which would require the SSA to apply one legal standard in Connecticut but another in California. We have just as much, if not more, difficulty with a policy whereby one claimant is governed by one legal standard but his neighbor, lacking in either financial resources, litigational persistence, or physical or mental stamina, is governed by another. *Cf. United States v. Stauffer Chemical Co.*, *supra*, 104 S.Ct. at 582 (White, J., concurring), discussed at page 1352 *supra*.

We assume that plaintiffs, as indigent and physically or mentally impaired individuals seeking an entitlement to Social Security disability benefits, are entitled to no more than the rational basis standard of equal protection scrutiny. *See City of Cleburne v. Cleburne Living Center*, —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (mental retardation not a suspect classification); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28–29, 93 S.Ct. 1278, 1293–95, 36 L.Ed.2d 16 (1973) (wealth not a suspect classification); *Richardson v. Belcher*, 404 U.S. 78, 81–84, 92 S.Ct. 254, 257–59, 30 L.Ed.2d 231 (1971) (applying rational basis standard to legislation concerning Social Security benefits). Nevertheless, the arbitrary distinctions created by the Secretary's non-acquiescence policy, regarding those claimants who obtain a disability determination in accordance with circuit court precedents and those claimants who do not, cast serious doubt on the validity of the Secretary's non-acquiescence policy. In *Lopez v. Heck-*

*ler*, 713 F.2d 1432 (9th Cir.1983), the Ninth Circuit agreed with the district court's observation that

> The policy of nonacquiescence announced by the Secretary creates two standards governing claimants whose disability benefits are terminated as a result of such nonacquiescence. If such a claimant has the determination and the financial and physical strength and lives long enough to make it through the administrative process, he can turn to the courts and ultimately expect them to apply the law as announced in *Patti* and *Finnegan*. If exhaustion overtakes him and he falls somewhere along the road leading to such ultimate relief, the nonacquiescence and the resulting termination stand. Particularly with respect to the types of individuals here concerned, whose resources, health and prospective longevity are, by definition, relatively limited, such a dual system of law is prejudicial and unfair.

*Id.* at 1439 (quoting district court decision, 572 F.Supp. at 30); *see also Jones v. Califano*, 576 F.2d 12, 18 (2d Cir.1978), discussed at page 1380 *infra*; *Aldrich v. Schweiker*, 555 F.Supp. 1080, 1088 (D.Vt. 1982). We agree that the arbitrary distinctions drawn as a consequence of the policy are difficult to reconcile with constitutional standards.[33]

A comparison of the SSA with other agencies which adhere to a non-acquiescence policy further reveals the dubious legality of the SSA's particular non-acquiescence policy. Both the Internal Revenue Service ("IRS") and NLRB, the two primary proponents of non-acquiescence policies, either generally adhere to an *inter*circuit form of the doctrine, *see Lopez v. Heckler*, *supra*, 725 F.2d at 1503 n. 12 (describing IRS policy); Subcommittee Report, at 27 (same), or have been harshly

---

**33.** The concepts of arbitrariness and irrationality have been discussed in both due process and equal protection terms. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 441–42, 102 S.Ct. 1148, 1160–61, 71 L.Ed.2d 265 (1982) (separate opinion of Blackmun, J.) (equal protection); *id.* at 444, 102 S.Ct. at 1162 (Powell, J., concurring) (same); *United States Railroad Re-*

*tirement Board v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460–61, 66 L.Ed.2d 368 (1980) (equal protection); *Griffin v. Illinois*, 351 U.S. 12, 17, 76 S.Ct. 585, 589–90, 100 L.Ed. 891 (1956) (due process and equal protection). As noted previously, Fifth Amendment due process embodies the concept of equal protection. *See* fn. 2 *supra*.

criticized for failing to so limit their non-acquiescence policy. *See* pages 1354–55 *supra*. Even with respect to those situations where these agencies refuse to follow a circuit court decision within the circuit that rendered it, the IRS and NLRB can at least offer a practical explanation for such behavior. Under the venue provisions governing the situs of litigation with these two agencies, private parties are often able to bring suit in any one of a number of circuits. Under the National Labor Relations Act, a party may sue in the circuit where the alleged unfair labor practice occurred, where the party resides, where the party transacts business, or in the D.C. Circuit. *See* 29 U.S.C. § 160(f). Under the Internal Revenue Code, parties may litigate tax controversies either by suing for a refund in federal district court or by refusing to pay the disputed amount and defending its actions in United States Tax Court. In either situation, venue in the circuit court is essentially determined at the lower court level by residence (for individuals), or by principal place of business or principal office or agency (for corporations). 26 U.S.C. § 7482(b)(1); 28 U.S.C. § 1402(a). In suits initiated by private parties, the court may transfer the action to a more convenient forum. 28 U.S.C. § 1402(a)(2). In Tax Court cases, the parties may agree on the circuit court to which any appeal will be made. 26 U.S.C. § 7482(b)(2). Thus, in many NLRB and IRS cases, since it is often difficult for the agency to predict in which circuit the litigation may ultimately be brought, and thus to know which circuit's law to apply, the existence of intra-circuit non-acquiescence often will be apparent only when the situs of the appeal has been determined. In this situation, non-acquiescence at the agency level is a more readily understandable phenomenon.

In SSA cases, such venue uncertainty is largely absent. Under the Social Security Act, a claimant may obtain judicial review of a final determination of the Secretary in the district of his or her residence or principal place of business. 42 U.S.C. § 405(g).

Given the physical, fiscal and employment-related disabilities of many such claimants, it is usually the case that judicial review will occur in the circuit where the claimant resides. Thus, the SSA usually knows well in advance of the judicial review process in which circuit the controversy is likely to arise.

We also believe that the SSA's role in the federal statutory scheme is unique with respect to the impact of its decision-making authority on the statute's intended beneficiaries. Were we dealing with administrative policy concerning the labor laws or tax regulations, there would be the solace of knowing that most litigants will be relatively affluent and sophisticated so that their legal rights will be pressed by privately retained counsel. Here, we deal with a quite different group of claimants. According to statistics provided by defendants, almost half (49.2%) of all claimants are without legal representation in their pursuit of disability benefits, and approximately three out of every eight claimants (37.6%) are without any representation whatsoever, legal or otherwise. *See* Defendants' Memorandum Concerning Representation of Claimants. The consequences of this phenomenon are obvious. If every claimant denied benefits as a result of the application of the non-acquiescence policy were properly represented, the case would automatically be appealed to the federal courts, which would reverse the decision and perhaps also award costs and counsel fees under 28 U.S.C. § 2412(d)(1)(A). *See, e.g., DeLeon v. Secretary of Health and Human Services, supra,* 730 F.2d at 938. This practice would soon prove to be too expensive, and the Secretary either would abandon the non-acquiescence policy or would seek a revision of the Court of Appeals' determination from either the Supreme Court or Congress. To the extent, therefore, that the non-acquiescence policy has a budgetary motivation, it must be premised on the assumption that a significant number of HHS claimants will be unrepresented and unaware of their rights. Such considerations, of course, cannot justify the policy at issue here. Learned Hand told us "Thou shalt not ration justice" [34]

---

**34.** 75th Anniversary Address Before the Legal Aid Society of New York, February 16, 1951, 9 Brief Case, No. 4, p. 5 (1951).

and no budgetary constraints or administrative expediency will justify our doing so.

If a fair and uniform application of the disability benefit provisions enacted by Congress results in an expenditure of resources in excess of that which our society is willing to expend for these purposes, Congress should directly confront that circumstance. We should not, however, strive to conserve limited resources by failing to accord claimants rights which the highest relevant federal court, construing Congress' statutory scheme, has said is their entitlement. The SSA's unique status as enforcer and adverse party in Social Security disability cases often places it in what it perceives to be the unpalatable position of being confronted with unfavorable circuit court decisions which have a potential applicability to hundreds or thousands of subsequent claimants. In our view, this factor only augments the serious doubts we have concerning the validity of SSA's manner of refusing to implement and enforce these decisions even in the circuits in which they are rendered.

The reservations we have expressed concerning the validity of the SSA's intra-circuit non-acquiescence policy do not necessarily mean that any and all intra-circuit non-acquiescence is likely to be unlawful. For example, in certain situations the passage of time will be accompanied by criticism and gradual erosion of a particular legal rule such that it is reasonably certain that reconsideration by the circuit court will soon be forthcoming. For example, in *United States v. Cocke,* 399 F.2d 433 (5th Cir.1968) (cited in Defendants' Objections to Report, at 85 n. 76), *cert. denied,* 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969), in which the court overruled its 1947 decision in *Commissioner v. J.S. Abercrombie Co.,* 162 F.2d 338 (5th Cir.1947), the litigation was prompted by the IRS' non-acquiescence in the *Abercrombie* decision. The conduct of the IRS, however, was of a qualitatively different character than that of the SSA in the instant case. After the Tax Court issued a decision in *Abercrombie,* the IRS filed a non-acqui-

escence notice and appealed the decision. Shortly after the Fifth Circuit's affirmation of the Tax Court's decision, the IRS withdrew its non-acquiescence. Over the years, the IRS sought to interpret *Abercrombie* narrowly in recognition of its dissatisfaction with the decision. Only in 1963, after 16 years and at least 15 scholarly works which were critical of the *Abercrombie* decision, did the IRS reinstate its non-acquiescence with *Abercrombie,* a decision which was hailed by at least one commentator as a "return[ ] to the path of righteousness, never more to roam, we hope". *See United States v. Cocke, supra,* 399 F.2d at 449 (*quoting* Hambrick, 'Another Look at Some Old Problems—Percentage Depletion and the ABC Transaction,' 34 G.W.L.Rev. 1, 31 n. 115 (1965) ). Less than two years later, the *Cocke* litigation commenced, leading to the overruling of *Abercrombie. See Cocke v. United States,* 263 F.Supp. 762 (S.D.Tex.1966). *See also Hartman Tobacco Co. v. United States,* 471 F.2d 1327 (2d Cir.1973) (en banc) (cited in Defendants' Objections to Report, at 85 n. 76) (involving IRS' non-acquiescence in 1957 decision (*Barker v. Commissioner,* 250 F.2d 195 (2d Cir.1957) ) which had been "sharply criticized" by courts and commentators, rejected by four other circuit courts, and called into question by a 1967 Second Circuit decision which approvingly cited and was consistent with other circuit court decisions which conflicted with *Barker*). There is no similarity, however, between *Cocke* and the Secretary's persistent refusal to adhere to recently issued and expressly reaffirmed circuit court rulings concerning the Social Security Act. While few courts would question the constitutionality of agency conduct resembling the IRS' with respect to *Abercrombie,* an overwhelming number of courts have emphatically rejected agency conduct which more closely resembles that of the Secretary here. In our opinion, this distinction, one which defendants virtually ignore in their legal analysis of the non-acquiescence policy, is critical to our conclusion that the Secretary's non-acquiescence policy is likely to be found unlawful.[35]

---

**35.** In support of their argument that litigants, particularly the federal government, are not

bound by the *stare decisis* effect of circuit court

Intra-circuit non-acquiescence in a circuit court decision also might be less troublesome if utilized where the agency has substantial reason to believe that subsequent consideration of the disputed issue in other forums has created conditions which are likely to lead either to reconsideration by the circuit court in question or to Supreme Court review. For instance, where an agency which has lost in one circuit is able to obtain, through inter-circuit non-acquiescence, a series of favorable decisions in other circuits, the agency might be justified in returning to the original circuit which rendered the unfavorable decision and urging it to reconsider its position in light of the benefit of having other circuit courts' pronouncements on the issue. *See, e.g., NLRB v. Action Automotive, Inc.,* — U.S. —, 105 S.Ct. 984, 987, 83 L.Ed.2d 986 (1985) (NLRB, in 1982, adopted position in Sixth Circuit contrary to 1965 Sixth Circuit decision where Fifth, Seventh, and Ninth Circuits had recently ruled in NLRB's favor). Success in this endeavor will have avoided hardship and inconsistent application of the law to claimants within the circuit, will have avoided the need for premature Supreme Court resolution of the issue, and will have resulted in the ultimate vindication of the Secretary's position. Failure to obtain a favorable ruling will at least concretize the conflict and thus increase the chances for success in the agency's effort to obtain *en banc* reconsideration by the circuit court, Supreme Court review, or congressional remediation.

Defendants have pointed out examples in which courts have either expressly or implicitly permitted an agency to reap the benefit of its non-acquiescence in a circuit court's decision by upholding the agency's position in subsequent litigation. Defendants, however, have failed to uncover any example of intra-circuit agency non-acquiescence in which an agency has repeatedly and routinely ignored circuit court rulings despite the absence of any reasonable likelihood of obtaining reconsideration of the unfavorable decisions, and where the agency has also failed to pursue either congressional remediation or Supreme Court review. The situation here is precisely the opposite. The SSA has been admonished by this circuit's appellate and district courts for its refusal to adhere to repeatedly articulated statutory principles established by the Second Circuit Court of Appeals. The primary remediation recently provided by Congress was to essentially *overrule* the SSA's non-acquiescence in circuit court rulings requiring proof of medical improvement in a claimant's condition as a precondition to the termination of benefits. *See* 42 U.S.C. § 423(f).[36] Thus, re-

rulings, defendants cite *United States v. Estate of Donnelly,* 397 U.S. 286, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970), in which the Supreme Court upheld the Treasury Department's filing of a federal tax lien notice in Michigan (located within the Sixth Circuit) despite the apparent invalidity of the particular filing procedure under a prior Sixth Circuit ruling. The Court held that its decision would be given retroactive effect, stating that "[d]eviant rulings by circuit courts of appeals, particularly in apparent dictum, cannot generally provide the 'justified reliance' necessary to warrant withholding retroactive application of a decision construing a statute as Congress intended it." *Id.* at 295, 90 S.Ct. at 1038. The Court also noted the following:

Acts of Congress are generally to be applied uniformly throughout the country from the date of their effectiveness onward. Generally the United States, like other parties, is entitled to adhere to what it believes to be the correct interpretation of a statute, and to reap the benefits of that adherence if it proves to be correct, except where bound to the contrary by a final judgment in a particular case. *Id.* at 294–95, 90 S.Ct. at 1038–39. As with the Supreme Court's NLRB decisions described previously, *see* fn. 27 *supra,* we are unwilling to read into Supreme Court dictum concerning an agency's right to disagree with the "dictum" of a circuit court, a rule which permits the type of agency intra-circuit non-acquiescence which is at issue in this case. In addition, for a discussion of the differences between IRS and SSA non-acquiescence, see pages 1363–64 *supra.*

**36.** The 1984 amendments to the Social Security Act also legislatively overruled two SSA policies which had been declared invalid by the courts and in which the Secretary essentially had little opportunity to non-acquiesce. Section 4 requires the Secretary to consider multiple impairments in combination, rather than separately, in determining whether a claimant is severely impaired within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(2)(C); *see Dixon v. Heckler,* 589 F.Supp. 1494, 1498 (S.D.N.Y. 1984) (granting preliminary injunction against

gardless of whether agency adherence to an intra-circuit non-acquiescence policy is permissible in certain limited instances, the manner in which the SSA has implemented and adhered to such a practice in this Circuit and others has been in no reasonable sense limited in its application.

In its persistent refusal to abide by authoritative interpretations of the very statute which it is charged with administering, the SSA has created a litigation burden of unprecedented proportions on the courts,[37] litigants and administrative agency personnel, resulting in the needless expenditure of resources on the determination, judicial review of, and frequent redetermination (after remand) of disability claims. It has caused needless delays in compensating claimants who are forced to endure the multi-layered administrative process before obtaining the benefits which courts have said are their entitlement and, undoubtedly, the outright denial of benefits for other claimants who are unable or otherwise fail to pursue their claims to the courts. It has frustrated congressional intent, by virtue of the agency's persistent failure to apply the law in accordance with this intent as interpreted by the federal appellate courts in accordance with *Marbury*. It even has placed its own ALJs in the untenable position of "trying to serve two masters" (*Hillhouse v. Harris, supra*, 547 F.Supp. at 93): the courts, who interpret the Constitution and laws which ALJs have sworn to uphold; and the Secretary, who has essentially instructed ALJs that they may disregard such interpretations in favor of her own. That these consequences reflect a serious departure from any reasonable conception of an orderly system of justice simply cannot be gainsaid.

Secretary's multiple impairment policy). Section 5 requires the creation of new standards for evaluating mental impairments, in response to the SSA's policy on mental disability eligibility. 42 U.S.C. § 421 note; *see City of New York v. Heckler*, 578 F.Supp. 1109 (E.D.N.Y.) (invalidating Secretary's policy on evaluation of mental impairments), *aff'd*, 742 F.2d 729 (2d Cir. 1984); *see also Mental Health Association of Minnesota v. Heckler*, 720 F.2d 965 (8th Cir. 1983) (upholding preliminary injunction against policy).

In conclusion, we believe that plaintiffs are likely to succeed in showing that the Secretary's non-acquiescence policy as practiced up until approximately two months ago was inconsistent with the constitutionally required separation of powers and effected an arbitrary and unlawful discrimination among disability claimants.

### (ii) *Interim Circular No. 185*

As we noted at the outset of our discussion, the Secretary's non-acquiescence policy has met with increasing scrutiny and criticism both from the courts and from members of Congress. In addition, the Court, at oral argument on the parties' respective motions, directed the defendants to review their position with respect to the SSA's then-existing non-acquiescence policy. Tr. I 52, 58, 64. In apparent response to these expressions of concern, the SSA has recently been engaged in a review of the policy. *See* Baker Aff. (Mar. 1, 1985). On June 3, 1985, in conjunction with the filing of their objections to the Magistrate's Report, defendants announced that they had adopted a new policy concerning the non-acquiescence issue. The new policy is contained in Interim Circular No. 185 ("Interim Circular") and supersedes the prior non-acquiescence policy contained in § 1–161 of the OHA Handbook. According to Charles Baker, the Undersecretary of HHS, the SSA's new policy "accommodates the interests of the courts and claimants by providing that *only* those few cases that the agency, after consultation with the Department of Justice, has determined are appropriate test cases for relitigation may be taken to the courts." Baker Declaration ¶ 4 (emphasis in original).

**37.** Statistics from early 1984 regarding the Secretary's termination of disability benefits reveal that of the approximately 470,000 individuals who had their disability benefits terminated since March 1981, benefits were reinstated on appeal to 160,000 claimants and an additional 120,000 cases were still pending. *See DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930, 931 n. 1 (2d Cir.1984).

**1368**

Under the Secretary's new policy, when a circuit court renders a decision which is at variance with established SSA policy the SSA will issue an SSR containing the SSA's interpretation of the decision. This SSR will then be applied by ALJs and the Appeals Council as set forth below. On its face, then, the Interim Circular purports to modify the Secretary's previous non-acquiescence policy only at the ALJ and Appeals Council levels. As we will discuss further, state agencies responsible for rendering initial disability determinations will apparently not consider these SSRs in rendering disability determinations, but will make their determinations in accordance with SSA policy.[38]

As set forth in the Interim Circular, which we have annexed as Appendix C to this opinion, the ALJs' decisionmaking process will depend on how the ALJ is prepared to rule under the SSR standard and the SSA's own policy. Three variations are possible. First, if SSA policy and circuit court case law conflict but the ALJ is prepared to grant benefits under SSA policy, the ALJ need not consider circuit court case law in rendering a decision. Second, if the ALJ is prepared to deny benefits under both SSA policy and circuit court case law, the ALJ's decision must evaluate the evidence under both standards and must include findings and decisional language under both standards. Third, if the ALJ is prepared to deny benefits under SSA standards but grant benefits under circuit court case law, the ALJ is to prepare a "recommended" decision containing sections analyzing the claim under both standards. Interim Circular, at 4.

The Appeals Council's course of action will vary depending on the ruling of the ALJ. Again, three possibilities exist. First, if the ALJ decides in favor of the claimant under SSA policy, and the Appeals Council believes that the claimant is not entitled to benefits under SSA policy, the Appeals Council must consider whether a favorable decision could have been made under circuit court case law. If so, [1][39] own motion review "need not be taken" and the ALJ's favorable decision will become the final decision of the Secretary. If the outcome under circuit court case law is unclear, the Appeals Council is to remand for a hearing and recommended decision. *Id.* at 6.

Second, when an ALJ denies benefits under both agency and court standards, if the claimant requests review of the ALJ's decision and the Appeals Council believes the decision with respect to circuit case law is incorrect, the request for review will be granted. If the Appeals Council believes that "from a litigation standpoint the case might be expected to result in a court decision adverse to the Secretary" if benefits were denied and the claimant appealed, [2] the Appeals Council will grant benefits. If the Appeals Council believes further development of case law by the ALJ is necessary, the Secretary will remand. If the Appeals Council "believes the issue should be relitigated," the Appeals Council will follow the procedures described below. *Id.* at 7.

Third, when an ALJ would deny benefits under SSA policy but grant benefits under circuit court decisional law, the Appeals Council will review the ALJ's recommended decision. If the Appeals Council disagrees with the ALJ's interpretation of circuit law, the Appeals Council will either issue a revised, unfavorable decision or will remand for further development. If the Appeals Council agrees with the ALJ's findings under case law, the Appeals Council will "ordinarily adopt" the ALJ's recommended decision. However,

38. In New York, the state agency review function is performed by the Office of Disability Determinations of the New York State Department of Social Services pursuant to an agreement with SSA. *See* 42 U.S.C. § 421(a)(1). The state agency is required to conduct disability determinations in accordance with the standards set forth in the Social Security Act and the

Secretary's own rules, regulations, and written guidelines. *See* 42 U.S.C. § 421(a)(2); 20 C.F.R. §§ 404.1603(a), 416.1003(a).

39. The bracketed numbers have been inserted by the Court for the purpose of clarifying our discussion of this issue.

If the AC [Appeals Council] agrees with the ALJ's conclusion in a decision which is unfavorable to the claimant under SSA policy but favorable to the claimant under circuit court law but believes the issue involved should be relitigated in that circuit in the context of that case, the AC will prepare a draft decision unfavorable to the claimant which will be forwarded to the SSA Special Policy Review Committee for its review. If the Committee decides that the case is an appropriate vehicle for relitigating the issue, the Office of the General Counsel shall consult with the Department of Justice as to whether or not it believes relitigation of the issue is appropriate. If relitigation is determined to be appropriate, the AC's unfavorable decision will be issued. If relitigation is not appropriate in the particular case, [3] the ALJ's recommended decision favorable to the claimant will be adopted by the AC because it will have been decided that, from a litigation standpoint, the case might be expected to result in a court decision adverse to the Secretary if an unfavorable administrative decision were issued and judicial review were sought by the claimant.

*Id.* at 8. The Interim Circular makes no provision for the publication of agency decisions to non-acquiesce in circuit court rulings.

For a number of reasons, we continue to have serious reservations concerning the validity of the Secretary's non-acquiescence

policy. First, it is fairly clear that *state* agencies will continue to render disability determinations based on SSA policy rather than circuit court precedent. This interpretation of the scope of the Interim Circular is consistent with that rendered by participants in a congressional subcommittee hearing conducted three days after the Secretary's issuance of the Interim Circular, *see* Hearing on the Implementation of the Social Security Amendments of 1984, Subcommittee on Social Security, House Committee on Ways and Means (June 6, 1985), Jones Statement, at 3 (Ex. II to Plaintiffs' Response to Defendants' Objections to Report); Abrams Testimony, at 6 (Ex. JJ); Flemming Testimony Outline, at 9 (Ex. KK); Sweeney Testimony, at 22–23 (Ex. MM),[40] and has not been controverted or disclaimed by the Secretary. *See* Defendants' Reply Memo Concerning Report, at 5–6. As a result, a substantial amount of the unfairness and inequity adverted to earlier remains intact: all claimants will continue to have their cases decided initially in accordance with SSA policy, even when a circuit court has held that a different legal standard must be applied. Only those claimants who persevere to the federal administrative agency level will even have an opportunity to receive a disability determination in accordance with congressional standards as interpreted by federal appellate courts. A claimant's entitlement to benefits will thus not be evaluated under the legal standards enunciated by federal circuit courts unless the claimant has the financial resources, legal assistance,[41] per-

---

**40.** All of these speakers expressed reservations concerning the significance of the Secretary's modification of SSA's previous non-acquiescence policy. *See* Jones Statement, at 3 ("there does not on the surface appear to be a basic change in her policy"); Abrams Testimony, at 2 ("the Secretary ... in fact reasserts her claimed right to flout [United States Court of Appeals] decisions"); Flemming Testimony Outline, at 9 ("the doctrine of non-acquiescence is still very much alive"); Sweeney Testimony, at 22 ("the policy remains in place, the procedures are just different").

**41.** The assistance of some legal or other representative in this context is thus significantly different from the role of a lawyer in prosecuting veterans benefits claims. *Cf. Walters v. National Association of Radiation Survivors, ——*

U.S. ——, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (upholding validity of $10 attorney fee limitation in veterans benefits proceedings). In *Walters,* the Supreme Court relied on evidence that the presence of attorneys at veterans benefits proceedings added very little to the reliability or accuracy of the proceedings in holding that a financially unfettered right to retain an attorney in VA proceedings was not required under the Due Process Clause. In the instant case, under the Interim Circular unrepresented claimants at the state agency level will have their disability claims determined in accordance with one set of legal principles, while those claimants who appeal unfavorable, non-acquiescent determinations to the federal agency level (by dint of their own sophistication or with the assistance of counsel or other representative), may well have their disability claims determined initially in

severance, and physical and mental capacity necessary to pursue his or her disability claim at least to the federal agency level. Claimants who are unable to pursue their claims to the federal agency level will have their disability determinations made solely in accordance with SSA policy without regard to conflicting circuit law. Circuit court decisions which may well entitle the claimants to disability benefits will never inure to their benefit.

The Interim Circular is thus similar to the Secretary's previous non-acquiescence policy in its method of differentiating between claimants. Just as the SSA's former non-acquiescence policy created arbitrary distinctions between those claimants who obtain benefits by seeking judicial review and those claimants who do not, the Interim Circular preserves a similar form of differentiation between those who appeal adverse state agency determinations and those who do not. The constitutional problems which the policy creates are substantially the same in both instances. Indeed, the situation presented here closely resembles the Secretary's method of computing the amount of retroactive SSI benefits to award to claimants previously receiving

state welfare benefits which was at issue in *Jones v. Califano*, 576 F.2d 12 (2d Cir. 1978). In *Jones*, the Secretary adhered at the state agency level to one method for calculating retroactive benefits, while following a more favorable standard at the federal agency level. In holding that the plaintiff need not exhaust administrative remedies prior to asserting her federal court challenge to the Secretary's benefit calculation standards, the court noted that the Secretary's policy essentially created

> a situation in which the Appeals Council consistently rules in favor of claimants and the Secretary refuses to implement the method of benefit calculation adopted by his Appeals Council. Such a situation leads to unequal justice. Those who request a hearing will get their full benefits; those who fail to request a hearing will not.

*Id.* at 18. The Court concluded that "the Secretary's refusal to follow the rulings of his own Appeals Council raises colorable questions of equal protection and due process." *Id.* Thus, to the extent that the Secretary's original non-acquiescence policy entailed legally dubious distinctions among claimants, the modifications in the policy do little to obviate this concern.[42]

accordance with another, more hospitable, set of legal principles. To this extent, the Interim Circular makes the determination of entitlement largely dependent on factors, such as the existence of counsel or other representative to assist the claimant, unrelated to the underlying factual basis of the claim. While the accuracy of the agency proceeding itself may or may not be substantially altered by the presence of claimant assistance, such assistance is likely to have a significant impact on the legal standard which is applied by the agency in determining a claimant's disability claim.

**42.** In their latest submission to this Court, filed July 16, 1985, defendants argue that non-acquiescence, insofar as it relates to proceedings at the state agency level, has not been challenged by plaintiffs in their amended complaint and that they have not been affected by, and thus have no standing to challenge, this aspect of the Secretary's new non-acquiescence policy. Defendants take too narrow a view of this action at an unacceptably late point in these preliminary injunction proceedings. The general concept of discrimination among claimants, which the Interim Circular now makes relevant at the state agency level, has always been a part of plaintiffs' non-acquiescence challenge. The

complaint itself alleges that the Secretary's non-acquiescence policy created an unlawful discrimination between claimants who do or do not seek judicial review of a non-acquiescent agency decision. *See* Amended Complaint ¶ 31. The Interim Circular continues the policy of non-acquiescence at the state agency level, thus effectuating a similar discrimination between those claimants who do or do not seek federal agency review. Defendants certainly cannot claim surprise at either this notion of discrimination, or even the particular problems with the state agency-level discrimination which its new policy creates. Indeed, *Jones v. Califano*, 576 F.2d 12 (2d Cir.1978) (discussed in text at page 1370 *supra*), a case arising out of the Secretary's use of a particular retroactive benefit calculation method in this Circuit, discussed at length the same type of intra-agency discrimination at work here.

This is also not a case in which the litigants have not in any meaningful way been affected by the challenged policy. All class members were denied benefits, or had benefits terminated, pursuant to determinations by a state agency which was free to disregard Second Circuit case law in making its determinations. They were thus required to incur the delay, cost and effort

While the precise magnitude of this continued state agency non-acquiescence is at present unclear, it is likely that substantial numbers of claimants will be denied disability benefits as a result of state agency non-acquiescence in circuit court decisions. According to statistics provided by the government, of 920,719 claimants whose disability claims were denied at the initial state agency level in 1984, only 422,907 of them had their claims processed at the state reconsideration level. Of the 340,174 claimants whose claims were denied after state agency reconsideration of their claims, only 246,846 filed requests for hearings before ALJs. *See* Office of Hearings and Appeals, FY 84, Key Workload Indicators, at 15 (Annexed to Defendants' Reply Memo Concerning Report). Thus, nearly 600,000 claimants whose claims were denied at the state agency level failed to reach the ALJ hearing level. This factor alone undermines much of the force of defendants' assertion that the Interim Circular provides that in all cases other than "test" cases, "where granting of benefits would be compelled by circuit precedent, benefits can now be awarded in the administrative process...." Baker Declaration ¶ 4. Instead, the new policy will be functionally identical to the old policy, and thus perpetuate its inconsistency with Fifth Amendment and separation of powers principles, for almost two-thirds of all Social Security disability claimants.

Defendants correctly observe that some circuit court precedents will not have applicability at the state agency level. Thus, for example, Second Circuit case law on the rendering of credibility determinations re-

of pursuing federal remedies. Most significantly in light of the economic status of most claimants, non-acquiescence at the state agency level deprives initial claimants of benefits at least until a subsequent remedy becomes operative. In addition, members of the class are not simply claimants who allege the unlawful nature of a particular level of administrative review but who nevertheless already received or are assured of receiving benefits at some subsequent level of agency review. *Cf. Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 2018, 80 L.Ed.2d 622 (1984) (plaintiffs who filed claims with fiscal intermediary but failed to pursue administrative remedies required to exhaust under § 405(g) where similarly situated claimants' Medicare claims were denied by fiscal intermediary but granted by ALJs). This is also not a case in which the defendants have completely revoked an allegedly unlawful policy, thus removing any basis for further, prospective legal challenge and obviating the need to consider whether preliminary injunctive relief is appropriate. Rather, it is a situation in which the defendants' conduct has essentially spread the potentially discriminatory impact of its non-acquiescence policy from one point in the disability review process to another.

Finally, defendants' argument, taken in conjunction with its position regarding the exhaustion requirement of § 405(g), would essentially immunize the new policy from a challenge to the discriminatory nature of state agency non-acquiescence. Defendants have maintained in numerous other Social Security suits, and have asserted in this litigation, that claimants who do not exhaust all of their administrative remedies cannot seek judicial review of an unfavorable agency determination. Thus, defendants would argue, the many claimants who would be preju-

diced by state agency non-acquiescence could not raise an objection to this policy in federal court for failure to exhaust under § 405(g). Here, on the other hand, claimants who *have* exhausted these remedies are purportedly without legal capacity to challenge the Secretary's new policy insofar as its state agency aspects are concerned. We are unwilling to construe plaintiffs' ability to challenge the new non-acquiescence policy so narrowly that judicial review of claimants' challenge to state agency non-acquiescence is precluded in this manner.

Whether or not individual class members have standing to assert a claim of state agency non-acquiescence, the City of New York is also a party to and has standing in these proceedings, and will be harmed by the Interim Circular just as it was with the Secretary's original non-acquiescence policy: in both instances, individuals who fail to overcome the various layers of non-acquiescent agency review will require the financial and social service assistance of the City. We also note that regardless of the discriminatory aspects of the Interim Circular, plaintiffs also have standing to challenge the Secretary's new non-acquiescence policy on other grounds. *See* pages 1372–74 *infra.*

The class certified in this Court's Order includes those claimants whose claims will be rejected by ALJs and not restored through further administrative appeal. At the time plaintiffs proposed this definition of the class, there was no differentiation between the Secretary's non-acquiescence policy as between the state and federal agency levels. In light of the dichotomy that now appears to exist, plaintiffs may wish to amend their proposed class definition to include all claimants whose claims are denied by virtue of a non-acquiescence policy at any level of agency review.

garding in-person testimony of claimants will obviously not have to be "acquiesced" in by state agencies since such agencies do not conduct in-person proceedings with claimants prior to rendering determinations on disability claims. We fail to see, however, why such a phenomenon is at all relevant to the issue of whether state agency non-acquiescence is permissible. For example, state agencies, like ALJs or Appeals Council panels, will almost always have to evaluate the opinion of a treating physician and determine whether to give it binding effect in light of the other evidence in the record. If state agencies were not required to acquiesce in Second Circuit decisions on this point, the consequences which we have delineated will be fully present.

Defendants' contention that non-acquiescence at the state agency level is necessary to preserve the SSA's ability to decide whether to relitigate an unfavorable precedent does not answer this concern. There is little reason for the Secretary to delay acquiescence in a circuit court decision until the Appeals Council level, with non-acquiescence the practical rule in all preceding levels of agency review. The Secretary can require state agency officials to apply circuit court precedent as a general rule until they are instructed, for justifiable reasons, *see* pages 1365–66 *supra*; Order ¶ 6c, to do otherwise. At that point, the circuit court will be in a position to determine the continued wisdom of its earlier decision based on a full administrative record in which the circumstances surrounding the application of the rule in question to a particular claimant have been fully "fleshed out," *see* Defendants' Reply Memo Concerning Report, at 9. Defendants have simply not proferred any reasonable justification for a policy which mandates adherence to and application of two different legal standards at different stages of agency review. Instead, the Secretary's policy essentially reverses what might be considered the normal "presumption" of agency decisionmaking—that all decisions by all agency officials will be in accord with relevant federal appellate court precedents, with exceptions narrowly circumscribed to situations where the circumstances justify such a departure.

The examination of the Secretary's new non-acquiescence policy as it affects the *federal* agency decisionmaking process reveals that SSA will generally acquiesce in disability determinations which would be favorable under circuit court standards, but unfavorable under SSA standards, in three situations (indicated by the bracketed numbers inserted above). Even in those situations, however, the extent to which this policy eliminates the burdens and inequities of the Secretary's previous policy is questionable. In [1], the Appeals Council is not bound to exercise its own motion review power, but it reserves the right to do so and to thereafter reverse the ALJ's erroneous granting of benefits. In [2], four events must occur in order for the Secretary to even have to consider acquiescing in circuit court case law: the claimant must appeal the unfavorable determination to the ALJ level; an ALJ must deny benefits under both SSA policy and circuit court case law; the claimant must appeal the ALJ's decision; and the Appeals Council must conclude that the ALJ's decision under circuit court standards is in fact erroneous. At that point, the Appeals Council will acquiesce in circuit court case law only upon concluding that further development of the case law by the ALJ is unnecessary and that judicial reversal of any unfavorable determination is likely to occur if the claimant seeks judicial review.

In [2] and [3], the Appeals Council reserves the right to non-acquiesce in circuit court decisions when "appropriate" to do so. On its face, this portion of the new non-acquiescence policy reflects a tempering of the prior non-acquiescence practice of the SSA. Under § 1–161, agency personnel presumably did not even consider whether a claimant was entitled to benefits under circuit court legal standards; if a conflict between SSA policy and circuit court precedents existed, ALJs were instructed to essentially disregard the latter and apply the former in all future cases. Here, the agency will non-acquiesce only when the Appeals Council, in conjunction

with the SSA Special Policy Review Committee and the Department of Justice, considers the case an "appropriate" one for relitigation based on its evaluation of the likelihood of judicial reversal of an unfavorable decision.

Even with this change, however, the standard by which such determinations will be made is both vague and not particularly well-suited to achieving the goals which SSA purports to seek in its non-acquiescence policy. The new policy admits of no objectively ascertainable limitation on non-acquiescence to those situations in which such a policy might be appropriate. For example, nowhere does the policy state that non-acquiescence will be limited to those situations in which Supreme Court review will be sought if the Secretary does not prevail. Nor is it limited to situations in which other circuit courts have ruled in the Secretary's favor subsequent to the circuit court's unfavorable decision, thus establishing some reasonable, objective basis for determining that relitigation is appropriate and may well be successful and thus should be pursued. It is also not limited to those situations in which congressional amendments to the Social Security Act have overruled or undermined the legal foundation for the unfavorable circuit court decision. Instead, the decision whether to non-acquiesce is linked solely to the Secretary's own evaluation of the agency's chances for success on appeal if the agency refuses to apply a circuit court decision. There is little assurance, absent articulation of at least some specific standards, that the agency's evaluation of its ability to succeed in litigating an issue in the courts will accurately reflect the circumstances in which non-acquiescence might be appropriate, particularly in light of the agency's position that it is acquiescing in this circuit's treating physician rule. In short, the new policy is simply inadequate in assuring that intra-circuit non-acquiescence will be limited to those instances in which such a course of action is appropriate. Thus, it is still quite likely that claimants will continue to have their disability claims evaluated in accordance with SSA policy rather than conflicting circuit court precedents despite the absence of circumstances which justify this practice. In this respect, both the separation of powers problems and discriminatory aspects of the Secretary's former non-acquiescence policy remain in place under the Interim Circular.

The Interim Circular also preserves a considerable amount of the unfairness inherent in the previous non-acquiescence policy. The ALJ's decision based on circuit court case law is merely a tentative one. While a claimant whose benefit eligibility has been terminated may elect to continue receiving benefit payments during his or her administrative appeal, *see* 42 U.S.C. § 423(g), no provision is made for a successful claimant seeking an initial grant of benefits to receive even interim, recoverable benefits pending the Appeals Council review of his or her decision. Such claimants are thus required to endure additional periods of time—up to six months in some instances (Fried Declaration ¶¶ 6–8; Morawetz Declaration ¶ 5), in addition to the time already spent pursuing claims through the non-acquiescing state agency levels—without receiving benefits to which they are entitled under both circuit court precedent and an ALJ's decision. *Cf. Smith v. Schweiker,* 709 F.2d 777, 781 (2d Cir.1983) (describing *Jones v. Califano, supra,* in which Secretary adhered to legal standard at state agency level but applied different, more favorable standard at federal agency level) ("Under these circumstances, concededly 'needy' individuals for whom 'time is a precious commodity' might obtain the higher level of benefits only by prosecuting their claims three rungs up the administrative ladder to the Appeals Council."). ALJs are required to evaluate testimony and weigh evidence in accordance with two sets of guiding legal principles, a task which certainly could not be expected to improve the quality, accuracy or efficiency of the already overburdened decision-making process. Again at the Appeals Council level, disability benefits are withheld from claimants whom the highest administrative agency authorities have deemed entitled to such benefits under cir-

cuit court case law. Finally, the Secretary, in three situations, has reserved the power to remand cases for "further development" or reapplication of circuit court standards, thus potentially adding additional layers to the already burdensome and lengthy administrative process for many claimants.

The Social Security disability system is an elaborate one, with up to four separate levels of administrative review and the opportunity for even more protracted agency claim evaluation by virtue of remands, reconsiderations, or requests for further development of relevant issues. We recognize that the Interim Circular provides for acquiescence, subject to appropriate relitigation of contested precedents, at the Appeals Council level. We are nevertheless concerned, for all the reasons expressed previously, with an agency policy that essentially provides for the continued ability to disregard or fail to pay benefits in accordance with relevant and valid circuit court precedents at no fewer than three of the four levels of administrative review. In theory, under the terms of the Interim Circular, the "final decision" of the Secretary for purposes of judicial review may well generally be one in accord with circuit court precedents. But in reality, the final decision for the many claimants who do not reach the Appeals Council stage will be one which may be contrary to circuit court law. The agency's policy of acquiescence will only operate to the benefit of those who persist with their claims through all levels of agency review. And to the extent that federal SSA officials are bound to apply the provisions of the Social Security Act as interpreted by federal circuit courts, state agencies are no less bound to do so. *See* 42 U.S.C. § 421(b). Even at the highest levels of agency review, assurances are lacking that the decision to non-acquiesce in circuit court decisions will be at all limited to those situations in which external circumstances justify this departure from adherence to statutory interpretations rendered by the federal courts of appeals. In sum, we seriously doubt that the assertion of authority to disregard federal circuit court precedents at all but the highest level of multilayered agency review is a legit-

imate exercise of administrative decision-making power.

In evaluating the terms, conditions and likely consequences of the Secretary's new policy, this Court is not being confronted for the first time with an administrative agency non-acquiescence policy and being asked to evaluate the legality of this policy as if it had been the agency's policy *ab initio*. In particular, plaintiffs argue that the Secretary's revised policy, premised as it is on agency acquiescence in circuit court decisions "as interpreted by the agency," is simply a procedural variation of the SSA's previous non-acquiescence policy. *See* Plaintiffs' Response to Defendants' Objections to Report, at 6–7. At this stage of the proceedings, this Court assumes—recognizing plaintiffs' vigorous assertion that this assumption is ill-founded—that the defendants will interpret circuit court precedents reasonably and in good faith. Nevertheless, several features of the SSA's revised non-acquiescence policy—the failure to require agency acquiescence at the state agency levels, at which initial determinations are made; the inequitable distinctions which are perpetuated under the revised policy; the burdens which the revised policy both imposes on claimants (*e.g.*, delay) and fails to alleviate (*e.g.*, failure to provide interim benefits to claimants who receive a favorable recommended decision from an ALJ), and the unacceptably vague assurances that the Secretary's acquiescence policy will limit non-acquiescence in a meaningful, reasonable and justifiable manner—cast considerable doubt on the extent to which the Interim Circular successfully alleviates the concerns we have previously expressed regarding the previous non-acquiescence policy of the SSA. In sum, we conclude that plaintiffs are likely to succeed in showing that the non-acquiescence policy of the Secretary continues to run afoul of well-established constitutional principles of separation of powers and Fifth Amendment due process and thus warrants the granting of preliminary injunctive relief.

#### d. *Propriety of Injunctive Relief*

 Defendants rely on the Fourth Circuit's recent decision in *Hyatt v. Heckler*, 757 F.2d 1455 (4th Cir.1985), in arguing that preliminary injunctive relief is inappropriate regardless of the merits of plaintiffs' legal challenge to the SSA's non-acquiescence policy.

*Hyatt v. Heckler* involved, *inter alia*, a challenge to the Secretary's alleged non-acquiescence in the Fourth Circuit's precedent for evaluating hypertension and diabetes mellitus in disability cases. The district court ordered the Secretary to follow Fourth Circuit precedents in making disability determinations for claimants with these impairments. The Fourth Circuit reversed. The Court focused on the fact that Congress had considered and rejected legislation which would have regulated or substantially curtailed the Secretary's non-acquiescence policy. The Court found this situation analogous to Congress' refusal to implement mandatory time deadlines for rendering disability determinations, a refusal which led the Supreme Court to invalidate judicially-imposed deadlines in *Heckler v. Day*, 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984). *See also Hill v. Heckler*, 592 F.Supp. 1198, 1210 (W.D.Okla.1984) (standard for reviewing termination of benefits is for Secretary to decide unless overruled by Congress, not courts).

For a number of reasons, we agree with the Magistrate that the congressional inaction at issue in *Hyatt* and *Day* are not analogous, and that injunctive relief is appropriate in this case notwithstanding the *Hyatt* decision. First, Congress' decision not to impose limitations on the Secretary's non-acquiescence policy can hardly be compared to the "clear expression of congressional disapproval" of mandatory deadlines at issue in *Day*. To the contrary, the Conference Committee Report on the 1984 amendments to the Social Security Act expressly cautioned that the agreement to delete the House and Senate proposals should not be interpreted as an approval of SSA non-acquiescence. The Committee also noted that questions had been raised concerning the constitutionality of the Secretary's policy, described the "undesirable

consequence" of the policy in Social Security cases, urged the Secretary to apply the policy only when the Secretary expected to seek Supreme Court review of the unfavorable circuit court precedent, and stated that "the legal and Constitutional issues raised by non-acquiescence can only be settled by the Supreme Court," 1984 Conference Report, at 38, U.S.Code Cong. & Admin.News 1984, p. 3096, a process which quite obviously requires lower courts to confront these legal issues in the first instance. Thus, far from making a considered policy-based determination that, on balance, congressional legislation in this area was unwarranted, *see Heckler v. Day, supra*, 104 S.Ct. at 2254 (accepting argument that "Congress expressly has balanced the need for timely disability determinations against the need to ensure quality decisions in the face of heavy and escalating workloads and limited agency resources" and that mandatory deadlines "are inconsistent with achievement of the Act's primary objectives"), Congress in this case appears to have given every indication that its refusal to act should not preclude (indeed, was based in part on the perceived need for) judicial resolution of the non-acquiescence issue. While a congressional invitation to judicial resolution does not carry with it the obligation of acceptance, we are persuaded that Congress' treatment of the non-acquiescence issue does not render judicial review of the question inappropriate.

Second, we are not entirely convinced that the denial of injunctive relief "does not leave claimants without a remedy." *Hyatt v. Heckler, supra*, 757 F.2d at 1460. While the remedy adverted to by the *Hyatt* court—the availability of judicial review of a non-acquiescent disability determination in accordance with circuit court precedent—might be sufficient in an otherwise ordinary challenge to an unfavorable agency disability decision, it is the process itself of non-acquiescence, and the unnecessary judicial review which it causes, which plaintiffs challenge as unlawful. The *Hyatt* court itself noted that such a procedure is "long and wasteful to the claimant and the government. Both the district court and

the conferees spoke forcefully to avoid the harm and extravagance of the policy of routine non-acquiescence. The Secretary should not deem vacation of the injunction as approval of the policy." *Id.* In addition, the Secretary's obvious disagreement with this Circuit's treating physician rule might well result in a determination that continued non-acquiescence in this rule is appropriate and thereby render additional administrative procedures meaningless and wasteful for members of the class in this case. In light of our conclusion that the standards for granting preliminary injunctive relief have been satisfied, the refusal to grant injunctive relief cannot in our view properly be based on a remedy which essentially relegates plaintiffs to the precise administrative process which they seek to avoid.

Finally, defendants' contention that the judicial imposition of an acquiescence policy would create administrative burdens similar to those involved in *Day* misperceives both the scope of relief necessary at this stage of the proceedings and the reasoning of *Day*. The Supreme Court's disapproval of judicially imposed mandatory deadlines in *Day* was not based on the extent of the agency modification of administrative procedures which such deadlines would have entailed; it was based on the congressional preference for quality decisionmaking over prompt decisionmaking and the inconsistency of mandatory deadlines with that preference. Moreover, in formulating a grant of relief, this Court is mindful of the policy modifications and other actions which the Secretary will be required to undertake and has fashioned its relief to be commensurate with the nature and scope of the alleged violation. Accordingly, we conclude that the granting of preliminary injunctive relief is not inconsistent with either *Heckler v. Day* or Congress' treatment of the non-acquiescence issue.

Finally, defendants contend that the grant of preliminary injunctive relief will essentially transform ordinary judicial review of unfavorable agency determinations into contempt proceedings for violation of this Court's order. We simply disagree. Contempt proceedings are appropriate when an order of the Court is violated, *e.g.*, if the Secretary fails to notify agency officials of the correct standards for evaluating the opinion of a treating physician in accordance with paragraph 6d of this Court's Order. They are not appropriate where an official simply misapplies a correct legal standard to the facts of a particular case. This Court's order does not require ALJs to grant benefits in cases involving a treating physician's opinion of disability; it orders the defendants to instruct ALJs to decide cases in accordance with Second Circuit precedents on this and other issues which arise in disability determinations. As long as the provisions of this Order are fully complied with, we see no reason why unfavorable determinations will not be reviewable in accordance with the normal substantial evidence standard.

### 2. *Bellmon Review*

### a. *Introduction*

In 1980, Congress passed an amendment to the Social Security Act. This amendment, referred to as the Bellmon Amendment in recognition of its sponsor, Senator Henry Bellmon, provides that

> The Secretary of Health and Human Services shall implement a program of reviewing, on his own motion, decisions rendered by administrative law judges as a result of hearings under section 221(d) of the Social Security Act [subsec. (d) of this section], and shall report to the Congress by January 1, 1982, on his progress.

Social Security Disability Amendments of 1980, Pub.L. 96–265, § 304(g), 94 Stat. 441,-456 (1980) (codified at 42 U.S.C. § 421 note). This amendment was prompted by increasing concern over the ever-widening disparities between the rate at which state agency disability determinations resulted in "pro-claimant," or "allowance," decisions (*i.e.*, the initial grant of benefits or the continuation of such benefits) and the significantly higher rate at which federal ALJs issued pro-claimant decisions, as well as the disparities which existed among the ALJs themselves. *See* H.R.Rep. No. 944,

96th Cong., 2d Sess. 57; *reprinted in* 1980 U.S.Code Cong. & Ad.News 1392, 1405; S.Rep. No. 408, 96th Cong., 2d Sess. 53, *reprinted in* 1980 U.S.Code Cong. & Ad. News 1277, 1331.

Following the enactment of the Bellmon Amendment, the Social Security Administration instituted a program for reviewing allowance decisions of ALJs. The decision to focus initially on ALJ allowance decisions in the Bellmon Review·program was based primarily on three factors: the SSA's interpretation of the legislative intent underlying the Bellmon Amendment; the SSA's conclusion that allowance decisions were likely to be the most error-prone decisions and would not otherwise be subject to review; and the fact that a high percentage of denial decisions were already subject to review by the Appeals Council due to claimant-initiated appeals. *See* Subcommittee Hearing, at 204; *AALJ v. Heckler*, 594 F.Supp. 1132, 1136 (D.D.C.1984). This policy was embodied in SSR 82–13, a Social Security ruling issued in January 1982. The ruling explained that

> Although the Appeals Council of the Office of Hearings and Appeals (OHA) receives and acts upon requests for review submitted by claimants dissatisfied with hearing decisions and dismissals, in the past several years the Council has not conducted an ongoing, pre-effectuation review of favorable administrative law judge decisions for the purpose of identifying the need for, and, where necessary, taking corrective action. Consequently, in accordance with the statutory mandate, OHA will conduct a comprehensive, ongoing program under which a prescribed percentage of administrative law judge decisions involving the issue of disability, particularly those allowing previously denied claims for disability benefits, will be evaluated prior to their effectuation, even though there is no request for review. When appropriate, the decision will be referred for possible review by the Appeals Council.

Since October 1981, the SSA has considered for own motion review, or "Bellmon Review," four categories of ALJ decisions:

(1) allowance decisions of newly hired ALJs;

(2) decisions referred by the Office of Disability Operations, which are commonly referred to as ODO protest cases;

(3) a national random sample of ALJ decisions; and

(4) decisions of particular ALJs.

The first two methods of Bellmon Review are not presently at issue in this case. None of the named plaintiffs received a decision from an ALJ who was among those selected for review under these standards. The own motion review program for new ALJs apparently involves both allowance and denial decisions, Tr. II 87–88, and was in place prior to the onset of Bellmon Review. Smith Aff. ¶ 13. The decisions selected for own motion review under these two methods initially constituted approximately 16% of all Bellmon Review cases. *See AALJ v. Heckler, supra,* 594 F.Supp. at 1134.

The national random sample category commenced in April 1982 and included 7½% of all ALJ allowance decisions in Title II and Title II/Title XVI concurrent disability cases. (Pure Title XVI disability cases have never been included in the Bellmon Review program.) Initially, national random sample cases comprised 21% of all cases selected for Bellmon Review. *See id.*

The final and most controversial category of ALJ decisions selected for Bellmon Review was the allowance decisions of ALJs with the highest allowance rates. This portion of Bellmon Review was commenced in October 1981. Initially, the ALJs selected for review were chosen on the basis of having allowance rates of greater than 70% (for hearing officers) and 74% (for ALJs). Approximately 110 ALJs, or 13% of all ALJs nationwide, were selected for Bellmon Review on this basis. This category of Bellmon Review cases initially constituted 63% of all cases selected for Bellmon Review. *Id.* at 1134. These high allowance ALJs were divided into four categories based on their "own motion review" rate (*i.e.*, the rate at which the Appeals

Council reviewed an ALJ decision based on legal error, abuse of discretion, lack of substantial evidence, or in cases involving a broad policy or procedural issue which may affect the general public interest): 100% review (*i.e.*, all of their decisions were reviewed), 75% review, 50% review, and 25% review. An ALJ was removed from individual Bellmon Review if the ALJ had a 5% or lower own motion review rate for three consecutive months. Together with the allowance decisions selected pursuant to the national random sample method commenced in April 1982, the number of ALJ allowance decisions selected for Bellmon Review (excluding newly hired ALJ decisions and ODO protest cases) was approximately 15% of all ALJ allowance decisions rendered in Title II and Title II/Title XVI cases. *See* Smith Aff. ¶ 16 & n. 3.

In September 1982, Louis B. Hays, the former OHA Associate Commissioner, wrote a memorandum to all ALJs concerning the Bellmon Review program.[43] The memorandum described the reasons for the implementation of the program and explained that allowance rates were used as a basis for selecting ALJs for Bellmon Review "because of Congressional intent and because studies had shown that decisions in this group would be the most likely to contain errors which would otherwise go uncorrected." *See* Memorandum of Louis B. Hays, September 24, 1982, at 1 (Subcommittee Hearing, at 204). The memo then described the expansion of the Bellmon Review program to include randomly selected, newly hired ALJ, and ODO protest allowance decisions and gave a brief description of each of these portions of Bellmon Review. The memo also explained that al-

though the basis for selecting individual ALJs for Bellmon Review was their allowance rates, the determination of whether to remove an ALJ from Bellmon Review was based on his or her own motion review rate. The memo then described a feedback program designed to achieve "long term improvement" in ALJ decisionmaking. *Id.* at 3. According to the memo, a memorandum from the Chief ALJ would be sent to the Regional Chief ALJ describing the problems found in a particular ALJ's decisions. The Regional ALJ would then meet with the ALJ to discuss the memo and review steps to take in order to improve the accuracy of the ALJ's decisions. If further review revealed that the ALJ's decisions had not improved, the Chief ALJ was to consider additional counseling or special training; if measurable improvement still did not occur, "other steps" would be considered. *Id.* at 4.

When data became available on the own motion review rates of individual ALJs, Bellmon Review of individual ALJs was then based on ALJ own motion review rates. By March 1983, sufficient own motion review data was available so that the selection of ALJs on the basis of allowance rates ended. Smith Aff. ¶ 16(b); *AALJ v. Heckler, supra,* No. 83–0124, Order at 1 (D.D.C. June 29, 1985). In June 1983, some unappealed ALJ denial decisions began to be considered for Bellmon Review.[44] These ALJs were selected on the basis of having a significantly above-average "grant review" rate, *i.e.*, the rate at which the Appeals Council grants claimants' requests for review of ALJ denial decisions.[45]

---

**43.** This was not the first notice to ALJs concerning Bellmon Review. ALJs were notified in February 1981 of SSA's apparent plans to institute a procedure for reviewing the decisions of high allowance ALJs as part of its implementation of the Bellmon Amendment. *See* Subcommittee Hearing, at 67.

**44.** ALJs were not informed of the decision to include denial decisions in the Bellmon Review program. *See AALJ v. Heckler, supra,* 594 F.Supp. at 1135. Whether the decision not to disclose this expansion of the Bellmon Review program to ALJs was a strategically wise exer-

cise of discretion is an issue we do not consider critical to resolution of these motions.

**45.** The counseling program which had been planned was objected to by ALJs and was never implemented. *See* Tr. II, at 37–38; Mason Aff. ¶ 16; *AALJ v. Heckler, supra,* 594 F.Supp. at 1135. The feedback program has been conducted on a purely voluntary basis. *See AALJ v. Heckler, supra,* 594 F.Supp. at 1135. Thus, the formal educational aspect of Bellmon Review essentially consists of Appeals Council review of ALJ decisions in individual cases. Tr. II, at 61.

A number of other significant events occurred in 1983 concerning the Bellmon Review program. In January, the Association of Administrative Law Judges filed a lawsuit challenging the SSA's Bellmon Review program, alleging that it compromised their decisional independence in violation of the APA. *See AALJ v. Heckler, supra.* In June, the Senate Subcommittee on Oversight of Government Management held hearings on, *inter alia*, the Bellmon Review program and the SSA's non-acquiescence policy. In October, the Subcommittee issued a report which, as will be discussed below, was highly critical of both programs and recommended that they be terminated.

In 1984, the Bellmon Review program was altered in two significant respects. First, on June 21, 1984, the SSA terminated the individual ALJ portion of the program. According to a letter written by Frank V. Smith III, the new OHA Associate Commissioner,

1) the selected ALJ portion of the Bellmon review has, to a large extent, served its purpose and,

2) increasing the number of cases reviewed under the national random sample (NRS) portion of the Bellmon review represents both a more efficient and flexible use of our resources at this time.

The results of the Bellmon review show that there has been a progressive narrowing of the difference in the own motion rates between the selected ALJ and national random sample portions of the review ...

This data strongly indicates to me that the selected ALJ review has contributed to significant improvement in decisional quality and consistency. Therefore, the problem of wide variation in decisional accuracy among ALJs, which the selected ALJ portion of the Bellmon review was implemented to address, appears to have diminished considerably. For these reasons retention of this portion of the Bellmon review is not justified at this time.

Ex. Q in Support of Plaintiffs' Motion for a Preliminary Injunction. According to the letter, these changes were being made "on an interim basis". *Id.*

Second, on July 16, 1984, the scope of the national random sample portion of Bellmon Review expanded to include ALJ denial decisions. According to Lawrence W. Mason, Mr. Smith's Executive Assistant, as of May 1, 1985 approximately 2.5% of all unappealed ALJ denials have been considered for Appeals Council own motion review. Mason Aff. ¶ 8.

b. *Legal Issues*

Plaintiffs contend that the Bellmon Review program, in its various forms, deprived them of their right to a fair and impartial hearing in violation of the APA, the Social Security Act, and the Due Process Clause of the Fifth Amendment, and constituted unlawful discrimination in violation of the Fifth Amendment. Plaintiffs contend that the program pressured ALJs to reduce the number of allowance decisions which were rendered and thereby deprived Social Security claimants of their right to an unbiased and impartial hearing officer. Plaintiffs presently seek to enjoin the continuation or further implementation of the Bellmon Review program, and to obtain an order directing the defendants to identify and provide other information concerning those claimants who may have been denied or terminated from disability benefits as a result of the Bellmon Review program.

Defendants have raised a number of jurisdictional and other defenses to plaintiffs' challenge to Bellmon Review. These defenses can be summarized as follows:

(i) the named plaintiffs lack standing to raise their claims;

(ii) plaintiffs' claims are moot;

(iii) plaintiffs waived their Bellmon Review claims by failing to raise their claims before the appropriate administrative authorities; and

(iv) the Bellmon Review program (a) is consistent with the Bellmon Amendment's language and purpose, (b)

was and is appropriate in its focus on allowance decisions because of the greater likelihood of error in these decisions and the already-existing claimant initiated process for reviewing ALJ denials, and (c) has not compromised the impartiality of ALJs in an unlawful manner.[46]

### (i) *Standing*

Defendants raise two objections based on standing.

■■■ First, defendants point out that the named plaintiffs are all Title XVI Supplemental Security Income claimants and that Bellmon Review has been directed only at Title II and concurrent Title II/Title XVI cases. We agree with the Magistrate that this standing argument is supported by "neither the record nor logic." Report, at 44. Surely it cannot be seriously argued that an ALJ who hears all three types of cases and applies identical substantive criteria to all of them, *see Hankerson v. Harris,* 636 F.2d 893, 895 n. 2 (2d Cir.1980); *Rivera v. Harris,* 623 F.2d 212, 216 n. 4 (2d Cir.1980), might be influenced by Bellmon Review in deciding the Title II and concurrent Title II/Title XVI cases on his or her docket but then rid his or her mind of such influences upon turning to the Title XVI cases on this same docket. In light of plaintiffs' claim that impartiality in ALJ decisionmaking has been affected by the Bellmon Review program, we reject the contention that the alleged impact of the program can be confined in the manner urged by defendants.[47]

Second, defendants contend that the named plaintiffs have not in fact been injured by Bellmon Review. Defendants correctly point out that the ALJs who decided the cases of plaintiffs Stieberger, Sullivan and Happy were never subject to Bellmon Review under the "individual ALJ" portion of the program, and that the ALJ who decided plaintiff Vega's case only had his denial decisions subjected to Bellmon Review under this part of the program. *See* Smith Aff. ¶ 26e. Defendants also note that the ALJ who decided plaintiff Johnson's case had his decisions subject to Bellmon Review from May 1, 1982 to March 11, 1983; Johnson had his hearing before this ALJ on January 17, 1984 and a decision was rendered on March 30, 1984. *See id.* ¶ 26d; Johnson Aff. ¶ 5.[48] Two observations are appropriate. First, Johnson certainly has standing to raise his claim. His ALJ was subject to individual ALJ review at a time when such review was based on allowance rates, and may well have carried the alleged effects of Bellmon Review with him into his subsequent decisionmaking. Second, plaintiffs' challenge is not limited to the individual ALJ portion of Bellmon Review but also includes the national random sample portion. According to plaintiffs, the SSA's initially exclusive consideration of allowance decisions for Bellmon Review created a pressure to limit or reduce the number of allowance decisions rendered by ALJs. In addition, even those ALJs who were not subject to individual ALJ Bellmon Review were surely aware of the practice, as well as its consequences for their colleagues who were included in this part of the program. In these circumstances, even a non-targeted ALJ may have rendered determinations which were improperly affected by the alleged pressure of Bellmon Review. There is no indication that the decisions of plaintiffs' own ALJs were somehow immunized from the random sam-

---

**46.** We reject defendants' suggestion, *see* Defendants' Memo in Support of Motion to Dismiss, at 15, that claimants who have sought judicial review of their unfavorable ALJ determinations have thereby received due process, thus eliminating their Bellmon Review claim from consideration. *See* Report, at 46–47; page 1395 *infra.*

**47.** Plaintiffs have indicated a willingness to intervene a Title XVI claimant if necessary to obviate this objection. *See* Plaintiffs' Response to Defendants' Objections to Report, at 20*. While we do not mean to preclude the taking of such steps as a precautionary matter, we find it unnecessary as a legal matter.

**48.** The Johnson affidavit indicates, apparently incorrectly, that his hearing was held on January 17, 1983. Since Johnson's application for benefits was rejected by the state agency on April 11, 1983, we assume that his subsequent hearing before an ALJ occurred some time subsequent to that date.

ple selection process and were otherwise unaffected by Bellmon Review. Plaintiffs Stieberger, Johnson, Sullivan and Happy all had hearings before ALJs during the period in which individual ALJ review was in effect and the random portion of Bellmon Review included only allowance decisions. Therefore, regardless of the merits of plaintiffs' claim as described above, we believe that plaintiffs have standing to assert it.

### (ii) *Mootness*

■■■ Defendants contend that the 1984 alterations in their Bellmon Review program have rendered plaintiffs' challenge to these "past practices" moot. Defendants' Objections to Report, at 32. We note initially that plaintiffs have not indicated any satisfaction with the currently existing Bellmon Review program but instead seek its immediate cessation. Thus, to the extent that a national-random sample of primarily allowance decisions is still in effect, plaintiffs' challenge to this recently modified portion of Bellmon Review is not moot. In addition, plaintiffs not only seek immediate prospective relief but also an eventual redetermination of unfavorable disability determinations rendered while defendants' then-existing Bellmon Review program was in effect. *See* Plaintiffs' Preliminary Injunction Memo, at 31; *see also W.C. v. Heckler, supra*, slip op. at 8 (challenge to Bellmon Review not moot insofar as retrospective relief is sought). While we recognize defendants' desire to focus this Court's consideration on the current Bellmon Review program, plaintiffs' claim and request for relief, as well as a proper analysis of the issues raised by both parties' motions, necessarily require a temporally broader examination of defendants' Bellmon Review program.

The more difficult issue raised by defendants' mootness argument relates to plaintiffs' request for prospective relief with respect to past practices—namely, the individual ALJ portion of Bellmon Review—which are currently not in effect. Plaintiffs seek an order prohibiting defendants from instituting new procedures or reinstituting abandoned procedures for own motion review of ALJ allowance decisions without prior approval of this Court. Plaintiffs claim that such relief is proper based on the Secretary's own acknowledgement of the "interim" nature of the changes and the fact that the individual ALJ portion of Bellmon Review was abandoned in part because it had succeeded in reducing ALJ allowance rates. Plaintiffs thus contend that a recurrence of increasingly high allowance rates may result in reimplementation of individual ALJ Bellmon Review.

The Court finds itself in the curious position of being asked to enjoin a policy which is no longer adhered to by its original proponents. We recognize, however, that apart from the propriety *vel non* of granting such relief, as a matter of mootness doctrine the possibility that the prior practices may be resurrected is not wholly conjectural. *See* Ex. Q in Support of Plaintiffs' Motion for a Preliminary Injunction (letter of Frank V. Smith III, dated June 21, 1984) ("[R]etention of this portion of the Bellmon review is not justified at this time ... These changes in the Bellmon review mechanism are being made on an interim basis ... [A]t this time I have not made any final decision regarding the continuing structure of the Bellmon review."). We thus agree with the District of Columbia District Court in *AALJ v. Heckler* that, based on this evidence of the Secretary's intentions, "there remains a live controversy between the parties" concerning this aspect of plaintiffs' challenge to Bellmon Review. 594 F.Supp. at 1141.

### (iii) *Waiver*

■■■ Defendants contend that plaintiffs' Bellmon Review claim is not appropriately before this Court by virtue of their failure to raise this specific challenge to the Secretary's determination during their administrative proceedings. *See* Defendants' Memo In Support of Motion to Dismiss, at 12*. Defendants rely on § 556(b) of the APA and the Supreme Court's decision in *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54

(1952) ("*Tucker*"), for the proposition that claimants must specifically raise claims of ALJ bias during their administrative proceedings or else be deemed to have waived such claims.[49]

With respect to § 556(b), defendants are correct in noting that allegations of ALJ bias are generally to be made at the administrative level. 5 U.S.C. § 556(b) ("On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case."); *cf.* 20 C.F.R. §§ 404.940, 416.1440.[50] Similarly, in *Tucker*, the Court held that the failure to timely raise an objection that a hearing examiner in an Interstate Commerce Commission ("ICC") Act case was not appointed pursuant to § 11 of the APA barred a subsequent court challenge on that basis to the agency's unfavorable determination. The Court noted that the plaintiff, a motor carrier, did "not claim to have been misled or in any way hampered in ascertaining the facts about the examiner's appointment" and did not offer any excuse for its failure to object before the agency. *Id.* at 35, 73 S.Ct. at 68. The Court also observed that

the defect in the examiner's manner of appointment did not actually prejudice the plaintiff. According to the Court, there was "no suggestion that [the examiner] exhibited bias, favoritism or unfairness[,]" *id.*; the Court instead found that the claim was "clearly an afterthought, brought forward at the last possible moment to undo the administrative proceedings without consideration of the merits and can prevail only from technical compulsion irrespective of considerations of practical justice." *Id.* at 36, 73 S.Ct. at 68. In response to the claimant's contention that objection to the ALJ's qualifications would have been futile since the agency had a "predetermined policy on this subject," the Court concluded that the agency was nevertheless entitled to be "put on notice of the accumulating risk of wholesale reversals being incurred by its persistence" and that timely objection at the agency level was therefore required. *Id.* at 37, 73 S.Ct. at 69.[51]

In several respects, the circumstances surrounding plaintiffs' Bellmon Review claim differ significantly from those contemplated by § 556 and at issue in *Tucker*.

First, the instant case, unlike *Tucker*, involves allegations that the challenged policy of the Secretary created bias or lack of

---

**49.** The *Tucker* issue has been explicitly or implicitly adverted to at prior stages of this litigation as one of exhaustion, *see* Plaintiffs' Reply Memo, at 13; Plaintiffs' Response to Defendants' Objections to Report, at 23, and as one of waiver, *see* Report, at 42; Defendants' Memo in Support of Motion to Dismiss, at 12\*; Defendants' Objections to Report, at 45. The characterization of defendants' argument is not without legal significance: while failure to exhaust administrative remedies implies that such remedies can be subsequently pursued and judicial review sought thereafter if necessary, waiver implies that the claim which was not raised before the agency is lost and cannot be raised thereafter. We believe the latter characterization of defendants' argument is the accurate one, in light of the *Tucker* Court's treatment of the issue, *see Tucker, supra,* 344 U.S. at 38, 73 S.Ct. at 69 (precluding motor carrier from raising challenge to manner of ALJ's appointment and remanding case to district court for determination of merits other than alleged ALJ disqualification), and the statutory reference to timeliness, *see* 5 U.S.C. § 556(b).

**50.** These regulations provide:

An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision. If you object to the administrative law judge who will conduct the hearing, you must notify the administrative law judge at your earliest opportunity. The administrative law judge shall consider your objections and shall decide whether to proceed with the hearing or withdraw. If he or she withdraws, the Associate Commissioner for Hearings and Appeals, or his or her delegate, will appoint another administrative law judge to conduct the hearing. If the administrative law judge does not withdraw, you may, after the hearing, present your objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another administrative law judge.

**51.** The Court also rejected the argument that the defect in the examiner's appointment deprived the ICC of jurisdiction or power and thus rendered its decision a nullity. 344 U.S. at 37–38, 78 S.Ct. at 69–70.

impartiality on the part of ALJs. Thus, unlike *Tucker*, where the motor carrier was "not actually prejudiced" by the defect in the ALJ's qualifications, 344 U.S. at 35, 73 S.Ct. at 68, plaintiffs claim that the Secretary's Bellmon Review policy did in fact prejudice their ability to obtain a fair and impartial determination of their claims. This is thus not a case in which a claimant has belatedly attempted to undo an unfavorable determination by dint of "technical compulsion irrespective of considerations of practical justice", *id.* at 36, 78 S.Ct. at 68, but rather is one in which defendants are alleged to have denied plaintiffs' constitutional and statutory rights which indeed may have affected the agency's determination of the merits of their claims. Plaintiffs' claim, unlike that of plaintiff's in *Tucker*, does relate to the fairness and impartiality of the factfinding process and thus cannot be dismissed out of hand. *Cf. Public Utility District No. 1 v. Federal Power Commission*, 242 F.2d 672, 681–82 (9th Cir.1957) (*Tucker* does not preclude federal court challenge to agency's failure to conduct hearing despite petitioner's failure to object during administrative proceedings; denial of hearing is "presumptively prejudicial").

Second, regardless of whether the ICC was predisposed to deny objections to ALJ qualifications such as those raised by the motor carrier in *Tucker*, it is also true that the plaintiff in *Tucker* could have had its rights fully vindicated if in fact the ICC had given the plaintiff a new administrative hearing by a duly appointed hearing officer. Indeed, in the typical case of alleged ALJ bias or disqualification, the agency can fairly easily provide the claimant with a new ALJ and consequently an unbiased determination. Hence, timely objection to ALJ bias is required in order to provide an opportunity for the agency to cure any such defect in the administrative agency decisionmaking process while the claimant is still before the agency.

In this case, however, plaintiffs challenge not the individualized bias of a single ALJ but the constitutionality of a systemwide program which allegedly created agencywide pressure among ALJs to deny disability claims. If plaintiffs' theory is correct, the Bellmon Review program causes agencywide bias among all ALJs who operate with the knowledge that the Appeals Council is scrutinizing ALJ allowance decisions with particular interest. In such circumstances, a new hearing before a different ALJ would not have remedied the systemwide bias of which plaintiffs complain. Cessation of the policy, rather than simply a new hearing before a different ALJ, is the only relief which would have satisfied plaintiffs' challenge to Bellmon Review. Thus, while § 556 of the APA contemplates administrative consideration of ALJ bias claims, we do not believe it reasonable to construe congressional intent to preclude a challenge not to the individual prejudices or lack of qualifications of a single ALJ, but to a decisional review policy with alleged agencywide impact on ALJ impartiality.

Third, the nature of plaintiffs' claim is of a distinctly different character than the ALJ bias claim contemplated under § 556(b). We agree with defendants that the ordinary claim of personal bias of an individual ALJ is one which should be raised at the earliest opportunity. A claimant should not be heard to complain months or years after an unfavorable determination that the judge who denied his or her claim was overtly biased or unfair in his conduct or decisionmaking. *See Marcus v. Director, Office of Workers' Compensation Programs, U.S. Department of Labor*, 548 F.2d 1044, 1050–51 (D.C.Cir.1976). In this respect, the failure of plaintiffs Stieberger and Vega to raise their claims of actual perceived bias on the part of their ALJs is problematic. Each plaintiff alleged in her affidavit circumstances which they characterize as constituting evidence of ALJ bias, *see* Stieberger Aff. ¶ 10, Vega Aff. ¶¶ 19–25, yet neither of them appears to have raised this claim at the agency level. For many other claimants, however, the evidence of ALJ bias due to Bellmon Review undoubtedly was considerably more subtle in form. It is surely reasonable to conclude that ALJs, many of whom have acknowledged in a variety of ways

that they felt agency pressure to reduce their allowance rates, did not outwardly manifest the impact of this alleged pressure during hearings. In such circumstances, the Social Security claimant could hardly have been expected to realize that an ALJ's refusal to accord probative weight to the claimant's evidence of his or her disability or to otherwise treat their claim with favor was due in part to an agency-created pressure to deny otherwise deserving disability claims, rather than a perceived lack of sympathy or pro-government bias. While it is reasonable to require prompt objection to perceived bias or lack of impartiality, it is simply not similarly reasonable to require such objection when this perception is not evident.

This is also not a case in which claimants were not "in any way hampered" in their ability to ascertain the facts giving rise to their claim. We have already discussed the circumstances surrounding defendants' implementation of Bellmon Review and the relatively circumspect nature of the program. *See* pages 1332–34 *supra.* Defendants are correct in observing that plaintiff-intervenor Patricia Happy filed her motion to intervene in this action even prior to exhausting her administrative remedies, and thus cannot claim to have been unaware of the grounds for her challenge to the impartiality of her ALJ during the pendency of her administrative appeal. For plaintiffs Stieberger, Johnson and Sullivan, however, there is no similar showing that they had "reasonable cause to believe that grounds for disqualification exist[ed]" at the time their final agency decisions were rendered. *Marcus v. Director, supra,* 548 F.2d at 1051, *quoted in Hummel v. Heckler,* 736 F.2d 91, 93–95 (3d Cir.1984) (Social Security claimant not precluded from raising challenge to Bellmon Review where claimant did not learn of grounds for disqualification until after Secretary's final decision was rendered). For these, and similarly situated, claimants, the aforementioned circumstances provide an additional reason for permitting a legal challenge to defendants' Bellmon Review policy to be raised in this proceeding. As noted previously, certain plaintiffs may be precluded from asserting at the trial on the merits the outward manifestations of bias which their affidavits disclose they were aware of at the time of their appearances before the agency. What is not precluded is a showing of bias resulting from the Bellmon Review policy of which claimants were unaware at the time of their agency proceedings.

Finally, the circumstances surrounding defendants' planning and implementation of Bellmon Review reveal that the underlying purpose of *Tucker's* agency-level objection requirement has been fulfilled in this case. In *Tucker,* the claimant argued that assertion of its objection to the ALJ's manner of appointment would have been futile since the agency allegedly had a policy of overruling such objections. The Court concluded that such an argument, if accepted, would deprive the agency of an opportunity to be "put on notice of the accumulating risk of wholesale reversals being incurred by its persistence" and that claimants were thus required to raise their objections administratively so as to provide such notice to the agency. *Id.* at 37, 78 S.Ct. at 69.

In this case, however, the agency can hardly claim to have been unaware of the potential legal challenges to its Bellmon Review policy and the attendant risks of implementing it in its original form. This is not a case in which a disappointed claimant has raised a legal challenge to an agency policy where the agency was previously unaware of its potential invalidity. Rather, plaintiffs challenge a policy which has long been the subject of continued scrutiny by the agency and others. The SSA was aware even prior to implementing the program that a focus on allowance decisions was not without legal risk. An agency work group concluded in August 1980 that "some denial decisions should be included in the Bellmon Review process to avoid biased adjudication and any denial of due process." *AALJ v. Heckler, supra,* 594 F.Supp. at 1136. In drafting the congressional version of the Bellmon Amendment, the congressional Conference Committee deleted the reference to selection of high allowance ALJs for Bellmon Review which

was contained in the Senate's version of the legislation. Nevertheless, the Bellmon Review program instituted by the agency in October 1981 focused exclusively on ALJ allowance decisions and was based primarily on the selection of individual ALJs with the highest allowance rates. By the fall of 1982, the president of the Association of Administrative Law Judges protested to former OHA Associate Commissioner Louis B. Hays that the Bellmon Review program be abandoned in part because of the effect it would have in "chilling ALJ decisional independence". *Id.* SSA officials also sought the advice of legal counsel concerning the legality of the individual ALJ portion of Bellmon Review. Although the Office of General Counsel concluded that such a review procedure entailed "legal risk" and recommended that SSA include denial decisions in its Bellmon Review program, this advice was disregarded. *Id.* In January 1983, the ALJs' association filed its lawsuit in Washington, D.C. challenging the legality of the Bellmon Review program. Subcommittee Report, at 33. In June 1983, the Senate Subcommittee on Oversight of Government Management held hearings concerning the Bellmon Review program at which Mr. Hays, a defendant in this case, appeared. In October 1983, the Subcommittee issued its highly critical report concerning the program.

Under these circumstances, defendants can hardly be heard to say that the failure of claimants to raise this particular issue in their administrative appeals deprived the agency of the "notice" which *Tucker* found was due to administrative agencies in challenges to ALJ qualifications. Indeed, the Supreme Court, in recent Social Security cases, has expressed reservations concerning the efficacy of such an objection requirement. *Cf. Mathews v. Eldridge, supra,* 424 U.S. at 330, 96 S.Ct. at 900 ("It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.").

Of course, it would clearly be preferable if challenges to Bellmon Review had been raised by claimants during their administrative appeals in order to place the Secretary in an optimal position to reflect upon the wisdom of her policy and its impact on claimants, and to consider altering the policy if deemed prudent as a policy or legal matter in light of the potential risk of its invalidity. In this case, however, the nature of the bias alleged, the systemwide impact of the challenged policy, and the defendants' clear awareness of the legal risks involved in its particular form of Bellmon Review all weigh against a finding that plaintiffs' challenge to Belmon Review has been waived by failing to raise it administratively.

Unlike many other cases involving challenges to Social Security agency policies and procedures, all class members whose claims have been denied by the Secretary in this case have in fact exhausted all of their administrative remedies by presenting their claim of benefits to the state agency, an ALJ, and the Appeals Council. Courts have recognized that Social Security claimants who have exhausted administrative review procedures generally need not raise the specific grounds for a constitutional objection to an agency policy or procedure in order to satisfy § 405(g)'s jurisdictional prerequisites to judicial review. *See Mathews v. Eldridge, supra,* 424 U.S. at 329 n. 10, 96 S.Ct. at 900 n. 10; *Shrader v. Harris,* 631 F.2d 297, 300 (4th Cir.1980). To require claimants not only to have exhausted all of their administrative remedies but also to have raised a specific constitutional and statutory challenge to an agencywide decisional review procedure of which many of them were apparently unaware is, in our view, an unreasonable and unwarranted interpretation of the congressional intent underlying the APA and the Social Security Act. *Cf. Mathews v. Eldridge, supra,* 424 U.S. at 331 n. 11, 96 S.Ct. at 901 n. 11 ("statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered").

In light of the foregoing, we conclude that plaintiffs' Bellmon Review claim is not precluded by their failure to raise this claim before the agency.

### (iv) *The Legality of Bellmon Review*

As with the Secretary's non-acquiescence policy, plaintiffs seek no relief for past claimants which is necessary to avoid irreparable harm. *See* page 1341 *supra.* Therefore, we need not and do not determine whether plaintiffs are likely to succeed in demonstrating that Bellmon Review in any of its past forms was unlawful. Nevertheless, in order to understand our conclusions concerning plaintiffs' challenge to the policy currently in effect, and in order to rule on defendants' motion to dismiss or in the alternative for summary judgment with respect to plaintiffs' Bellmon Review claim, an examination of the Bellmon Review program in all its various forms is necessary. This examination must begin with a brief description of the nature of the ALJ's role in the Social Security adjudicative process.

The ALJ is a creature of statute, specifically, the APA. The ALJs' independence is provided for by several employment-related provisions of the APA: they are paid in accordance with Office of Personnel Management guidelines set independently of agency recommendations or ratings (5 U.S.C. § 5372); they are exempt from performance appraisals to which other federal employees are subject (5 U.S.C. § 4301(2)(D)); an agency must establish good cause, after providing the ALJ with an opportunity for a hearing before an independent body (the Merit Systems Protection Board), in order to take adverse action against an ALJ (5 U.S.C. § 7521(a)). Although the APA does not provide tenure and compensation protections equivalent to those provided for under Article III of the Constitution, the ALJ is more protected in these respects than other federal employees.

The decisionmaking independence of ALJs is also provided for by statute and renders them "functionally comparable" to federal district judges in many respects. *Butz v. Economou,* 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978). The ALJ must provide a claimant with a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act". *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 43 (2d Cir.1972). ALJs may not communicate *ex parte* with anyone within or without the agency about the facts of a particular case. 5 U.S.C. § 557(d)(1). The ALJ has a duty to develop all of the evidence and "to scrupulously and conscientiously probe into, inquire of, and explore for all of the relevant facts." *Gold v. Secretary of Health, Education and Welfare, supra,* 463 F.2d at 43 (*quoting Hennig v. Gardner,* 276 F.Supp. 622, 624–25 (N.D.Tex.1967)). The ALJ must not only examine the record for evidence which is in favor of the government's position, *Richardson v. Perales,* 402 U.S. 389, 408–09, 91 S.Ct. 1420, 1430–31, 28 L.Ed.2d 842 (1971), but also has a particular duty in *pro se* cases to assist the parties in developing the record regarding the claimant's allegedly disabling condition. *See Kane v. Heckler,* 731 F.2d 1216, 1219–20 (5th Cir.1984); *Bluvband v. Heckler, supra,* 730 F.2d at 892; *Broz v. Schweiker,* 677 F.2d 1351, 1364 (11th Cir.1982), *vacated and remanded on other grounds,* 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983); *Hankerson v. Harris, supra,* 636 F.2d at 896. The ALJ must render a decision based solely on the applicable legal rules and on the evidence adduced at the hearing. *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970). Finally, the ALJ, like an Article III judge, is entitled to absolute immunity from liability in damages for actions taken in their judicial capacity. *Butz v. Economou, supra,* 438 U.S. at 508–14, 98 S.Ct. at 2911–15.

The ALJ's independence is not unlimited. The ALJ is subject to the rules and regulations promulgated by the agency and is duty-bound to apply these rules. *See D'Amico v. Schweiker,* 698 F.2d 903 (7th Cir.1983); *AALJ v. Heckler, supra,* 594 F.Supp. at 1141. Thus, the ALJ must apply even those rules with which the ALJ disagrees. *D'Amico v. Schweiker, supra.*

Although an unappealed and unreviewed ALJ decision becomes the "final decision of the Secretary," 42 U.S.C. § 405(g), the agency, in reviewing such a decision, retains "all the powers which it would have in making the initial decision". 5 U.S.C. § 557(b). The APA "authorizes the Secretary, not the ALJ, to make [judicially] reviewable final decisions in disability cases." *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984). Since the Secretary has delegated this final decisionmaking authority to the Appeals Council, "[i]t is the Appeals Council's decision, not the ALJ's, that a court reviews to determine whether the agency's decision is based upon substantial evidence" or is otherwise in accordance with the law. *AALJ v. Heckler, supra,* 594 F.Supp. at 1141.

In sum, ALJs can best be described as quasi-judicial officers who possess some, but not all, of the characteristics of Article III judges, but who are more independent than other federal executive branch employees. What defendants fail to recognize, however, is that the ALJ, despite his or her responsibility for applying regulations of the agency in addition to the laws of Congress and the decisions of the courts (leaving non-acquiescence aside for the moment), nevertheless is required to be an *impartial* arbiter of the cases which the ALJ decides. The ALJ must decide cases without bias for his or her employer, and without sympathy or bias for the claimant. The ALJ must decide cases just as any state or federal judge decides cases: based wholly and solely on the applicable legal rules and the facts as established by the record. In recognizing the existence of this implicit constitutional and statutory guarantee to impartial decisionmaking by ALJs, resolution of this motion entails no novel or unprecedented legal principle but simply the reiteration of what has repeatedly been recognized by others. *See, e.g., Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982) ("As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."); *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct.

1610, 1613, 64 L.Ed.2d 182 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."); *Butz v. Economou, supra,* 438 U.S. at 513, 98 S.Ct. at 2914 ("[T]he process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency."); *Goldberg v. Kelly, supra,* 397 U.S. at 271, 90 S.Ct. at 1022 ("an impartial decision maker is essential" in welfare benefit termination evidentiary hearings); *Borg-Johnson Electronics, Inc. v. Christenberry,* 169 F.Supp. 746, 753 (S.D.N.Y.1959) (Kaufman, J.) (provisions for appointment of "impartial, independent Hearing Examiners are the very heart and soul" of the APA); Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1279 (1975) ("an unbiased tribunal is a necessary element in every case where a hearing is required"). This right to an impartial ALJ has been recognized in Social Security disability cases as well. *See, e.g., Given v. Weinberger,* 380 F.Supp. 150, 154–55 (S.D.W.Va.1974) (ALJ's prejudicial manner of conducting hearing "taint[s] due process"); *cf.* 20 C.F.R. §§ 404.940, 416.-1440 ("An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision....").

We are also mindful, however, that this impartiality does not negate the agency's right to implement procedures for supervising and reviewing the ALJ decisionmaking process in order to insure faithful adherence to its policies and procedures. Implicit in the provisions of the APA and the Social Security Act, and indeed explicit in the Bellmon Amendment, is the power of the agency to institute procedures for reviewing the decisions of its ALJs. Nor, as the Magistrate recognized, do we understand plaintiffs to contend that this power of review cannot include decisions which are favorable to claimants. What is challenged here is the *manner* in which the

SSA has pursued this supervisory power of review.

### (a) *The Bellmon Amendment*

The parties sharply dispute the legislative history of the Bellmon Amendment and the extent to which the Bellmon Review program's focus on ALJ allowance decisions was consistent with this amendment. For the reasons discussed below, we find both plaintiffs' and defendants' reading of the Bellmon Amendment somewhat overstates the extent to which the Bellmon Review program is or is not consistent with the intent of its creators.

It is undisputed that Senator Bellmon himself was concerned particularly with the increasing number of ALJ allowance decisions. As Senator Bellmon noted:

Much of the problem has to do with the administrative law judge decision-making process itself, which is highly individualized. The judges are independent and differ in their procedural methods on hearings. According to the Finance Committee's report, the judges develop and decide cases in very different ways, some relying heavily on consultative medical examinations and others not, and some using vocational specialists a great deal in deciding cases while others do not. This has led to a great degree of variation in reversal rates among judges. Some have become known as "easy" judges, others as "hanging" judges. There seems to be more "easy" judges than "hanging" judges, however. The Finance Committee report points out that 87 percent of the judges reversed 46 percent or more of the cases they heard. *This seems to be an exceptionally high number of judges who reverse, on the average, almost half of the cases that come before them.*

These data indicate why the judges are considered by many experts to be the weakest part of the process. When you consider the individualized and independent style of the judges, combined with the highly subjective nature of many disability cases, there is the great potential for widely varying decisions and high reversal rates. Contributing to this are the factors which the judges must take into consideration when deciding a case. The use of vocational factors in considering a case makes the decision very subjective and heavily dependent on the individual judge's views. This has led to variations in reversal rates among judges and has brought concern that claimants are being treated differently.

The Social Security Administration has attempted to improve the situation by issuing a set of "vocational regulations" as guidelines for deciding cases. As yet, this has not had any effect on slowing the increase in reversal rates. Indeed, the rate has continued its upward climb. More regulations are not going to do the job. *We need a method to review the decisions made by the judges so that there is greater consistency among different judges and better assurance that disability awards are not being granted inappropriately in a large number of cases.*

The variations in reversal rates promotes inequitable treatment of claimants, Mr. President. It means that if you happen to get assigned to a judge who is lenient, you stand a better chance of getting a favorale decision than if you get one of the tougher judges. This is not fair or equitable.

126 Cong.Rec. 1408 (1980) (emphasis added). Senator Bellmon noted that the SSA's Appeals Council had ceased exercising its own motion review authority during the mid-1970's, and that the amendment which he proposed would require the SSA to conduct such reviews. *See id.; see also AALJ v. Heckler, supra,* 594 F.Supp. at 1135 n. 6.

Plaintiffs rely on the findings of the 1983 Senate Subcommittee Report adverted to earlier in arguing that Senator Bellmon's statements do not reflect the true legislative intent behind the Bellmon Amendment. In order to properly evaluate plaintiffs' argument, we quote in full from the Subcommittee Report:

There is very little legislative history on the Bellmon Amendment. It was offered as an unprinted floor amendment

by Senator Long on behalf of Senator Bellmon, who simply introduced the amendment and submitted the written statement of Senator Bellmon for the record. The amendment was accepted by the Senate without debate.

According to Senator Bellmon's statement [1][52] the SSA was to review the allowance decisions of those ALJs with high allowance rates. [2] In addition, as passed by the Senate, the amendment not only required the Secretary of Health and Human Services (HHS), to report to Congress on the progress of the program, but [3] outlined what was to be considered and included in the report:

> In his report [the Secretary] must indicate the percentage of decisions being reviewed and describe the criteria for selecting decisions to be reviewed and the reversal rate for individual administrative law judges by the Secretary (through the Appeals Council or otherwise), and the reversal rate of State agency determinations by individual administrative law judges.

However, when the amendment was taken up for review by the Conference Committee, the Committee struck all language specifying what was to be included in the report to Congress [i.e., [3] above]. Thus, *the Conference Committee struck all references to the assessment and evaluation of the ALJ reversal rate* and simply required that the SSA review ALJ decisions and report on that review [i.e., [2] above]. There was no mention in the amendment itself or the legislative history (but for the introductory statement of Senator Bellmon) that the SSA should focus on allowance decisions or target only ALJs with high allowance rates [i.e., [1] above]. Nevertheless, the SSA has repeatedly insisted that it was the intent of Congress to focus the review on only ALJ allowance decisions of those judges with the highest allowance rates.

The Subcommittee requested that the SSA provide documentary evidence and support for its interpretation of the legis-

lative intent behind the Bellmon Amendment. The Subcommittee received from the SSA only a copy of Senator Bellmon's statement which has already been discussed. Thus, in formulating its interpretation of the legislative intent regarding the Bellmon Amendment, the SSA ignored the language of the amendment itself and the changes made by the Conference Committee when it reviewed the amendment.

Subcommittee Report, at 9 (footnotes deleted) (emphasis in original).

Plaintiffs contend that this report establishes that Congress "rejected Senator Bellmon's preoccupation with allowance decisions" in enacting the Bellmon Amendment. *See* Plaintiffs' Reply Memo, at 14. We recognize that the language of the amendment itself says nothing about "allowance" decisions but mentions only "decisions." *See* page 1376 *supra*. We are not persuaded, however, that the "changes made by the Conference Committee" either related to or negated Senator Bellmon's expression of concern with allowance decisions. In our opinion, the bracketed numbers which we have inserted above demonstrate the unduly broad significance which the Subcommittee gave to the Conference Committee's review of the amendment. Even if the actions of the Conference Committee can be construed as exhibiting disapproval of the targeting concept adverted to by Senator Bellmon ([1] above), the changes made do not evince similar disapproval of the agency's focusing on allowance decisions in general in implementing the Bellmon Amendment. While it is clear from the remainder of their Report that the policy positions of the Subcommittee members are at variance with those of Senator Bellmon, we cannot thereby accord their interpretations and policy judgments superior weight in construing the legislative history of the Act. To the extent plaintiffs suggest that the SSA's primary concentration on reviewing ALJ allowance decisions is inconsistent with the legislative history

---

**52.** *See* fn. 39 *supra*.

of the amendment, this contention is overstated.

Although we have recognized that the Bellmon Amendment was indeed prompted by a concern with the high allowance rates of ALJs, we nevertheless reject the defendants' apparent contention that its conduct is thus entirely consistent with the amendment's legislative history and is thereby immunized from further review or invalidation. While we agree that the SSA's emphasis on allowance decisions is consistent with the Bellmon Amendment's legislative history, the question of whether the manner in which the SSA has implemented the Bellmon Amendment is still a proper subject of judicial inquiry and one which is not foreclosed by its legislative history. Nothing in the statute or its legislative history "required" (see *AALJ v. Heckler, supra,* 594 F.Supp. at 1136 (describing testimony of former OHA Associate Commissioner Louis B. Hays)) the SSA to implement a program for reviewing exclusively allowance decisions whose primary *modus operandi* was to target individual ALJs for own motion review based on their high allowance rates. According to the court in *AALJ v. Heckler,* the Senate version of the Bellmon Amendment required the targeting of high allowance ALJs; the Conference Report and the final version of the statute, however, clearly do not. *See AALJ v. Heckler, supra,* 594 F.Supp. at 1142 ("Senator Bellmon did state that SSA was to review the allowance decisions of those ALJs with high allowance rates but those remarks were not incorporated into the law."). In short, nothing in the Bellmon Amendment or its legislative history required the SSA to adopt a wholly one-sided approach to the review process based primarily on the targeting of high allowance ALJs, regardless of the consequences of such an imbalanced approach. It is thus necessary to consider whether the particular program instituted by the Secretary had the effect of compromising or undermining the impartiality of ALJs in an unlawful manner.

(b) *Justification For Agency Focus On Allowance Decisions*

Defendants offer two principal justifications for their focus on allowance decisions.

1. Defendants contend that the focus on allowance decisions was a reasonable allocation of agency resources to an area of ALJ decisionmaking not otherwise subject to review. Defendants correctly observe that over 50% of all ALJ denial decisions are subject to Appeals Council review by virtue of claimant-initiated appeals, and argue that its relatively modest consideration of 15% of Title II and concurrent Title II/Title XVI ALJ allowance decisions for own motion review "can hardly be said to emphasize, unduly or otherwise, review of allowance decisions." Defendants' Objections to Report, at 18. In this regard, defendants take strong objection to the suggestion that claimant-initiated review of ALJ denials are not entirely comparable or "parallel" to agency-initiated review of ALJ allowances.

In our view, defendants dismiss too lightly this suggestion. There are a number of identifiable differences between the claimant and agency-initiated review processes which may well explain the potential of the latter for interfering with ALJ impartiality. First, no ALJ can reasonably anticipate that all of his denial decisions will be appealed; for a variety of reasons, only approximately 50% of all ALJ denials are subject to claimant-initiated Appeals Council review. Under Bellmon Review, however, an ALJ with an unusually high allowance (or, by March 1983, own motion review) rate had up to 100% of his or her allowance decisions subject to the scrutiny of the agency for possible review, a procedure which was not necessarily confined in its alleged impact solely to ALJs actually under individual Bellmon Review but which may well have reverberated among other ALJs whose allowance rates were approaching unacceptable levels.

Second, Bellmon Review as formerly implemented by defendants had the untoward consequence of singling out a particular group of decisionmakers for agency re-

view. All ALJs, like any group of decision-makers, have experienced the displeasure of nonprevailing parties who seek solace and vindication in the form of appellate review; this every-day occurrence, virtually universal in the judicial branch, is a phenomenon with which all adjudicators must deal. Under Bellmon Review, however, individual ALJs were singled out from the rest of their colleagues for appellate review based solely on the bottom-line results which these ALJs were reaching in disability determinations. This targeting process, regardless of the benevolence of the motives which may have prompted it, simply cannot be compared and equated with the everyday psychological burdens which all ALJs shared and continue to share with respect to claimant-initiated denial review.

Third, the initiator of the review process is different for denials and allowances. While the truly independent and strong-willed ALJ might dismiss out of hand any suggestion that agency-initiated review creates pressures or conveys messages different from those associated with claimant-initiated review or that these distinctions are in any way relevant to his or her decision-making process, we agree with the *AALJ v. Heckler* court's observation that defendants "may have paid the ALJs an undue compliment" in denying this possibility. 594 F.Supp. at 1142. When litigants appeal unfavorable disability determinations, little "message" can reasonably be gleaned from their behavior other than their persistence, their access to counsel and/or their belief in the correctness of their position. When an ALJ's favorable determinations are singled out for scrutiny by his or her employer based on the frequency of such determinations or their variation from acceptable norms, the potential impact may well be considerably different. The Appeals Council's more frequent review of ALJ denial decisions thus cannot fully justify the SSA's exclusive focus on ALJ allowance decisions, based primarily on individual ALJ targeting, in its implementation of Bellmon Review.

2. Defendants contend that their focus on allowance decisions was justified by the greater likelihood that such decisions were in fact erroneous. This contention is indeed supported by evidence contained in the Secretary's January 1982 report to Congress which was submitted in accordance with the Bellmon Amendment's reporting requirement. *See* fn. 16 *supra*. This report notes that the Appeals Council was more likely to disagree with ALJ allowance decisions than ALJ denial decisions. Based on a random sample review of 3,600 ALJ disability decisions conducted prior to implementing the Bellmon Amendment, the SSA found the following:

> The major finding of the initial review was that significant differences in decision results were produced when these different decisionmakers were presented with the same evidence on the same cases. The ALJs allowed 64 percent of the cases. The Appeals Council, applying ALJ standards, allowed 48 percent. OA, applying DDS standards, allowed only 13 percent.

> An examination of the standards and procedures governing the ALJs and DDSs indicates distinct differences. In certain instances, operational definitions are not identical. In other instances, ALJ procedures permit a finding of disability that is not possible under the DDS standards. Finally, in some areas the definitions contained in the standards are the same, but procedures differ for evaluating evidence of impairment.

> Initial review data also indicated that, even when decisionmakers were applying the same standards, they were not applying them consistently. The Appeals Council denied 37 percent of the cases which ALJs allowed, and allowed 21 percent of the cases which ALJs denied. A detailed examination of the cases on which both the ALJs and the Appeals Council agreed shows that the Council agreed with the ALJs as to the *basis* for an allowance or denial much less frequently than it agreed on whether the case should be allowed or denied. Moreover, if the Appeals Council decision is taken as the "correct" decision under the rules governing ALJs, the review indicates that decisions to allow cases by

ALJs with high allowance rates are more often "incorrect" than the decisions of ALJs with lower allowance rates.

*Id.* at i-ii (emphasis in original). The Report then described the results of another study of ALJ allowance decisions:

In addition to studying overall allowance and denial rates, the initial review attempted to measure the consistency of decisionmaking among ALJs. The SSA corps of ALJs was divided into three groups of approximately equal size. Each group was composed of ALJs whose overall allowance rate fell within a given range. The sample of ALJ decisions selected for the first phase of the review was structured so that about one-third of the cases came from each group of ALJs. The three groups of ALJs, classified by their allowance rate levels, were:

| ALJ Allowance Rate Group | ALJ Allowance Percentage | ALJ Median Allowance Rate |
|---|---|---|
| Low Allowance Rate | 0–55% | 47% |
| Medium Allowance Rate | 56–70% | 63% |
| High Allowance Rate | 71–100% | 77% |

. . . . .

Table 5 shows that the Appeals Council allowed roughly 50 percent (ranging from 46–51 percent) of the cases from each of the three groups of ALJs. This relatively consistent Appeals Council allowance rate across the groups does not follow the pattern of high, medium, and low allowance rates that characterize the groups, and suggests that there are not major variations in the characteristics of cases decided by each group. The Appeals Council allowance rates for cases that the low and medium allowance rate ALJs originally allowed were consistent: 70 and 68 percent, respectively. However, the Appeals Council allowance rate for cases originally allowed by ALJs with high allowance rates dropped to 52 percent.

If the Appeals Council decision is taken as the "correct" decision under the standards and procedures governing ALJs, these findings would indicate that decisions to allow cases by ALJs with high allowance rates are more often "incorrect" than the decisions of ALJs with medium and low allowance rates. By the same token, no significant difference is found in Appeals Council decisions on cases originally decided by the ALJ groups with medium and low allowance rates. These two groups appear to be relatively homogeneous, using Appeals Council decisions as the criterion. This clearly suggests that the ongoing, own-motion review mandated by P.L. 96–265 should place the most emphasis on a review of cases decided by ALJs with high allowance rates.

*Id.* at 21, 23.

Our difficulty with the defendants' argument is two-fold. First, the critical assumption which underlies the validity of the Report's findings is that the Appeals Council decision is in fact the correct one. In the SSA, the non-acquiescence policy may well have rendered this assumption unfounded and consequently undermined the need for channelling own motion review efforts to high allowance ALJs. If the disparity in ALJ and Appeals Council allowance rates was in fact the result of ALJs' erroneous interpretations or applications of legal rules and precedents, a factual predicate for Bellmon Review of high allowance ALJ decisions would be discernable. If, however, this disparity was the result of ALJ *acquiescence* in federal court decisions in contravention of the Secretary's non-acquiescence in these same decisions, the Secretary could hardly claim that this disparity in allowance rates was the result of ALJ "errors" if the Secretary's non-acquiescence policy was itself unlawful. *See AALJ v. Heckler, supra,* 594 F.Supp. at 1142 ("[T]he ALJ may have difficulty discerning the correct result in a given case because of the Secretary's policy of nonacquiescence"); Ex. 4 to Mason Aff. (Freedom of Information Act letter to California attorney describing deficiencies in decisions of ALJ selected for Bellmon Review as including, *inter alia,* "undue weight given allegations/opinion evidence (excluding pain)"). Although on the

present state of the record we are unable to quantify the effect which this consideration may have had on the results of the SSA's preliminary study, we are nevertheless concerned that the study may present an unrealistic picture of the actual accuracy of ALJ decisionmaking.

Second, the existence of a factual predicate for the SSA's concern with allowance decisions does no more than supply statistical confirmation of Senator Bellmon's more instinctively-reached conclusions concerning such decisions. Consequently, the data does little more to justify or legitimize the particular manner in which the SSA chose to implement the Bellmon Amendment and thereby set about to remedy the perceived errors in ALJ decisionmaking. Nor does it somehow eliminate the possibility that individual ALJ Bellmon Review may have in fact unduly interfered with impartial decisionmaking by ALJs. The Bellmon Review program is thus still subject to scrutiny notwithstanding the results of the SSA's study.

#### (c) *Evidence of Bellmon Review's Impact on ALJ Impartiality*

Finally, defendants contend that Bellmon Review has not resulted in a deprivation of impartial decisionmaking by ALJs and thus has not violated any alleged constitutional or statutory guarantees of impartiality. Understandably, defendants' efforts at gathering evidence to "establish" the "absence" of bias consists of attempts to undermine the validity of contrary evidence proffered by plaintiffs. As described below, defendants are only partly successful.

Defendants have produced evidence which casts considerable doubt on the statistical evidence relied upon by the Magistrate and the Senate Subcommittee in their respective reports. First, both Reports place reliance on the alleged drop in the overall ALJ allowance rate from 67.2% in mid–1982 to 51.9% in mid–1983, a 23% decline. Magistrate's Report, at 54; Subcommittee Report, at III. Even assuming that none of this decline reflects proper adjustment for ALJ error and further assuming that reliance on such statistics is evidence of ALJ bias or lack of impartiality, *com-*

*pare Richardson v. Perales, supra,* 402 U.S. at 410, 91 S.Ct. at 1432 (ALJ reversal of 44% of unfavorable state agency determinations "attests to the fairness of the system and refutes the implication of impropriety") *with In re International Business Machines Corp.,* 618 F.2d 923, 929–30 (2d Cir.1980) (rejecting use of statistics regarding percentage of unfavorable rulings issued by judge to establish bias of judge), an SSA analysis of the Subcommittee Report pinpoints an analytical flaw in the aforementioned statistics which, if true, undermines the accuracy of the Report's findings. According to the SSA analysis, the 67.2% figure represents the allowance rate in continuing disability review (CDR) cases only and excludes dismissal decisions (*e.g.,* ALJ denials due to failure to establish entitlement to a hearing), while the 51.9% figure represents the allowance rate in all SSA cases (CDR, initial disability, retirement and survivors' insurance, and SSI cases) and includes dismissals, the latter factor clearly constituting one reason for the lower allowance rate. According to the SSA analysis, the ALJ allowance rate for CDR cases including dismissals decreased from 61.4% in mid-1982 to 60.5% in mid-1983, a 0.9% decline; the rate for CDR cases excluding dismissals decreased from 67.2% in mid-1982 to 64.7% in mid-1983, a 2.5% decline; the allowance rate for CDR and initial disability cases decreased from 53.0% in mid-1982 to 51.9% in mid-1983, a 1.1% decline. *See* SSA Staff Summary and Analysis of Levin/Cohen Report, "The Role of the Administrative Law Judge In the Title II Social Security Disability Insurance Program," at 2–3 (annexed to Defendants' Response to Plaintiffs' Post-Argument Brief).

These statistics, like plaintiffs', cannot be adopted without further inquiry. Other statistics still show a modest decline in ALJ allowance rates since the onset of Bellmon Review. *See* Subcommittee Report, at 15 (indicating decline in ALJ allowance rate from 74% in April 1981 to 70% in October 1981 to 64% in March 1982); *cf.* Bowie Aff. and Exhibits annexed. It may also be that changes in the substantive legal principles

governing Social Security disability cases during the period of Bellmon Review should have produced *increases* in the overall allowance rates of ALJs. While further factual development may shed additional light on the actual extent of decline in ALJ allowance rates and the validity of defendants' statistical analysis, at this stage of the proceedings defendants have cast doubt on the probative force of plaintiffs' numerical evidence of Bellmon Review's alleged impact on ALJ decisionmaking.

Second, defendants dispute the relevance of statistics regarding the frequency with which agency decisions in disability cases have been reversed by federal courts. While the Magistrate concluded that defendants "offered no alternative explanation" for this phenomenon, Report, at 55, the defendants' policy of non-acquiescence is at least one logical explanation for this activity. While the SSA's adherence to the non-acquiescence policy and the resulting reversal activity noted above are troubling in their own right, we are unable to conclude that the statistics described above may properly be construed as evidence of ALJ bias or lack of impartiality caused by Bellmon Review.

Third, defendants take issue with the Subcommittee Report's "principal finding" that "the SSA is pressuring its ALJs to reduce the rate at which they allow disabled persons to participate in or continue to participate in the Social Security disability program." Subcommittee Report, at III. Defendants' concerns with the validity of the Report's detailed findings are not without merit. In addition to the Subcommittee's overstated interpretation of the Bellmon Amendment's legislative history (*see* page 1389 *supra*) and the apparently flawed nature of its numerical findings (*see* page 1393 *supra*), the defendants have pointed to two instances in which an ALJ's oral or written testimony relied upon by the Subcommittee as evidence of agency pressure to reduce allowance rates was subsequently found by the court in *AALJ*

*v. Heckler* to constitute either legitimate concern with ALJ decisionmaking or evidence of ALJ dissatisfaction with perceived demands to allow, rather than deny, benefits. *See* Defendants' Objections to Report, at 27–28 n. 30.

Notwithstanding the above, defendants have failed to persuade this, or any other, tribunal that it has rebutted what can best be characterized as the practical impact of the Bellmon Review process on ALJ decisionmaking, in particular, its previous targeting of high allowance ALJs as the primary means of implementing its own motion review of allowance decisions. As one court has observed:

> In sum, the Court concludes, that defendants' unremitting focus on allowance rates in the individual ALJ portion of the Bellmon Review Program created an untenable atmosphere of tension and unfairness which violated the spirit of the APA, if no specific provision thereof. Defendants' insensitivity to that degree of decisional independence the APA affords to administrative law judges and the injudicious use of phrases such as "targeting", "goals" and "behavior modification" could have tended to corrupt the ability of administrative law judges to exercise that independence in the vital cases that they decide.

*AALJ v. Heckler, supra,* 594 F.Supp. at 1143.

These findings are consistent with the results of a survey conducted by Dr. Donna Cofer of Southwest Missouri State University and referred to in the Senate Subcommittee Report. Dr. Cofer found that of the ALJs who responded to her survey,[53] 77.1% agreed that the SSA was placing "tacit agency pressure" on them to reduce their allowance rates and 75.7% believed that the SSA's efforts to increase ALJ productivity had damaged the quality of their decisions. McCorry Aff. ¶ 69; Subcommittee Report, at 35. In light of these figures, it was not unreasonable for the Subcommittee to conclude that ALJs believed the Bellmon Re-

---

**53.** The Subcommittee Report noted that according to Dr. Cofer, the 70% response rate was

significantly greater than is normally expected. *See* Subcommittee Report, at 35 n. 179.

view program and the SSA's emphasis on increased productivity had pressured them "to decide cases in a certain way and at a faster rate, and that this pressure is having an adverse effect on the SSDI claimants." Subcommittee Report, at 35.

This conclusion was also echoed by Charles Bono, President of the Association of Administrative Law Judges, Inc. and the initiator of *Bono v. Heckler*, CA No. 77–0819–CV–W–4 (W.D.Mo.1977), the predecessor lawsuit to *AALJ v. Heckler*. According to Bono, ALJs selected individually for Bellmon Review are "under 100 percent scrutiny and all of his cases are subject to preeffectuation review ... This realization is predictably resulting in pressures on the "targeted" ALJs to do whatever they can to remove themselves from this special scrutiny." Subcommittee Report, at 13–14. Defendants have not rebutted this preliminary evidentiary showing of the impact of the former Bellmon Review program on ALJs. Tr. II 69.[54]

Our concern with the actual impact of Bellmon Review on ALJ decisionmaking is heightened by the nature of the role which ALJs play in the disability determination process. ALJs are ordinarily the first and only individuals to see, hear and evaluate the claimant in person; they have a duty to develop the record and conscientiously explore the facts surrounding the claimant's condition; they must make inherently subjective and individualized determinations regarding matters such as the degree of pain afflicting a particular claimant and the credibility of the claimant's complaints of pain. ALJs thus not only make factual determinations which are by law subject to Appeals Council review, but also *create* the very record which constitutes the basis for Appeals Council and judicial review. The

danger of an unduly coercive or pressure-inducing review procedure is thus not one which can easily be detected or remedied by a reviewing tribunal, but is one which threatens the integrity and impartiality of the factfinding which is so critical to the proper functioning of the disability determination process.

We are also unpersuaded at this stage of the proceedings that the SSA's shift from allowance rates to own motion review rates in the individual ALJ portion of Bellmon Review obviated the potential for ALJ bias or lack of impartiality. As noted previously, the own motion review rate is essentially the rate at which ALJ decisions are selected for Appeals Council for review based on, *inter alia*, legal error or lack of substantial evidence to support the ALJ's decision. But to the extent that this rate may have reflected ALJ adherence to pro-claimant circuit court decisions in which the Secretary had not acquiesced, we have difficulty concluding that the own motion review rate was an accurate measure of ALJ "error". Moreover, this modification in Bellmon Review did not eliminate the continued practice of ALJ "targeting" during a time in which the random portion of Bellmon Review was exclusively based on allowance decisions. The combination of these two practices thus may well have perpetuated substantially the same pressure which existed under the original form of Bellmon Review. As the court observed in *AALJ v. Heckler*,

> The practice of targeting ALJs on the basis of own motion rates, once that data became available, did reflect defendants' stated goal of improving the quality and accuracy of ALJ decisions. However, the evidence as a whole, persuasively

**54.** Defendants cite a 1978 study in support of the propriety of their Bellmon Review procedures. *See* Defendants' Objections to Report, at 33–34 & n. 35 (*citing* J. Mashaw, C. Goetz, F. Goodman, W. Schwartz, P. Verkuil & M. Carrow, Social Security Hearings and Appeals 123–24 (1978)). The emphasis of this study, however, appears to be in defending the legitimacy of individual ALJ review in the face of ALJ resistance to such techniques. *See id.* ("[N]o adverse action can be taken against an ALJ solely upon the ground of his statistical variation from prevailing practice. If charges are brought against him, he can refute the existence of good cause justifying dismissal."). The study excerpt does not address the more subtle question of whether such review procedures nevertheless interfered with the ALJs' impartial exercise of their statutory and regulatory duties to the detriment of claimants. The sources discussed in text address this question more directly.

demonstrated that defendants retained an unjustifiable preoccupation with allowance rates to the extent that ALJs could reasonably feel pressure to issue fewer allowance decisions in the name of accuracy.

594 F.Supp. at 1142.

It would be premature to conclude at this stage of the proceedings that Bellmon Review in its original form constituted nothing more than a legitimate and sincere effort to bring about uniform and correct standards for making disability determinations and was successful in its stated goal of improving decisional accuracy; whether Bellmon Review, as implemented by defendants, constituted an illegitimate effort to reduce the number of allowance decisions in order to simply reduce the fiscal burdens associated with the disability program and which resulted in the improper denial or termination of disability benefits by ALJs; or whether the Bellmon Review program was somewhere in between these two extremes. We recognize that allegations of bias or lack of impartiality on the part of decisionmaking tribunals are more easily made than substantiated, and that hearing examiners are presumed to be impartial in the performance of their duties. *See Schweiker v. McClure, supra,* 456 U.S. at 195, 102 S.Ct. at 1670. This is not, however, a case in which claimants have made generalized, unsupported assertions of hearing examiner bias based simply on the ALJ's position as a government employee who "might feel some pressure to protect the government purse." *Walters v. National Association of Radiation Survivors,* —— U.S. ——, 105 S.Ct. 3180, 3186 n. 6, 87 L.Ed.2d 220 (1985) (*quoting* district court decision, 589 F.Supp. at 1320 n. 17); *see Schweiker v. McClure, supra,* 456 U.S. at 196, 102 S.Ct. at 1670. Instead, this case involves the implementation of a result-based review procedure in which individual ALJs were singled out for decisional review, a process which members of Congress, the judiciary and the ALJ corps itself have recognized as being quite likely to create prejudicial pressures to deny benefits to disability claimants. We also note that at least one court has expressed some

concern regarding the SSA's motives in implementing Bellmon Review in the manner it did. *See AALJ v. Heckler, supra,* 594 F.Supp. at 1137 (describing evidence which "suggested that OHA had an ulterior goal to reduce ALJ allowance rates"); *see also* Subcommittee Hearing, at 35. In any event, we are persuaded that regardless of the motives underlying Bellmon Review, the SSA's original (*i.e.,* pre-1984) Bellmon Review program, by relying for a substantial period of time on the selection of individual ALJs for review of all or some of their allowance decisions as the primary means for implementing the Bellmon Amendment, may well have interfered with the ALJ's impartial decisionmaking and thereby raises clearly triable issues with respect to the legality of individual ALJ targeting under constitutional and statutory standards. *Compare Hummel v. Heckler,* 736 F.2d 91, 94 (3d Cir.1984) (if allegations concerning Bellmon Review program "are substantially accurate, the impartiality of administrative law judges who have been subjected to it might reasonably be questioned"); *AALJ v. Heckler, supra,* 594 F.Supp. at 1143 ("[D]efendants' unremitting focus on allowance rates in the individual ALJ portion of the Bellmon Review Program created an untenable atmosphere of tension and unfairness which violated the spirit of the APA, if no specific provision thereof ... [and] could have tended to corrupt the ability of administrative law judges to exercise [the decisional independence afforded under the APA] in the vital cases that they decide."). Defendants' motion for summary judgment must therefore be denied.

■ Whether plaintiffs are likely to succeed on the merits of their challenge to Bellmon Review as implemented prior to June, 1984, is an issue we need not decide. As noted previously, plaintiffs are not entitled to any preliminary relief of a retrospective nature with respect to their challenge to Bellmon Review. *See* page 1341 *supra.* In addition, we also reject plaintiffs' suggestion that an order enjoining the future implementation of previously used methods of Bellmon Review is appro-

priate at this time. While the interim nature of the changes made to the Bellmon Review program is sufficient to preserve the controversy between the parties, we believe it would be an unwarranted and unnecessarily intrusive exercise of judicial equitable power to order an executive agency to refrain from doing that which it has already indisputably refrained from doing. Any subsequent implementation of previously abandoned forms of Bellmon Review can be dealt with promptly if and when this occurs. Defendants are also ordered to afford plaintiffs and this Court ten (10) days notice prior to the reimplementation of any form of individual ALJ Bellmon Review which is based on ALJ allowance rates or own motion review rates. *See* Order ¶ 7b. The Court retains jurisdiction to deal with this, along with the other, aspects of this case.

 As for plaintiffs' request for prospective injunctive relief, *i.e.*, enjoining the SSA from continuing the Bellmon Review program in its present form, we believe that plaintiffs have failed to establish that they are likely to succeed in demonstrating the invalidity of the present program. Under Bellmon Review as presently practiced, no individual ALJ (other than newly hired ALJs) is targeted for review based either on allowance or own motion review rates. Moreover, the national random sample of ALJ decisions subject to Bellmon Review now includes a small percentage of ALJ denials. As discussed previously, we believe that the Secretary is entitled to employ procedures for reviewing the decisions of ALJs which supplement the claimant-initiated review process and which focus on ALJ allowance decisions more than ALJ denial decisions. We cannot conclude, as plaintiffs appear to suggest, that anything less than equally-balanced Bellmon Review of ALJ allowances and denials constitutes an undue intrusion into ALJ independence and impartiality or an impermissible discrimination among claimants. While the current Bellmon Review policy may not reflect the perfect or ideal balance in decisional emphasis, it is not this Court's function to insure that such perfection in the agency's performance of its statutory obli-

gations is achieved. We believe that the current policy is, on the present record, a reasonable reconciliation of the Secretary's desire to preserve some means for reviewing otherwise unreviewable ALJ allowance decisions and the claimants' desire to minimize the unfavorable impact of the Bellmon Review program on ALJ decisionmaking. *Cf. AALJ v. Heckler, supra,* 594 F.Supp. at 1141 (refusing, in decision dated September 10, 1984, to enjoin then-current Bellmon Review program; court noted that while "targeting high allowance ALJs for review, counseling and possible disciplinary action was of dubious legality," SSA had "modified the Bellmon Review Program significantly for the better"). Indeed, it is logical to conclude, and plaintiffs have so far failed to persuade us otherwise, that the Secretary's shift, over one year ago, from an exclusive focus on allowance decisions and on the individual ALJ portion of Bellmon Review to a primarily random sample of both allowance and denial decisions has alleviated to at least some degree the pre-existing pressure to reduce allowance rates. The evidence which plaintiffs have put forth concerning the effect of Bellmon Review on ALJ impartiality is cause for concern; this evidence, however, relates solely to the Bellmon Review program as it existed prior to the changes made in the summer of 1984. Plaintiffs, of course, are by no means precluded from attempting to prove at trial that this conclusion is unwarranted. In this regard, defendants' motion for summary judgment is premature; further opportunity for exploration of the actual experience of ALJs under the current system should be provided before this portion of plaintiffs' claim is resolved. In addition, if the sentiments of the Senate Subcommittee, the plaintiffs, or others are that even the present Bellmon Review program is unacceptable as a policy matter, it is within their power to pursue this position legislatively. *See* Subcommittee Report, at 37 (suggesting legislative repeal of Bellmon Amendment).

Finally, there is a "gap" relating to the Bellmon Review program which we must briefly address. We recognize that the two

most objectionable portions of Bellmon Review—the individual ALJ "targeting" and the random sample's exclusive focus on allowance decisions—ceased at almost the same time: the former, on June 21, 1984; the latter, on July 16, 1984. As a result, plaintiffs' contention that the SSA's exclusive emphasis on allowance decisions, however selected, is invalid relates to a 25-day period of time during which this particular "intermediate" version of Bellmon Review was in effect. In light of the narrow time frame during which the SSA's "intermediate" policy was in effect and the absence of any substantive relief which would be ordered by this Court if this particular form of Bellmon Review was considered likely to be found unlawful, we believe it is premature to determine whether plaintiffs are likely to succeed on this aspect of their challenge to Bellmon Review.

In sum, plaintiffs' request for preliminary injunctive relief is denied. Defendants' motion to dismiss, or alternatively for summary judgment, is also denied.

### 3. Conclusion

We summarize our conclusions with respect to the merits of plaintiffs' claims. Plaintiffs have made more than a colorable showing that the Secretary's Bellmon Review program was in its initial stages a potentially prejudicial one in its effect on the impartiality of ALJs. We are not persuaded, however, that plaintiffs have made a similar showing, much less demonstrated a likelihood of succeeding on the merits, with respect to the Bellmon Review program as it currently exists. While we recognize that changes to the program have been made on an "interim" basis, the present policy simply does not create the dangers of bias or lack of impartiality in the ALJ decisionmaking process which the original program may have entailed. Plaintiffs have failed to show why the present policy does not achieve the legitimate pur-

poses of agency review and supervision in a lawful manner.

Defendants' non-acquiescence policy, on the other hand, raises considerably more troublesome legal questions. In our view, the Secretary's previous non-acquiescence policy represented a radical departure from any previously accepted concept of the proper balance between the three branches of our federal government and created highly suspect distinctions between claimants based on their ability to exhaust their administrative remedies and obtain judicial review. There is a substantial likelihood that plaintiffs will succeed in establishing that the defendants in fact did not acquiesce in Second Circuit precedents concerning the treating physician rule, that Congress has not ratified the policies of the Secretary which conflict with such precedent, and that the Secretary's non-acquiescence policy violated constitutional principles of separation of powers and Fifth Amendment due process.[55]

The Interim Circular retains an unacceptably high degree of the previous policy's most troublesome features. We recognize that the circumstances have changed for the better since the issuance of the Magistrate's Report; non-acquiescence is no longer the unyielding agencywide rule which it has been in years past. But the new non-acquiescence policy continues to require many claimants to endure the consequences—either the delay or total denial of benefit payments—of an administrative agency's refusal to accept as authoritative a federal circuit court's interpretations of the statute which the agency administers as its legally mandated function. And in so doing, the policy preserves, virtually unaltered, a highly questionable basis for determining which claimants receive determinations pursuant to federal court decisions and which claimants do not. Plaintiffs are likely to succeed in demonstrating that the

---

**55.** We need not determine at this stage of the proceedings whether the Secretary's non-acquiescence policy may violate other constitutional guarantees, such as the procedural full and fair hearing component of the Due Process Clause. Cf. *Hyatt v. Heckler*, 579 F.Supp. 985, 1002 (W.D.

N.C.1984), *vacated and remanded on other grounds*, 757 F.2d 1455 (4th Cir.1985). We have merely stated what we believe are legal bases for challenging the policy on which plaintiffs are likely to succeed on the merits.

Secretary's non-acquiescence policy is subject to substantially the same legal infirmities as its predecessor.

## VII. RELIEF

We conclude that plaintiffs are likely to prevail on the merits of their challenge to the Secretary's non-acquiescence policy. Class members will be irreparably harmed if the Court withholds the relief set forth below.

The public interest, or balance of hardships, also clearly supports our conclusion that preliminary injunctive relief should be granted. We have already explored the plaintiff class' interest in obtaining this relief, and will not reiterate it here. Equally important is the relatively circumscribed nature of the relief granted. Plaintiffs do not seek (and have not been awarded) the payment of interim benefits to all class members regardless of the circumstances surrounding their claim; defendants are precluded only from denying benefits in the future on grounds contrary to the law of the Second Circuit. *Cf. Lopez v. Heckler, supra,* 725 F.2d at 1436 (estimating monthly cost of restoring benefits to all class members as $12,000,000); *but cf. Mental Health Association of Minnesota v. Schweiker,* 554 F.Supp. 157, 167 (D.Minn. 1982) ("There is no public interest in shifting financial responsibility for the psychiatrically disabled from a solvent disability fund to state and local government."), *aff'd in part and modified in part,* 720 F.2d 965 (8th Cir.1983). The government's right to recover benefits paid ·to claimants who ultimately fail to prevail on the merits of this action has been preserved. *See* Order ¶ 6e. No individualized notice to any class member has been required as part of our grant of relief. *Cf. Holden v. Heckler, supra,* 584 F.Supp. at 495; *Dixon v. Heckler, supra,* Order, at 3–4, ¶ 3–4; *Lopez v. Heckler, supra,* 572 F.Supp. at 32. Many of the concerns expressed by defendants regarding the scope of the relief requested by plaintiffs have been taken into account in the formulation of our Order. And it is certainly in the government's interest to *avoid* the wholesale invalidation of disability determinations which would occur if the

new non-acquiescence policy is declared invalid at a later date. In our view, both plaintiffs' and the public's interests strongly support the relief which this Court has granted.

The Court hereby grants the relief set forth in the Order issued in conjunction with this decision and annexed as Appendix A to this Opinion.

SO ORDERED.

## APPENDIX A

### ORDER

Plaintiffs, having moved this Court for orders granting intervention, consolidation, class certification and a preliminary injunction; and defendants, having moved this Court for orders granting dismissal, summary judgment, and remand; and the Court having granted interim disability benefits for the named individual plaintiff, proposed plaintiff-intervenors, and movants for consolidation by Order dated February 13, 1985; and having referred the matter by order dated March 8, 1985 for a hearing and report to Magistrate Naomi Reice Buchwald; and the Magistrate having duly issued a Report and Recommendation on May 8, 1985; and the Court having considered *de novo* those portions of the Magistrate's Report and Recommendation to which objection has been made,

IT IS HEREBY ORDERED that:

1. The motion of plaintiff Patricia Happy to intervene individually and on behalf of other persons similarly situated, is granted.

2. The motion of plaintiff Angel Vega, by his mother Carmen Vega, to intervene individually and on behalf of other persons similarly situated, is dismissed as moot.

3. The motion of plaintiff Milagros Sullivan to transfer her pending action, No. 84 Civ. 5804 (GLG), for consolidation with this action is granted.

4. The motion of plaintiff Harold Johnson for assignment of his complaint, No. 84 Civ. 7613 (LBS), filed as a related case, for consolidation with this action is granted.

5. Plaintiffs' motion for class certification is granted. The plaintiff class is defined as follows:

All New York State residents whose claims for benefits or continuation of benefits have been or will be denied or terminated pursuant to hearings before administrative law judges since October 1, 1981, based on a determination that they do not have a disability that prevents them from engaging in substantial gainful activity; and whose benefits have not been granted or restored through subsequent appeals.

6. Plaintiffs' motion for a preliminary injunction with respect to defendants' non-acquiescence policy is granted to the extent set forth herein. Pending a final determination of this action:

a. Defendants, and their agents, employees and successors are enjoined from denying or terminating Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits pursuant to policies, procedures, rulings or regulations which are inconsistent with decisions of the United States Court of Appeals for the Second Circuit, as further directed hereafter.

b. Defendants shall rescind, insofar as applicable to claims made by New York State residents, all written or oral instructions, policies, procedures, rulings and regulations, including Interim Circular No. 185, which state a general policy of non-acquiescence; which state specific non-acquiescence in any decision of the United States Court of Appeals for the Second Circuit; which state that defendants and their agents, employees and successors are bound only by decisions of the United States Supreme Court; which state that defendants and their agents, employees and successors shall not follow the law of the United States Court of Appeals for the Second Circuit where such is in disagreement with defendants' interpretation of Titles II and XVI of the Social Security Act or defendants' implementation thereof; and which state that the law of the United States Court of Appeals for the Second Circuit applies only in the specific case in which an interpretation of the Social Security Act or the defendants' implementation thereof arose.

c. Defendants and their successors shall henceforth inform in writing their agents and employees who adjudicate disability claims of all decisions by the United States Court of Appeals for the Second Circuit in which a final decision of the Secretary denying or terminating benefits was reversed, the specific provisions of the Social Security Act, or the policies, procedures, rulings or regulations of the Secretary which were in issue, and shall provide them with complete copies of all such decisions; and such writing shall also instruct that the decision announced shall be followed henceforth in the adjudication of all cases until such time as the decision is overturned on rehearing, rehearing *en banc*, appeal, or by subsequent court decision, or is superseded by legislation.

d. Defendants and their successors shall forthwith inform their agents and employees who adjudicate disability claims, in a writing conforming to the form specified in the immediately preceding subparagraph, and with notice to counsel for plaintiffs and the Court ten (10) days in advance of issuance in final form, that the decision of the United States Court of Appeals for the Second Circuit in *Bluvband v. Heckler*, 730 F.2d 886 (2d Cir.1984) shall henceforth be followed, and shall provide them with complete copies of this decision. The writing shall include the following statement about the decision:

(1) The opinion of a treating physician based on signs, symptoms or other findings is binding, unless contradicted by substantial credible evidence to the contrary. There is no requirement that the opinion be supported by objective clinical or laboratory findings.

(2) Where there is contradictory medical evidence in the file, the disability adjudicator shall make all reasonable efforts to resolve the issues by contacting medical treating or examining sources. If the adjudicator cannot resolve the contradictions, he or she shall

give greater weight to the medical facts, diagnoses and medical opinions based on signs, symptoms or other findings provided by a treating physician concerning the existence or limitations imposed by an impairment or combination of impairments than he or she gives to the opinions of and information provided by other sources, unless the treating physician has failed to give reasons for his or her opinion and continues to fail to do so despite the adjudicator's efforts to obtain such information as provided in this subparagraph (2), and as provided by section 9(a)(2) of the Social Security Disability Benefits Reform Act of 1984.

e. Defendants may, during the pendency of this action, pay benefits in accordance with subparagraph (a) of paragraph 6 of this Order without prejudice to defendants' right to recover such benefits, under the terms and conditions provided for in the Social Security Act, in the event that defendants ultimately prevail on the merits of this action.

7. With respect to defendants' Bellmon Review program:

a. Plaintiffs' motion for a preliminary injunction is denied.

b. Defendants shall provide the Court, the individual named plaintiffs, and The City of New York ten (10) days notice prior to the reimplementation of procedures for conducting own motion reviews of decisions by administrative law judges which are based in whole or in part on own motion review of the allowance decisions of individual administrative law judges selected on the basis of their allowance-of-benefits rates or their own motion review rates.

8. Defendants, their successors, agents and employees shall forthwith provide a copy of this Order to every person who is or becomes authorized to adjudicate Title II and Title XVI claims within New York State from the date of this Order until there is a final determination in this action.

9. Defendants shall report monthly on the first business day of each month, beginning on September 3, 1985, in writing to counsel for plaintiffs on all steps taken during the previous month to comply with this Order, and include in such report copies of all written materials issued in conjunction with compliance with this Order.

10. Defendants' motion to dismiss or in the alternative for summary judgment is denied.

11. Defendants' motion to remand plaintiff Theresa Stieberger's case to the Secretary is denied.

12. Defendants shall comply with all provisions of this Order, for which a specific date of compliance is not otherwise stated, within sixty (60) days of the date of this Order.

13. The parties shall confer and submit on or before September 23, 1985 a proposed schedule for the conducting and completion of discovery.

14. Nothing in this Order shall be construed as precluding members of the plaintiff class from obtaining greater relief on alternative grounds. Class members shall retain all rights to administrative and judicial review of decisions made as a consequence of this Order. Nothing in this Order shall be construed as precluding class members who choose to proceed with their individual court cases from seeking preliminary relief in those cases.

SO ORDERED.

## APPENDIX B

### PAPERS FILED BY PARTIES IN CONNECTION WITH MOTIONS

DOCUMENT DATE

PLAINTIFFS

1. Memorandum of Law In Support of Plaintiffs' Motion for a October 23, 1984
 Preliminary Injunction, and related affidavits and exhibits
 ("Plaintiffs' Preliminary Injunction Memo")

| DOCUMENT | DATE |
|---|---|

**PLAINTIFFS**

2. Memorandum of Law in Opposition to Defendants' Motion to Remand ("Plaintiffs' Memo in Opposition to Remand") 
January 28, 1985

3. Reply Memorandum of Law In Support of Plaintiffs' Motions for a Preliminary Injunction, Class Certification, Intervention and Consolidation, and related affidavits and exhibits ("Plaintiffs' Reply Memo") 
February 4, 1985

4. Post-Argument Memorandum of Law In Response to Class Certification Questions Raised by the Court ("Plaintiffs' Class Certification Memo") 
February 20, 1985

5. Plaintiffs' Response to "Defendants' Memorandum Concerning Instructions to Administrative Law Judges" ("Plaintiffs' Response to ALJ Memo") 
March 13, 1985

6. Plaintiffs' Memorandum of Law in Response to Defendants' Objections to the Magistrate's Report and Recommendation, and related affidavits and exhibits ("Plaintiffs' Response to Defendants' Objections to Report") 
June 21, 1985

**DEFENDANTS**

1. Defendants' Memorandum of Law in Support of Motion to Remand ("Defendants' Remand Memo") 
October 4, 1984

2. Defendants' Memorandum of Law (i) In Support of Defendants' Motion to Dismiss the Complaint or for Summary Judgment and (ii) In Response to Plaintiffs' Motions for a Preliminary Injunction, Class Certification, Intervention of New Plaintiffs and Consolidation with Existing Actions, and related affidavit ("Defendants' Memo in Support of Motion to Dismiss") 
February 4, 1985

3. Defendants' Memorandum Concerning Instruction to Administrative Law Judges ("Defendants' Memo on ALJs") 
March 4, 1985

4. Defendants' Reply to Plaintiffs' Response to Defendants' Memorandum Concerning Instruction to Administrative Law Judges ("Defendants' Reply Memo") 
April 1, 1985

5. Defendants' Memorandum of Law in Further Response to Plaintiffs' Motion for Class Certification and Plaintiffs' Post-Argument Brief ("Defendants' Response to Plaintiffs' Post-Argument Brief") 
April 1, 1985

6. Defendants' Memorandum Concerning Representation of Claimants 
April 12, 1985

7. Defendants' Memorandum Concerning Status of Bellmon Branches 
April 17, 1985

8. Defendants' Objections to Magistrate's Report and Recommendation, and related affidavits ("Defendants' Objections to Report") 
June 3, 1985

9. Defendants' Supplemental Memorandum Concerning Recent Developments in Cases Relied Upon By The Parties ("Defendants' Memo on Recent Developments") 
July 15, 1985

10. Defendants' Reply to Plaintiffs' Memorandum of Law in Response to Defendants' Objections to the Magistrate's Report and Recommendation ("Defendants' Reply Memo Concerning Report") 
July 16, 1985

## APPENDIX C

Department of
## HEALTH AND HUMAN SERVICES

Social Security Administration

Office of Hearings and Appeals

INTERIM CIRCULAR NO. 185

Office of Hearings and
Appeals Handbook

Applicability of Circuit Court Decisions at Administrative Law Judge and Appeals Council Levels

### I. *Background*

SSA has been subject to increasing litigation in recent years involving a myriad of program issues. One of the most troubling questions which has been raised by the Congress, the Courts, and by the public at large has been the issue of nonacquiescence. Recently, nonacquiescence has been the subject of various law suits challenging its legality. Moreover, the Congress, in enacting the 1984 Disability Amendments, indicated in the Conference Report on that legislation that the Secretary should seek a resolution of the issue. These developments have led to a reexamination of the agency's practices. As a result, the Secretary has decided to modify the longstanding policy and has established the procedures described below. These procedures require that particular circuit court decisions will be considered prior to a final decision of the Secretary being rendered on the case. Until further notification, the procedures contained in this Interim Circular supersede the instructions contained in section 1–161 *"Court Decisions"* of the OHA Handbook.

A series of Social Security Rulings (SSRs) will be issued identifying circuit court decisions which are at variance with established SSA policy (i.e. the law, Regulations and SSRs) for each of the circuits and which will be considered at the Administrative Law Judge (ALJ) and Appeals Council (AC) levels. These SSRs will provide a full description of the case and an explanation of how SSA will apply the decision within the circuit. They will be issued not as new adjudicative policy but rather as a part of the agency's procedures for reviewing claims from the standpoint of Court of Appeals law and as a part of the agency's ongoing litigation management program.

The ALJ should begin to address circuit court case law as soon as these SSRs are published. Thereafter, if the ALJ concludes that a circuit court decision, as interpreted by the agency in an SSR, dictates an allowance (partial or full) in a particular case while SSA policy would dictate a denial, a recommended decision favorable to the claimant will be issued by the ALJ and reviewed automatically by the AC. Wherever reference is made in this Circular to "applicable circuit court decisions," "applicable circuit court case law" or "circuit court case law" it means such decisions or case law as interpreted by the agency in an SSR.

### II. *ALJ Procedures*

### A. *General*

Where a request for hearing is received involving an issue on which an SSR has been published which indicates that circuit court case law in the circuit in which the claimant resides is at variance with SSA policy, the procedures discussed below will be followed.

### B. *Notice of Hearing*

The usual notice of hearing procedures will be followed. However, the notice of hearing will be revised to indicate that in certain situations the agency will also consider the applicable circuit court case law on the issue(s) to be decided. As appropriate, model language will be furnished in supplements to this IC.

### C. *Conduct of Hearing*

As usual, the ALJ is to inquire fully into the matters at issue. The inquiry must consider the applicable requirements established by circuit court case law, if appropriate, in addition to those under agency policy. The opening statement by the ALJ should indicate that the agency will consider whether the claimant will be found eligi-

ble, entitled, continued, etc. under applicable circuit court case law as well as under SSA policy.

### D. *Decision*

Preparation of the decision will differ depending on how the ALJ is prepared to rule in the case:

- Where applicable circuit court case law differs from SSA policy on a particular issue but the ALJ is prepared to rule fully favorably to the claimant under SSA policy, the decision need not consider or address the applicable case law. An initial ALJ decision should be issued in the usual manner.

- If the ALJ is prepared to find unfavorably to the claimant under both SSA policy and applicable circuit court case law, the decisional rationale should contain evaluation of the evidence addressing both established SSA policy and the case law. Findings and decisional language addressing both established policy and applicable circuit court case law should also be made. An initial ALJ decision should be issued in the usual manner.

- Where the ALJ is prepared to rule unfavorably to the claimant under SSA policy but favorably to the claimant under the agency's interpretation of circuit court case law as set forth in the applicable SSR, a *recommended* favorable decision will be issued. The recommended decision should contain separate sections on the case law which will be included following the standardized text statement of SSA regulations. A separate section should be included in the rationale using applicable circuit court case law. This should follow the section on evaluation of the evidence under established SSA policy. Separate recommended findings and a recommended decisional paragraph under the case law will be made and included following the recommended findings under SSA policy. Those sections of the recommended favorable decision dealing with applicable circuit court case law should be

specifically identified as such so that the AC can readily identify them in reviewing the recommended decision. As an example, after the section headed FINDINGS in which SSA policy would be applied, a separate section headed FINDINGS–CIRCUIT LAW APPLIED should be included.

### E. *Processing of Decision*

All decisions issued under this Circular will be processed in the usual manner. The usual notice to the claimant which accompanies a decision (recommended or initial) will be issued.

### III. *AC Procedures*

### A. *ALJ Decision Favorable to the Claimant Under SSA Policy*

If own motion review is being considered where the ALJ issued a favorable decision to the claimant under SSA policy which the AC considers to be contrary to such policy, the AC must determine whether a favorable decision could have been made under applicable circuit court case law. If so, own motion review need not be taken. If own motion review is not taken, the ALJ's favorable decision will become the final agency decision. If it is not clear whether the case law would result in a different decision, the AC should remand the case to an ALJ for a hearing, as necessary, and recommended decision on the issue of the effect of applicable circuit court case law on the claim.

### B. *ALJ Decision Unfavorable to the Claimant Under Both Agency Policy and Circuit Court Case Law*

A claimant may request review of an ALJ hearing decision which was unfavorable to the claimant under both SSA policy and applicable circuit court case law. Where the AC agrees that the unfavorable decision is supported by substantial evidence, the request for review will be denied. If the AC believes that the decision is not correct with respect to SSA policy, the usual AC procedures will be followed. Where the AC believes that the decision with respect to the agency policy is correct,

but may be incorrect with respect to circuit court case law, the request for review will be granted.

The following actions may be taken:

- If the AC believes that a decision favorable to the claimant should have been recommended under applicable circuit court case law and from a litigation standpoint the case might be expected to result in a court decision adverse to the Secretary if an unfavorable administrative decision were issued and judicial review were sought by the claimant, a decision favorable to the claimant will be issued by the AC.
- Where the AC believes that further development must be undertaken with respect to circuit court case law, the case will be remanded to the ALJ for that purpose.
- Where the AC believes that the decision unfavorable to the claimant is correct with respect to SSA's policy but contrary to circuit court case law but believes the issue should be relitigated in that circuit on the basis of that case, the AC will prepare a draft unfavorable decision which will be circulated and handled as described in section C below.

C. *ALJ Decision Unfavorable to the Claimant Under SSA's Policy—Favorable to the Claimant Under Circuit Court Case Law*

The AC will consider the recommended decision under its usual criteria. After its review, if the AC agrees with the ALJ's findings under circuit law as interpreted by the agency, the Council will ordinarily adopt the ALJ's recommended decision. If the AC is of the opinion that the ALJ's decision incorrectly interprets circuit law, corrective action will be taken by the AC (i.e., the AC will either issue a revised decision unfavorable to the claimant or remand for further development). A copy of the AC decision will be forwarded to an SSA Special Policy Review Committee for use in evaluating this procedure.

If the AC agrees with the ALJ's conclusion in a decision which is unfavorable to the claimant under SSA policy but favorable to the claimant under circuit court law but believes the issue involved should be relitigated in that circuit in the context of that case, the AC will prepare a draft decision unfavorable to the claimant which will be forwarded to the SSA Special Policy Review Committee for its review. If the Committee decides that the case is an appropriate vehicle for relitigating the issue, the Office of the General Counsel shall consult with the Department of Justice as to whether or not it believes relitigation of the issue is appropriate. If relitigation is determined to be appropriate, the AC's unfavorable decision will be issued. If relitigation is not appropriate in the particular case, the ALJ's recommended decision favorable to the claimant will be adopted by the AC because it will have been decided that, from a litigation standpoint, the case might be expected to result in a court decision adverse to the Secretary if an unfavorable administrative decision were issued and judicial review were sought by the claimant.